**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| JAMES QUINN, Derivatively on Behalf of Nominal Defendant APPLE REIT TEN, INC., <br><br> Plaintiff, <br><br> v. <br><br> GLADE M. KNIGHT, JUSTIN KNIGHT, KENT W. COLTON, R. GARNETT HALL, JR., DAVID J. ADAMS, ANTHONY F. KEATING III, DAVID BUCKLEY, KRISTIAN GATHRIGHT, DAVID MCKENNEY, BRYAN PEERY, and APPLE HOSPITALITY REIT, INC., <br><br> Defendants, <br><br> and <br><br> APPLE REIT TEN, INC., <br><br> Nominal Defendant. | Case No.  3:16-cv-00610-JAG |

**DECLARATION OF ROBIN WINCHESTER IN SUPPORT OF PLAINTIFF'S MOTIONS FOR FINAL APPROVAL OF THE SETTLEMENT AND FOR AWARD OF ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES AND TO APPROVE PLAINTIFF'S CASE CONTRIBUTION AWARD**

I, Robin Winchester, declare as follows:

1.        I, Robin Winchester, am a partner of the law firm of Kessler Topaz Meltzer &

Check, LLP ("Kessler Topaz").[1]  Kessler Topaz represents plaintiff James Quinn in this

derivative lawsuit filed on behalf of nominal defendant Apple REIT Ten, Inc. (the "Action").

The law firm of Williams & Skilling, P.C. serves as local counsel.  I have personal knowledge of

---

[1]   All capitalized terms that are not defined in this Declaration have the same meanings as defined in the Amended Stipulation and Agreement of Settlement dated as of December 7, 2016 (the "Stipulation"), ECF No. 149-1.

the matters stated in this Declaration based on my active supervision of and participation in the prosecution and settlement of the derivative claims asserted on behalf of Apple Ten in the Action.

2.      I respectfully submit this Declaration in support of Plaintiff's Motion under Rule 23.1 of the Federal Rules of Civil Procedure for Final Approval of the Proposed Settlement (the "Settlement") of the Action.  The Court preliminarily approved the Settlement by Order entered December 8, 2016 (the "Preliminary Approval Order") (ECF No. 150).

3.      I also respectfully submit this Declaration in support of Plaintiff's Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses and for Approval of Plaintiff's Case Contribution Award (the "Fee and Expense Application").

4.      For the reasons discussed below and in the accompanying memoranda, I respectfully submit that (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; and (ii) the Fee and Expense Application is reasonable and supported by the facts and the law and should be granted in all respects.

## I.      PRELIMINARY STATEMENT

5.      This Action was filed on July 19, 2016 and was actively and vigorously litigated by Plaintiff's Counsel until the Parties reached their agreement-in-principle to settle the Action on November 2, 2016 -- twelve days before a jury trial was scheduled to begin on November 14, 2016.   As is the practice in the "rocket docket," post-pleading phases were litigated simultaneously rather than sequentially.  Moreover, while cases in this District, even complex ones like the Action, are usually litigated in a much more truncated time frame compared to pretrial schedules in other federal courts across the country, even under the "rocket docket" standards, the schedule set in this Action was significantly compressed compared to the norm.

6.     For example, in February 2014 a shareholder lawsuit was filed in this Court challenging a transaction involving certain Apple REIT entities (captioned *DCG&T ex rel. Battaglia/Ira v. Knight,* No. 3:14-cv-00067-JAG) and the pretrial order in that matter set a bench trial for seven months after its entry, allowing the parties five months to conduct discovery and two months between the close of discovery and trial to file all pretrial submissions and motions. In contrast, in this Action, the Court's Initial Pretrial Order (the "Pretrial Order") (ECF No. 74), set a jury trial for eleven weeks after its entry, giving the Parties just six weeks to conduct all discovery and only three weeks between the close of discovery and trial to file all pretrial submissions and motions. This posed unusual challenges for this complex Action and required Plaintiff's Counsel to commit significant resources to prosecute this matter, dedicating certain attorneys solely to the advancement of this case, and required Plaintiff's Counsel to optimize the efficiency of the work performed on the case. Only after significant efforts, as detailed below, did Plaintiff and Plaintiff's Counsel succeed in obtaining a very favorable recovery for Apple Ten and its now former shareholders totaling $32 million in cash (the "Settlement Amount"), which has been deposited into an interest-bearing escrow account.

7.     As provided in the Stipulation, in exchange for this payment, the proposed Settlement resolves all derivative claims asserted in the Action by Plaintiff on behalf of Apple Ten and its now shareholders against Defendants.

8.     The proposed Settlement was reached only after hard-fought settlement negotiations and with the substantial assistance of the Honorable Magistrate Judge David J. Novak ("Judge Novak"). On August 4, 2016, the Parties participated in a one-day mediation session conducted by Judge Novak. That mediation was unsuccessful. On November 2, 2016, the Parties participated in a second mediation. In connection with these settlement efforts,

Plaintiff submitted a supplemental mediation statement including analysis by Plaintiff's two experts who specialized in the fields of M&A negotiations/corporate governance and corporate entity valuation/financial damages. The Parties' second attempt at mediation was successful following a full day of settlement negotiations mediated by Judge Novak.

9.     The Settlement of this Action was made possible only through the significant efforts of Plaintiff's Counsel and only after the Parties had fully developed the factual record and had nearly concluded preparations for trial, which was scheduled to commence 12 days after the second mediation. Plaintiff's Counsel had to develop their legal theories, fully develop the factual record through extensive discovery, and prepare for trial up to the day of the Settlement. Plaintiff's Counsel, among other things:

- Independently formulated and substantiated a compelling theory of the case and factual narrative, without any guidance or assistance from outside sources often present in other derivative litigation, such as investigations by the U.S. Securities and Exchange Commission ("SEC") and/or Department of Justice and/or a class action based upon violations of federal securities laws;

- Conducted a significant factual investigation into Apple Ten, Apple Hospitality and the Defendants;

- Drafted two detailed complaints;

- Researched the law pertinent to the claims asserted against Defendants and the potential defenses to those claims;

- Defeated Defendants' motions to dismiss brought under Rules 23.1 and 12(b)(6);

- Served comprehensive written discovery on Defendants and four non-parties and negotiated extensively regarding responses;

- Reviewed and analyzed over 156,000 pages of documents produced by Defendants and non-parties in a compressed schedule;

- Took depositions of nine fact witness and two experts and defended two expert depositions and Plaintiff's deposition;

- Engaged in extensive meet and confer conferences and reviewed and analyzed Defendants' 106 page privilege logs containing 1,777 withheld documents, and moved to compel the production of documents withheld on the basis of privilege;

- Drafted and prepared a motion to compel certain documents and responses to interrogatories and engaged in extensive meet and confer conferences which resulted in the production of withheld documents and responses to the interrogatories;

- Responded to seven sets of discovery requests served on Plaintiff including a total of fifty-seven interrogatories, twenty-two document requests and six requests for admission;

- Engaged in extensive expert analysis and discovery, worked with experts to analyze the process employed during the Merger negotiations and a fair value for Apple Ten stock and damages in the case, and prepared two expert reports concerning subjects fundamental to the trier of fact's ability to decide the case;

- Filed motions *in limine* and a *Daubert* motion to exclude Defendants' deal process expert;

- Thoroughly analyzed Defendants' damages assumptions, methodologies, and calculations;

- Submitted numerous documents in anticipation of trial, such as witness list, exhibit list and deposition designations; and

- Worked extensively with a trial graphics vendor and prepared demonstrative exhibits for use at trial.

10.     Thus, at the time the Settlement was reached, Plaintiff's Counsel and Plaintiff had a thorough and realistic understanding of the strengths and weaknesses of the Parties' positions concerning liability and damages and their respective ability to prove or defend the Plaintiff's claims at trial.

11.     I believe that the Settlement, when viewed in the context of the risks and uncertainties of continued litigation, as discussed below, is an excellent result for Apple Ten and its former shareholders.  Moreover, the Settlement Amount of $32 million represents a recovery

of approximately 15% of Plaintiff's top-line damages, and is the largest derivative settlement in the Fourth Circuit.

## II.     THE PROSECUTION OF THE ACTION

### A.     Plaintiff's Counsel's Pre-Filing Investigation and the Demand

12.     Plaintiff's Counsel began investigating the Merger in April 2016 shortly after the transaction involving the combination of Apple Ten and Apple Hospitality was announced on April 13, 2016.  Plaintiff's Counsel reviewed the public announcement documents, including the Merger Agreement, as well as dozens of other SEC filings by Apple Ten, Apple Hospitality and other Apple REIT related entities dating from 1997 through 2016 in order to understand the complex and inter-related history of the various Apple REIT entities, its board members and management.   Plaintiff's Counsel also began researching the substantive law of the Commonwealth of Virginia to determine the viability of potential claims.  Plaintiff's Counsel's legal research indicated that the various claims that could be brought for breaches of fiduciary duties and other misconduct by the members of Apple Ten's Board of Directors (the "Apple Ten Board"), Apple Ten/Apple Hospitality's management and Apple Hospitality were required to be brought as derivative claims pursuant to the Virginia Stock Corporation Act ("VSCA").

13.     Plaintiff's Counsel retained a financial damages and valuation expert, Garrett M. Wilson, CFA, CVA, a Senior Manager in the Denver office of RGL Forensics ("RGL"), a global forensic accounting and corporate finance advisory firm, to assist with determining the potential damages to Apple Ten and its shareholders in connection with the Merger.

14.     Shortly after the Merger was publicly announced, James Quinn ("Plaintiff"), a long-time shareholder of Apple Ten, contacted Plaintiff's Counsel about his legal rights concerning the Merger and retained Kessler Topaz Meltzer & Check, LLP to represent him in the Action.

15.     The statutory scheme set forth in the VSCA requires that a shareholder make a pre-suit demand on a board of directors before commencing a derivative lawsuit.  Accordingly, in late-May 2016, Plaintiff's Counsel began drafting a letter pursuant to Va. Code § 13.1-672.1(B) (the "Demand Letter") to send to the Apple Ten Board on behalf of Plaintiff demanding that it investigate and remedy potential breaches of fiduciary duty and certain conflicts relating to the Merger.  During that time, Apple Ten and Apple Hospitality issued a preliminary joint proxy statement on May 24, 2016 and Plaintiff's Counsel continued their investigation while working with their expert, Mr. Wilson, to determine the extent of the potential damages.

16.     On June 22, 2016, Plaintiff's Counsel sent the Demand Letter to the Apple Ten Board, demanding that its members investigate and take certain actions against the Defendants to remedy the alleged breaches of fiduciary duty and other violations of law associated with the Merger.  *See* Exhibit A to the Complaint (ECF No.  1).

**B.     The Complaint and the Preliminary Injunction**

17.     On July 15, 2016, Apple Ten filed with the SEC its definitive proxy statement (the "Proxy") and set a special meeting date of August 31, 2016 for both Apple Ten and Apple Hospitality's shareholders to vote on the Merger.  Because the vote on the Merger was scheduled to take place in less than six weeks and in light of the Apple Ten Board's failure to respond to the Demand Letter, on July 19, 2016, Plaintiff filed his Verified Shareholder Derivative Complaint ("Complaint") (ECF No. 1) in this Court.

18.     The Complaint asserted two claims: (1) a claim for breach of fiduciary duty of loyalty and good faith against the members of the Apple Ten Board (defendants Glade M. Knight, Kent W. Colton ("Colton"),  R. Garnett Hall, Jr. ("Hall"), David J. Adams ("Adams") and Anthony F. Keating III ("Keating")) for (a) approving the Merger, which the Complaint alleged was unfair to Apple Ten and its shareholders, and (b) knowingly issuing materially false,

incomplete and misleading statements in the Proxy in solicitation of the votes of Apple Ten shareholders; and (2) a claim for aiding and abetting those breaches of fiduciary duty against Apple Hospitality and defendants Justin Knight, David McKenney ("McKenney"), Kristian Gathright ("Gathright"), Bryan Peery ("Peery") and David Buckley ("Buckley"), who were executive officers of both Apple Ten and Apple Hospitality.  The Complaint also sought equitable relief to enjoin the special meeting of Apple Ten shareholders scheduled for August 31, 2016.

19.    The Complaint alleged, *inter alia*, that the Merger of Apple Hospitality (acquirer) with Apple Ten (target) was the product of a conflict-riddled process designed to favor the interests of Glade Knight, the founder, Chairman, and CEO of Apple Ten and the founder and Executive Chairman of Apple Hospitality, and certain of Apple Ten/Apple Hospitality's directors and executives at the expense of Apple Ten and its shareholders, who would receive as Merger consideration an amount below the fair value of Apple Ten common shares.

20.    The Complaint alleged that Glade Knight orchestrated an artificial, non-competitive negotiation process conducted on one side by a Special Committee stacked with Glade Knight's long-time friends (defendants Colton, Hall and Adams) and on the other side by Apple Ten/Apple Hospitality management who stood on both sides of the Merger, including Glade Knight's son Justin Knight, the President of Apple Ten and CEO and director of Apple Hospitality.  The Complaint alleged that the Special Committee predetermined from the outset to approve Apple Hospitality's acquisition of Apple Ten on terms favorable to Glade Knight.  For example, Plaintiff alleged that the Special Committee engaged in a dysfunctional negotiation with Apple Hospitality, whereby the Special Committee simply gave away its negotiating

leverage in exchange for nothing, failed to inform itself of several key issues that would have resulted in an increased value of Apple Ten, and ignored the advice of its advisors.

21.     The Complaint further alleged that the Merger served primarily to allow Glade Knight and his management team to cash out the "Series B shares," for which they would receive a significant windfall.  Glade Knight owned all 480,000 issued and outstanding shares of Apple Ten Series B preferred stock, which he acquired for $0.10 each when Apple Ten was formed.  As a result of the Merger, the Series B shares would receive a special windfall payment totaling approximately $65 million, and Glade Knight assigned $16 million of that amount to his long-time associates who were executives of both Apple Ten and Apple Hospitality, including his son Justin Knight.  Thus, Plaintiff asserted that Glade Knight and his fellow Apple Ten directors violated their fiduciary duties of loyalty and good faith by approving the Merger to the detriment of Apple Ten and its shareholders and that the executives of Apple Ten/Apple Hospitality who stood on both sides of the Merger (defendants Justin Knight, McKenney, Gathright, Peery and Buckley) aided and abetted the directors' breaches of fiduciary duty.

22.     The Complaint also alleged that Proxy contained material misstatements and omissions relating to the Merger, thereby preventing Apple Ten shareholders from casting an informed vote.  Plaintiff alleged that the misrepresentations and omissions related to the merger consideration offered for Apple Ten shares, financial valuation information used by Apple Ten's financial advisor, and key information relating to the Merger negotiation process.

23.     The Complaint detailing these allegations was the product of a significant investigation by Plaintiff's Counsel.  In connection with the Complaint, Plaintiff's Counsel consulted with a financial damages and valuation expert, Mr. Wilson, and reviewed and analyzed thousands of pages of: (a) SEC filings; (b) public statements made by Defendants; and (c) media

and financial analyst reports and other public documents concerning Apple Ten and Apple Hospitality and their businesses.

24.     On July 21, 2016, Plaintiff filed a Motion for Expedited Proceedings (ECF No. 5) and Memorandum in Support thereof (ECF No. 6) seeking to obtain discovery on an expedited basis in advance of a motion for preliminary injunction (the "P.I. Motion") to enjoin the August 31, 2016 special meeting of Apple Ten shareholders until Apple Ten made material corrective disclosures to allow for an informed vote.  On the same day, Plaintiff also served on Defendants his First Request for Production of Documents seeking documents relating to the Merger, potential conflicts of interest, the financial condition of Apple Ten and the Series B shares.

25.     During the next several days, Plaintiff's Counsel and counsel for Defendants, McGuireWoods, LLP and Hogan Lovells, met and conferred multiple times and worked diligently toward an agreement on the discovery that would be conducted in an expedited timeframe, including the production of documents and depositions to be taken in advance of the filing of Plaintiff's P.I. Motion.  As a result of those discussions, on July 27, 2016, Defendants began a rolling production of documents to Plaintiff.

26.     On July 26, 2016, Plaintiff served non-party Citigroup Global Markets, Inc. ("Citi"), the Special Committee's financial advisor, with a subpoena *duces tecum* and *ad testificandum*.  After extensive discussions with Citi's counsel, White & Case LLP, Citi agreed to produce certain categories of responsive documents on a rolling basis beginning on August 7, 2016.

27.     While Plaintiff was negotiating and conducting discovery on an expedited basis, on July 25, 2016, the Court ordered the Parties to attend a settlement conference with Judge Novak, and a mediation was scheduled for August 4, 2016.  In advance of the mediation, on July

28, 2016, Plaintiff sent Judge Novak a confidential mediation statement, and the next day supplemented his mediation statement with additional information and analysis performed by Plaintiff's financial damages and valuation expert.

28.     On August 4, 2016, Judge Novak held a settlement conference attended by Plaintiff, Plaintiff's Counsel and counsel for Defendants.   No resolution was reached at its conclusion.

29.     The day after the mediation, August 5, 2016, the Court held a teleconference to hear argument on Plaintiff's Motion for Expedited Proceedings, as the Parties were unable to reach an agreement on a hearing date or briefing schedule for Plaintiff's P.I. Motion.   After the conference, the Court issued an order setting the following briefing schedule: (1) Plaintiff's opening memorandum in support of his P.I. Motion due by 5:00 p.m. on Saturday, August 13, 2016; (2) Defendants' opposition due by 5:00 p.m. on Saturday, August 20, 2016; and (3) Plaintiff's reply due by 5:00 p.m. on Wednesday, August 24, 2016.   The Court set a hearing date of Friday, August 26, 2016 at 9:00 a.m. for Plaintiff's P.I. Motion.

30.     The following week, Plaintiff's Counsel took the depositions of three defendants and a representative of Citi, the Special Committee's financial advisor, as follows:

- **Defendant Colton** - Apple Ten Director and Special Committee Member, deposed on Monday, August 8, 2016 in Tysons Corner, Virginia;

- **Defendant Glade Knight** - the founder, Chairman, and CEO of Apple Ten and the founder and Executive Chairman of Apple Hospitality on Tuesday, deposed on August 9, 2016 in Richmond, Virginia;

- **Jens Thomas Jung** - a representative of Citi, deposed on Thursday, August 11, 2016 in New York City, New York; and

- **Defendant Justin Knight** - the President of Apple Ten and CEO and director of Apple Hospitality on Friday, deposed on Friday, August 12, 2016 in Richmond, Virginia.

31.     In total, Defendants and Citi produced, and Plaintiff's Counsel reviewed, over 84,000 pages of confidential, non-public documents in advance of filing the P.I. Motion.

32.     On Saturday, August 13, 2016, Plaintiff filed his P.I. Motion (ECF No. 42), Memorandum in Support and the Declaration of Garrett Wilson (ECF No. 44), who opined on the financial unfairness of the Merger and the materiality of alleged financial omissions from the Proxy.  In the P.I. Motion Plaintiff argued that the Court should issue a preliminary injunction because Plaintiff was likely to succeed on the merits of his breach of fiduciary duty claims. Plaintiff argued that Defendants' conduct in connection with the negotiation and approval of the Merger was not entitled to the business judgment protections of Virginia Code § 13.1-690, which protects only good faith, well informed, non-self-interested decisions of a director, because: (1) a majority of the members of the Special Committee were not independent due to long-time personal and financial ties to Glade Knight; (2) the Special Committee hired conflicted advisors who had decades-long histories of working for Glade Knight; and (3) the Special Committee did not negotiate in good faith and failed to inform itself during negotiations, *e.g.*, by failing to understand the difference between a "go-shop" and a pre-signing "market check," and by giving up in exchange for nothing the valuable appraisal rights guaranteed to Apple Ten shareholders in Apple Ten's Charter.

33.     Further, Plaintiff argued that he was likely to succeed on the merits of his breach of fiduciary duty claims because the Proxy contained materially inadequate disclosures which prevented Apple Ten shareholders from casting an informed vote on the Merger.  Plaintiff identified two areas where disclosures were materially inadequate: (1) the negotiation process of the Merger, including the multiple conflicts identified above, and the defective "negotiations"; and (2) the financial valuation of the Merger.  Regarding the financial valuation, Plaintiff's

expert Mr. Wilson concluded that the Proxy failed to provide critical information to Apple Ten shareholders, such as projections of funds from operations ("FFO") and adjusted funds from operations ("AFFO"); cash flow information and terminal value growth rates used by Citi; and key inputs in Citi's comparable companies analysis and precedent transactions analysis which significantly altered the purported value of Apple Ten to make it lower than its actual value.

34.     Defendants filed their opposition brief on Saturday, August 20, 2016 (ECF No. 56).  In their opposition, Defendants argued that Plaintiff could not show a likelihood of success on the merits of his claims under Virginia's deferential business judgment rule.  Defendants primarily relied upon the Supreme Court of Virginia's decision in *Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc. ("Willard")*[2] which explicitly rejects the Delaware Supreme Court's decision in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[3] and holds that so-called "*Revlon* duties" do not apply to Virginia corporate directors.  Thus, under *Willard* the members of the Apple Ten Board had no duty to obtain the highest price for Apple Ten's shareholders in the context of a merger.  Further, Defendants argued, under *Willard*, there is no objective reasonableness standard and that directors' actions are protected by § 13.1-690 as long as the directors "discharged their duties in accordance with their 'good faith business judgment of the best interests of the corporation' . . . ."[4]  Thus, Defendants argued that because the Apple Ten Board and the Special Committee acted in good faith when negotiating the Merger and relied on their independent legal and financial advisors, Virginia's business judgment rule prohibited second-guessing the outcome of those deliberations.  Defendants further argued that Virginia law did not require the disclosures that Plaintiff sought in the Proxy, specifically

---

[2] 258 Va. 140 (Va. 1999).

[3] 506 A.2d 173 (Del. 1986).

[4] *Willard*, 258 Va. at 158.

arguing that the financial details and projections demanded were immaterial, and that Virginia law imposed no duty to make further disclosures.

35.     Plaintiff filed his reply brief on Wednesday, August 24, 2016 (ECF Nos. 64, 65). Plaintiff argued that *Willard* was factually inapposite, as the defendant directors in *Willard* were well-informed and followed the advice of their financial advisors, whereas here, Defendants were uninformed, in part, and chose to ignore the advice of their financial advisor. Plaintiff noted that the Special Committee failed to conduct a pre-signing market check as Citi recommended; failed to negotiate for all-stock consideration, which would have triggered valuable appraisal rights for Apple Ten shareholders; and failed to consider rejecting a merger transaction with Apple Hospitality altogether when the offer price did not adequately and fairly compensate Apple Ten shareholders for the value of their Apple Ten shares. In sum, Plaintiff argued that the Special Committee chose a negotiating strategy that most favored Glade Knight and Apple Hospitality and, thus, did not act in good faith as required to be entitled to the protections of the business judgment rule under Virginia law.

36.     In addition to the expedited discovery and briefing in connection with the P.I. Motion, on August 5, 2016, Defendants filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 23.1 (the "Rule 23.1 MTD") (ECF No. 28), and concurrently therewith filed a Motion to Expedite the briefing on that motion (ECF No. 33).

37.     Three days later, on August 8, 2016, Defendants filed a Motion to Compel Discovery (ECF No. 34), demanding that Plaintiff make himself available for a deposition no later than August 12, 2016. The Court denied Defendants' Motion to Expedite but ordered the Parties to agree upon a date for Plaintiff's deposition (ECF No. 35). As a result of those

discussions, on August 19, 2016, Defendants took the deposition of Plaintiff James Quinn in Washington, D.C.

38.     The Parties fully briefed the Rule 23.1 MTD in advance of the preliminary injunction hearing.  In that motion, Defendants argued that the Action should be dismissed in its entirety because Plaintiff, who was a shareholder of both Apple Ten and Apple Hospitality, did not qualify as an adequate representative of Apple Ten and its shareholders pursuant to Rule 23.1.  Plaintiff filed his opposition brief on August 19, 2016 (ECF No. 53) and argued that Plaintiff was an adequate representative under Rule 23.1, as no "economic antagonism" existed between him and Apple Ten's shareholders merely as a result of his ownership of Apple Hospitality stock and, thus, there was no basis to dismiss the Action.  Defendants filed their reply brief on August 24, 2016 (ECF No. 68).

39.     On August 26, 2016, the Court held a three hour hearing on Plaintiff's P.I. Motion.  After hearing argument from the Parties and the direct and cross-examined testimony of Glade Knight and Justin Knight, the Court entered an order denying the P.I. Motion.  In making its ruling, the Court noted that *Willard* was "a big problem for the plaintiff in this case . . . ." Prelim. Inj. Hr'g Tr. 36:11-12 (a copy of the Preliminary Injunction Hearing Transcript is attached hereto as Exhibit A).  Despite the significant protections that Virginia law accords to corporate directors and the high hurdles that Plaintiff would need to overcome, including *Willard*, the Court nevertheless noted multiple times throughout the hearing that it believed Plaintiff's claims would "go[] to go to a jury," *see, e.g., id.* at 94:14-15; 124:15-17; 126:25-127:1, and, in the context of discussing *Willard*, explicitly stated that it believed Plaintiff "can get it to the jury, which I think you can – make no mistake about that . . . ." *Id.* at 94:14-15.  At the conclusion of the hearing, the Court was going to set a trial to begin approximately thirty

days later (the end of September), but in light of the additional discovery that needed to be conducted, agreed to delay the trial by a couple of months and ordered a teleconference to be held on August 31, 2016 to set a trial date and pretrial schedule.

40.    On August 30, 2016, counsel for the Parties met and conferred on a proposed pretrial schedule. On August 31, 2016, the Court held a teleconference with the Parties and entered the Pretrial Order (ECF No. 74), which provided deadlines for all pretrial matters to be completed and/or submitted to the Court and set a one week jury trial to begin on November 14, 2016.  Specifically, the Pretrial Order set the following deadlines:

- **Close of Fact Discovery:** Oct. 11, 2016 (41 days)

- **Expert Reports:** Oct. 14, 2016 (44 days)

- **Rebuttal Expert Reports:** Oct. 18, 2016 (48 days)

- **Completion of Expert Depositions:** Oct. 21, 2016 (51 days)

- **Mot. for Summ. Judg. and Mot. in Limine:** Oct. 28, 2016 (58 days)

- **Designation of Discovery/Witness List/Trial Exhibits:** Oct. 31, 2016 (61 days)

- **Opps. to Mot. for Summ. Judg. and Mot. in Limine:** Nov. 4, 2016 (65 days)

41.    In addition to the foregoing deadlines, the Pretrial Order permitted Defendants to file motion(s) to dismiss by September 7, 2016 with oppositions due by September 21, 2016 and replies due by September 26, 2016.  The Pretrial Order further required that written responses to discovery requests be due within fifteen days of service and, if that day fell on a weekend or holiday, such responses would be due on the Friday beforehand.

42.    On August 31, 2016, Apple Ten and Apple Hospitality held their respective special meetings for shareholders to vote on the Merger.  The Merger was approved, and the transaction closed the following day, September 1, 2016.

C. **Extensive Fact Discovery, Investigation, Research and Analysis**

1. **Plaintiff's Document Requests and Interrogatories**

43.     Given the limited six week window in which to conduct all remaining fact discovery, on September 1, 2016, Plaintiff immediately propounded his Second Set of Document Requests on Defendants.  The categories of documents sought in Plaintiff's First and Second Sets of Document Requests were critical to Plaintiff's prosecution of the Action and included information and communications concerning the negotiation of the Merger; valuations performed of Apple Ten stock, including those performed by the three financial advisors involved in the Merger, Citi, Robert W. Baird & Co. ("Baird") and Wells Fargo Securities, LLC ("Wells Fargo"); the formation of the Special Committee and the selection of its financial and legal advisors;  the Special Committee's meetings and deliberations;  fees paid to the Special Committee's financial and legal advisors for past services rendered; the conversion ratios and consideration paid for Apple Ten's Series B shares; forecasts and financial projections of Apple Ten; and relevant minutes and board materials of the Apple Ten and Apple Hospitality Boards of Directors.

44.     On September 1, 2016, Plaintiff also served his First Set of Interrogatories on Defendants, and on October 7, 2016, served his Second Set of Interrogatories on the Special Committee Members (defendants Colton, Hall and Adams).   The interrogatories sought information bearing on the independence (or lack thereof) of the defendants involved in the negotiation of the Merger and their advisors, such as the Special Committee members' income received from Apple Ten, Apple Hospitality and other Apple REIT related entities; other income received by the Special Committee members during their service on the various Apple REIT boards; income received by Glade Knight; amounts paid to McGuireWoods by Defendants and the Apple REIT entities for past and present services rendered; and the Special Committee

members' personal and financial ties and relationships with Glade Knight and his close family members and/or friends.

45.     Defendants served their objections to the Second Set of Document Requests on September 16, 2016, objecting on numerous grounds, and many of the responses were vague and did not identify which, if any, documents Defendants intended to produce.   Defendants also served their objections to Plaintiff's First Set of Interrogatories that same day and refused to provide any substantive responses, stating, among other grounds, that the information sought was not discoverable under Virginia law based upon the holdings in *WLR Foods, Inc. v. Tyson Foods, Inc.*, 65 F.3d 1172 (4th Cir. 1995) and *Willard*.

46.     Immediately and over the next ten days, Plaintiff and Defendants engaged in extensive meet and confer sessions in an attempt to resolve their disagreements and exchanged numerous letters and communications detailing each Party's respective positions.   While Plaintiff came close to seeking the Court's intervention on a number of the issues regarding Defendants' responses, including drafting a motion to compel production and responses, on the eve of filing that motion (September 26, 2016) the Parties reached an agreement and Plaintiff's Counsel ultimately obtained from Defendants adequate documents and information responsive to the document requests and the interrogatories.

### 2.     Discovery from Plaintiff

47.     On September 2, 2016, Defendants served seven sets of discovery requests on Plaintiff, which included a total of fifty-seven interrogatories, twenty-two document requests and six requests for admission.

48.     Plaintiff served responses and objections to the document requests on September 16, 2016.   The Parties thereafter participated in multiple meet and confer sessions regarding the

scope of the production and reached an agreement whereby Plaintiff produced a total of approximately 600 pages of documents.

49.    Plaintiff served initial responses and objections to Defendants' interrogatories on September 16, 2016.   The majority of Defendants' interrogatories related to the merits of Plaintiff's allegations, while others were directed at Plaintiff's personal investment history, his financial net worth and investments in Apple Ten and Apple Hospitality.   Plaintiff conducted investigations necessary to respond substantively to the detailed interrogatories and amended his responses on October 21, 2016 to incorporate additional evidence obtained during discovery and as a result of Plaintiff's Counsel's continued investigation.

### 3.    Defendants' Answers

50.    On September 9, 2016, Defendants filed their Answers to the Complaint and asserted affirmative defenses to Plaintiff's allegations (ECF Nos. 83, 84).   Defendants denied all of Plaintiff's allegations of wrongdoing, specified forty-one distinct defenses and reserved the right to asserted additional defenses as the litigation progressed.

### 4.    Plaintiff's Non-Party Discovery

51.    In addition to the extensive discovery obtained from Defendants, Plaintiff also sought and received useful document discovery from several non-parties.   As discussed above, Plaintiff served a subpoena *duces tecum* and *ad testificandum* on Citi, the Special Committee's financial advisor, on July 26, 2016, received certain categories of documents in connection with the P.I. Motion, and took the deposition of Jung, the Citi representative who advised the Special Committee.   On September 1, 2016, Plaintiff served subpoenas *duces tecum* and *ad testificandum* on several additional non-parties, including: (1) Baird, Apple Hospitality's financial advisor who rendered a fairness opinion in connection with the Merger; (2) David Lerner Associates, Inc., the

exclusive broker for the Apple REIT entities; and (3) Wells Fargo, the financial advisor for Apple Hospitality during the Merger negotiations.

52.     The non-parties were represented by experienced inside counsel and large law firms (*e.g.*, White & Case LLP and Hunton & Williams LLP) who negotiated the scope, process and timing of the documents produced.   Plaintiff's Counsel received over 8,286 documents, totaling over 70,648 pages.   These subpoenas yielded numerous documents that ultimately supported key components of Plaintiff's case.   In particular, the information obtained from Citi was critical to Plaintiff's damages and valuation analysis for purposes of determining the fair valuation of Apple Ten stock, and the communications produced by Citi and Wells were important to proving Plaintiff's allegations that the Merger negotiation process was defective and that the Special Committee did not act in good faith and therefore was not entitled to the protections of the business judgment rule.

### 5.     Depositions of Fact Witnesses

53.     Plaintiff's Counsel conducted document discovery simultaneously with deposition preparation.   During fact discovery, Plaintiff's Counsel took the depositions of:

- **Defendant R. Garnett Hall, Jr.,** Apple Ten Director and Special Committee Member, deposed on September 23, 2016 in Richmond, Virginia;

- **Defendant David J. Adams,** Apple Ten Director and Special Committee Member, deposed on September 28, 2016 in Richmond, Virginia;

- **Glenn W. Bunting**, Apple Hospitality Director, deposed on October 11, 2016 in Richmond, Virginia;

- **Defendant Bryan Peery,** Executive Vice President and Chief Financial Officer ("CFO") for Apple Ten and Apple Hospitality, deposed on October 12, 2016, in Richmond, Virginia; and

- **David Kieske**, a representative of Apple Hospitality's financial advisor, Wells Fargo, deposed on October 12, 2016, in New York City, New York.

54.     As discussed above in Paragraph 30, in addition to the foregoing, Plaintiff's Counsel also took the depositions of defendant Kent Colton (Apple Ten Director and Special Committee Member), defendant Glade Knight (founder, Chairman of the Board of Directors, and CEO of Apple Ten and founder and Executive Chairman of the Board of Apple Hospitality), defendant Justin Knight (President of Apple Ten and President and CEO of Apple Hospitality); and Jens Thomas Jung (a representative of Citi, the Special Committee's financial advisor), in connection with Plaintiff's P.I. Motion.   In total, Plaintiff's Counsel conducted nine fact-witness depositions.   Additionally, Plaintiff's Counsel prepared for and defended the deposition of Plaintiff in Washington, D.C.  *See* ¶ 37, above.

### 6.     The Document Productions and Plaintiff's Counsel's Program for Efficiently Conducting Discovery

55.     Given the compressed discovery period in connection with both the P.I. Motion and Pretrial Order, the Parties met and conferred to design a document production and deposition schedule providing for documents to be produced sufficiently in advance of depositions and allowing both sides to take or defend the depositions in a cost- and time-effective manner.   The implementation of the schedule required significant efforts by Plaintiff's Counsel.   Neither the preliminary injunction schedule nor the Pretrial Order set deadlines for Defendants' completion of document production, and Plaintiff's Counsel encountered substantial resistance in obtaining certain discovery, which required significant time meeting and conferring in an attempt to resolve the issues without the need for Court intervention.   As the Court noted at the P.I. hearing:

> Let me compliment both sides on doing a good job on a compressed schedule in this case. Not just with the briefing, which was enlightening, but with the degree of cooperation that occurred on what seems to me to be a large amount of discovery in a relatively short time. I know that you had change to change your schedules to do this. You had to change your schedule, and I am sure Mr. Knight and his colleagues had to go out of their way to provide information and to sit for depositions. I don't see that too often. So, thank you all for doing that. I

especially don't see it with out-of-town law firms. I am really impressed that on both sides.

Prelim. Inj. Hr'g Tr. 127:14-25.

56.     To put the timing of the document productions into perspective vis-a-vis the depositions, Apple Ten made its first production on July 27, 2016, when it produced 1,085 documents totaling 26,282 pages, and made a small production the following day of thirty more documents totaling 211 pages.  By August 5, 2016, Apple Ten had produced 2,148 documents totaling 32,004 pages.  During that same time period, Plaintiff's Counsel reviewed the entirety of Defendants' document productions and prepared to take the depositions of defendants Colton, Glade Knight, and Justin Knight on August 8, 2016, August 9, 2016 and August 12, 2016, respectively (and prepared for and participated in a mediation in Richmond, Virginia with Judge Novak on August 4, 2016).  Additionally, between August 7, 2016 and August 10, 2016 Citi made three productions which totaled 2,891 documents and 41,151 pages.  Plaintiff's Counsel reviewed these productions and took the deposition of Citi's representative Jens-Thomas Jung on August 11, 2016, only one day after Citi completed its production.

57.     In September, discovery continued following the entry of the Pretrial Order. Between September 21, 2016 and September 26, 2016, Apple Hospitality produced 2,478 documents totaling 36,865 pages.  On October 7, 2016, Apple Hospitality produced an additional 170 documents totaling 904 pages.  Apple Ten also began producing additional documents on September 20, 2016, and completed its production on October 3, 2016, producing an additional 491 documents totaling 4,691 pages.  Defendants Hall and Adams were deposed on September 23, 2016 and September 28, 2016, respectively, and Glenn Bunting and Defendant Peery were deposed on October 11, 2016 and October 12, 2016, respectively.

58.     At the same time, Plaintiff's Counsel was also negotiating with Citi's counsel White & Case LLP for an additional production of documents, as its first production in early August contained only financial analyses and other Merger-related documents, but did not include any email communications.  Plaintiff's Counsel and counsel for Citi engaged in multiple meet and confer sessions to negotiate a set of custodians and search terms for an ESI search protocol.    Thereafter, on October 12, 2016, Citi made a production of primarily email communications totaling 1,270 documents and 9,633 pages.

59.     Plaintiff's Counsel and counsel for Wells Fargo, Hunton & Williams LLP, also held multiple meet and confer sessions to negotiate the scope of the documents and information it would produce.  Between September 27, 2016 and October 17, 2016, Wells Fargo made four document productions totaling 4,125 documents and 17,864 pages.  Plaintiff's Counsel took the deposition of Wells Fargo representative David Keiske on October 12, 2016.

60.     Baird, the financial advisor to Apple Hospitality who issued a fairness opinion in connection with the Merger, made a production of documents on October 5, 2016.  Baird's production included email communications, financial and property information for both Apple Ten and Apple Hospitality, fairness presentation materials, and slide presentations made to the Apple Hospitality Board of Directors totaling approximately 2,000 pages.   David Lerner Associates also made a small production of documents.

61.     In total, Defendants and non-parties produced, and Plaintiff's Counsel reviewed, over 14,398 documents totaling over 156,324 pages.

62.     To accomplish the rigorous task of reviewing the responsive documents in an expedited time frame, including preparing for and taking nine merits depositions, Plaintiff's Counsel leveraged technology and effective organization of resources to review and analyze the

document productions.  To put the volume of electronic document production into perspective, if one person had read each page of the production at a rate of two minutes per page continuously without sleep or breaks, excluding the voluminous spreadsheets of data that likewise had to be analyzed, it would have taken that person over 215 days to review the document production. Thus, the document review required a rigorous, disciplined, and coordinated process of review, which Plaintiff's Counsel implemented as described below.

63.    First, a team of six associates and staff attorneys from Kessler Topaz was assembled to review the document productions.  These attorneys focused on reviewing the document productions to prepare for the P.I. Motion and hearing, depositions, and ultimately trial, and many of them assisted in deposition preparation.  These attorneys utilized review guidelines and protocols that were put in place to ensure efficient and accurate review of the documents.

64.    All aspects of the attorney review were carefully planned to eliminate inefficiencies and to ensure high-quality work product.  In analyzing the production, documents were identified and categorized in several major categories: (1) relevance (hot, significant, relevant, irrelevant); (2) individuals (*e.g.*, Peery, Colton, Glade Knight); (3) document type (*e.g.*, board minutes, emails, etc.); and (4) custodian (*i.e.*, who the document was gathered from). Within these categories, the lawyers conducting the review also had a menu of sub-categories, which further refined the review and helped to identify relevant documents quickly.

65.    There were also, at a minimum, weekly meetings to discuss important documents, deposition preparation efforts, and case/trial strategy.  In holding weekly litigation team meetings, Plaintiff's Counsel sought to ensure that attorneys were keyed into the issues being identified in the document review, in particular why certain documents were high value, and how

the documents were informing Plaintiff's Counsel's theories of liability.   Moreover, any documents identified as "hot" were further analyzed and assessed by partners (with the assistance of Plaintiff's Counsel's experts and consultants) on an ongoing basis.

66.     In order to further facilitate the cost and time-efficient nature of this process, all of the documents were placed in an electronic database that was created by and maintained on the Relativity platform at DLS Discovery, Plaintiff's Counsel's technology and litigation-support vendor.  The Relativity database allowed counsel to search for documents through Boolean-type searches, as well as by multiple categories, such as by author or recipients, keyword search, type of document (*e.g.*, emails, memoranda, or PowerPoint presentations), date, Bates number, etc.

67.     Plaintiff's Counsel utilized this technology to review and analyze the approximately 156,000 pages of documents produced in this Action on an exceedingly targeted and expedited basis, searching the document production for information concerning key witnesses and factual themes.  This approach was forensic in nature, utilizing document metadata (*i.e.*, the embedded bibliographic information in the documents) and key characteristics to identify witnesses, document custodians, and highly relevant evidence in short order.

68.     The document review process was instrumental in preparing for depositions. After the first-tier review and coding and tagging relevant documents, Plaintiff's Counsel then conducted a second-tier review of those documents most likely to contain useful information for each respective deposition.   From these reviews, partners, associates, and staff attorneys collaborated to prepare document indices and deposition outlines identifying documents to serve as preparation material and exhibits for the depositions.   Using these methods, Plaintiff's Counsel gained the benefit of multiple perspectives and expertise without duplicating efforts.

### 7.      Plaintiff's Motion to Compel

69.      In late September and early October, Apple Ten and Apple Hospitality produced their respective privilege logs which, in total, identified over 1,700 documents withheld on the basis of attorney-client privilege.   Most of the documents withheld were communications involving defendant David Buckley, the Chief Legal Counsel to both Apple Ten and Apple Hospitality who advised Apple Ten and Apple Hospitality during the Merger negotiations. Shortly thereafter, the Parties began to meet and confer about the withheld documents, including exchanging numerous correspondences regarding each Party's respective positions.   On October 28, 2016, after failing to reach a resolution, Plaintiff filed a Motion to Compel the Production of Documents Improperly Withheld under Attorney-Client Privilege and Supporting Documents along with an under seal Memorandum of Law in Support (ECF Nos. 127, 129).   Concurrently therewith, Plaintiff filed a Motion for Expedited Proceedings Concerning Plaintiff's Motion to Compel (ECF No. 131).   Specifically, Plaintiff moved to compel the production of certain communications between defendant Buckley and members of the Special Committee, Apple Ten, Apple Hospitality, and their outside counsel. Plaintiff argued that Buckley's communications were not privileged for three reasons: (1) any privilege was destroyed due to his simultaneous representation of Apple Ten and Apple Hospitality; (2) the crime-fraud exception to privilege applied because the withheld communications were themselves evidence of Buckley's aiding and abetting of the primary breaches of fiduciary duty; and (3) good cause existed under the doctrine to compel production of the communications as espoused in *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir. 1970).

70.      On November 1, 2016, the Court requested that Defendants provide copies of the challenged documents for *in camera* review and set a hearing on the motion for November 2, 2016.   On November 2, 2016, before the Parties attended a settlement conference with Judge

Novak, the Court held a hearing on Plaintiff's Motion to Compel and, at its conclusion, ordered

Defendants to submit any written response(s) by the next day, November 3, 2016.

### D.    Expert Reports and Expert Discovery

#### 1.    Plaintiff's Experts

71.    Plaintiff proffered two testifying experts and consulted with both of them

throughout the litigation:

(1)    Professor Guhan Subramanian, an expert on M&A negotiations and corporate
governance; and

(2)    Chad Coffman, CFA, an expert on corporate entity valuation and financial
damages.

#### a.    Expert Report of Professor Guhan Subramanian

72.    Professor Guhan Subramanian is a preeminent expert in the field of M&A

negotiations and corporate governance.  He serves as the H. Douglas Weaver Professor of

Business Law at the Harvard Business School (HBS) and the Joseph Flom Professor of Law and

Business at the Harvard Law School (HLS) and has taught at HBS and/or HLS continuously

since 1999.  Professor Subramanian serves as the faculty chair for the JD/MBA program at

Harvard University and the Vice-Chair for Research at the Harvard Program on Negotiation.  He

is the first individual to be double-tenured at Harvard Business School and Harvard Law School

and holds degrees in Economics, Law, and Business from Harvard University.  Professor

Subramanian's research and publications focus on issues of corporate M&A negotiations,

corporate law, and corporate governance, with a specific focus on "deal process design," and he

has published widely on these subjects in the *Harvard Law Review*, the *Stanford Law Review* and

the *Yale Law Journal*, among others.

73.    Professor Subramanian's 84-page expert report opined on two areas pertinent to

Plaintiff's breach of fiduciary claim: (1) the process the Special Committee employed in

negotiating the Merger; and (2) the disclosures made in the Proxy relating to the process and negotiation of the Merger.

74.     *First*, Professor Subramanian opined that due to informational asymmetries, managerial financial incentives, and timing considerations, the use of a "go-shop" in the context of this Merger (which was analogous to a management-led buyout) was unlikely to yield adequate price discovery and fair value for the Apple Ten shareholders.  His opinion was based, in part, upon empirical research he performed and published in a 2008 article in *The Business Lawyer*, entitled *Go-Shops vs. No-Shops in Private Equity Deals: Evidence & Implications*, which presented the first systematic empirical evidence on the structure and influence of go-shop provisions in M&A deals.  *See* 63 BUS. LAW. 729 (2008).  Professor Subramanian's report opined that the Special Committee's decision to forego a market check prior to signing the Merger Agreement with Apple Hospitality created an unlevel playing field between Apple Hospitality and prospective third-party bidders and, as a result, the go-shop process employed by the Special Committee after Apple Hospitality had agreed to the deal was unlikely to yield a fair value for the Apple Ten shareholders.

75.     *Second*, Professor Subramanian opined that the Proxy omitted information about the Merger process, including the tactical choices made by the Special Committee that were inconsistent with negotiation best-practices and/or inconsistent with testimony from the individuals who conducted the negotiations.  Professor Subramanian further opined that Apple Ten shareholders would reasonably want to know this type of information in order to cast an informed vote regarding the Merger.

76.     Although expert reports were not due until October, 14, 2016, Plaintiff served Professor Subramanian's 84-page expert report on Defendants on October 4, 2016 in order to

accommodate Professor Subramanian's schedule and to ensure that Defendants could depose him before the October 21, 2016 expert discovery deadline. Defendants deposed Professor Subramanian on October 10, 2016, in Boston, Massachusetts.

### b.    Expert Report of Chad Coffman, CFA

77.    Chad Coffman, CFA, is the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles. Plaintiff's Counsel retained Mr. Coffman to provide his expert opinion as to: (1) the reliability of the methods by which Citi, the financial advisor to the Special Committee, valued Apple Ten; and (2) the fair value of Apple Ten as of April 13, 2016, the date the Merger was approved by the Special Committee and the Apple Ten Board.[5]

78.    Mr. Coffman prepared a 26-page report in which he opined that the fair value of each Apple Ten share as of April 13, 2016 was $12.77, or $1.92 (17.7%) higher than the $10.85 per share amount approved by the Special Committee and the Apple Ten Board in connection with the Merger. Mr. Coffman based his expert analysis upon a valuation report provided by Citi and relied upon the same three valuation methodologies Citi used: (1) a discounted cash flow ("DCF") analysis; (2) a comparable companies analysis; and (3) a comparable transactions analysis.

79.    In his report, Mr. Coffman found that Citi's analyses had four major flaws and he made appropriate corrections to Citi's analyses. First, with respect to the DCF analysis, Mr. Coffman accepted the entirety of the Citi valuation with one exception – he increased the long-term growth rate of 0.7% used in Citi's calculation and replaced it with the projected long-term

---

[5] Plaintiff's valuation and financial damages expert from the inception of the Action through the P.I. Motion, Garrett Wilson, was unable to continue as Plaintiff's expert through expert discovery and trial due to scheduling conflicts. Thus, Plaintiff retained Mr. Coffman as his valuation and financial damages expert in mid-September for the duration of the litigation.

rate of inflation of 2.1%.   Mr. Coffman opined that it was more appropriate, yet still conservative, to assume that Apple Ten will grow at the long-term rate of inflation (*i.e.*, 0% real growth), rather than adopting Citi's implied perpetual growth rate that assumed Apple Ten would shrink in real terms over time into perpetuity, which would result in a declining business. Second, in the comparable companies analysis, rather than using all three companies identified by Citi, Mr. Coffman relied only on Apple Hospitality as a company comparable to Apple Ten due to the striking similarity between the assets of Apple Ten and Apple Hospitality, which Citi acknowledged was a near perfect comparable.  Third, also in the comparable companies analysis, based in large part on publicly available data and testimony from Citi that 10-15% was an appropriate premium in hospitality REIT transactions, Mr. Coffman applied a 10% control premium to the value of Apple Ten stock.  Finally, in the comparable transactions analysis, Mr. Coffman excluded all transactions that pre-dated the 2008 financial crisis, finding that these transactions were too remote in time to provide reliable indications of value.  Mr. Coffman then weighted the results of the three methodologies as follows: DCF – 45%, comparable companies – 45%, and comparable transactions – 10%, to reach his estimate of fair value of $12.77 per Apple Ten share, or $165 million in total.

80.    On October 14, 2016, Plaintiff served on Defendants the expert report of Chad Coffman, and Defendants' Counsel took his deposition on October 20, 2016 in Radnor, Pennsylvania.

## 2.    Defendants' Experts

### a.    Expert Report of William Rakes, Esq.

81.    On October 14, 2016, Defendants served on Plaintiff the expert report of William Rakes, Esq.  Mr. Rakes is a partner at the law firm Gentry Locke and has been practicing law for over fifty years in the Commonwealth of Virginia.  Mr. Rakes' eight-page expert report generally

opined that the process employed by Apple Ten and the Special Committee was proper under Virginia law because the Board engaged in an informed and deliberative process, untainted by conflicts of interest.  Plaintiff's Counsel deposed Mr. Rakes on October 19, 2016 in Roanoke, Virginia.

### b.        Rebuttal Expert Report of James Gavin

82.    On October 18, 2016, Defendants served on Plaintiff the rebuttal expert report of James Gavin.  Mr. Gavin is a managing director with Duff & Phelps' real estate advisory group with over thirty years' experience in the real estate industry.  His eight-page expert report was offered to rebut the conclusions of Plaintiff's damages expert, Mr. Coffman, regarding the fair value of Apple Ten.  Mr. Gavin employed a valuation methodology different than that used by both Mr. Coffman and Citi, the Special Committee's financial advisor, and concluded that the mid-point fair value of each Apple Ten share was $10.92, compared to Mr. Coffman's conclusion of $12.77 per share.  Plaintiff's Counsel deposed Mr. Gavin on October 21, 2016 in Washington, D.C.

### E.        Defendants' Motions to Dismiss

83.    While the Parties were conducting discovery, Defendants filed two motions to dismiss (in addition to the Rule 23.1 MTD filed on August 5, 2016 (ECF No. 28)).   On September 7, 2016, Apple Ten and the Director Defendants filed a Motion to Dismiss for Lack of Standing and Failure to State a Claim and Memorandum in Support thereof (ECF Nos. 77, 78).

84.    Defendants raised three main arguments.  First, Defendants argued that Plaintiff lacked standing to pursue the Action because once the Merger was approved and closed on September 1, 2016, Plaintiff was no longer an Apple Ten shareholder and therefore did not satisfy the "continuous ownership" rule as recognized in some jurisdictions as necessary for the

prosecution of derivative claims.   Second, Defendants argued that Plaintiff's claims were extinguished because Apple Ten's shareholders had "ratified" the transaction by voting to approve the Merger.   Finally, Defendants argued that under Virginia law Plaintiff's only available remedy for unfair merger consideration was to seek appraisal pursuant to the Virginia Code.

85.     Also on September 7, 2016, Apple Hospitality and the Executive Defendants filed a Motion to Dismiss for Failure to State a Claim and Memorandum in Support thereof (ECF Nos. 79, 80), and argued that Plaintiff failed to state a plausible claim for aiding and abetting a breach of fiduciary duty.

86.     On September 21, 2016, Plaintiff filed an Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss for failure to state a claim (ECF No. 87).  Plaintiff argued that he had standing to pursue the derivative action, notwithstanding that he no longer held Apple Ten common stock, based on the plain language of Virginia Code § 13.1-672.1(A)(1), which does not explicitly require a shareholder to maintain continuous ownership throughout the pendency of a derivative suit.   Rather, Plaintiff argued that the statute requires only that a "shareholder shall not commence or maintain a derivative proceeding unless the shareholder . . . [w]*as a shareholder of the corporation at the time of the act or omission complained of* . . . ."  Va. Code Ann. § 13.1-672.1(A)(1).  Plaintiff purchased his shares of Apple Ten in 2012 and continued to hold his shares through the Merger, and thus argued that he satisfied this prerequisite.   Plaintiff also argued that the approval of the Merger by Apple Ten shareholders did not "ratify" the Merger because, as alleged in the Complaint, Defendants issued materially misleading and incomplete information in the Proxy, rendering the vote uninformed. Plaintiff pointed to specific misleading and incomplete disclosures related to Apple Ten's

financial status, the long-term growth prospects of Apple Ten, highly relevant conflicts on the part of the Apple Ten Board and the Special Committee's advisors, and key financial metrics and analyses regarding Apple Ten's performance.   Thus, Plaintiff argued that the shareholder ratification defense was not available in such circumstances.

87.     Thereafter, on September 26, 2016, Apple Ten and the Director Defendants and Apple Hospitality and the Executive Defendants each filed a Reply in Support of their respective Motions to Dismiss (ECF Nos. 88. 89).

88.     On October 14, 2016, the Court entered an Order denying all three of Defendants' Motions to Dismiss (ECF No. 97).  On November 1, 2016 the Court issued its opinion (ECF No. 143), wherein the Court held that: (1) Plaintiff had standing to fairly and adequately represent Apple Ten in the derivative action under Rule 23.1 notwithstanding his ownership of both Apple Ten and Apple Hospitality stock; (2) Plaintiff had standing to pursue the derivative claims because he owned stock in Apple Ten at the time of the alleged wrongdoing; (3) neither the Apple Ten shareholders' vote in favor of the Merger, the Virginia Statute on Limitations of Remedies, nor Apple Ten's Articles of Incorporation barred the suit; and (4) Plaintiff adequately pled claims against Apple Hospitality and the Executive Defendants for aiding and abetting the Director Defendants' breaches of fiduciary duty.

### F.     Plaintiff's Motion to Amend Complaint

89.     On October, 14, 2016, Plaintiff filed a Motion for Leave to File an Amended Complaint and a Memorandum in Support thereof and attached thereto a Proposed Amended Complaint (ECF Nos. 98, 99).  After meeting and conferring with Defendants on that motion, on October 19, 2016, Plaintiff withdrew his Motion for Leave to File an Amended Complaint (ECF No. 100) and filed a new Motion for Leave to File an Amended Complaint and a Memorandum in Support (ECF Nos. 101, 102).   The amended complaint added one additional count for

violation of Virginia Code § 13.1-691, asserting that the Merger was a prohibited conflict of interest transaction.  This new claim under § 13.1-691 hinged on new evidence that had recently come to light during the deposition of defendant David J. Adams regarding his relationship with Glade Knight and Glade Knight's son-in-law, with whom Adams had founded a business, which rendered Adams conflicted.  Plaintiff intended to show at trial that defendants Adams, Colton and Keating, three of the four Apple Ten directors who voted to "ratify" the Merger and two of the three "Special Committee" members who negotiated the Merger, did not qualify as "disinterested" under Virginia law due to their significant personal and financial ties to Glade Knight, and thus, pursuant to Virginia Code § 13.1-691, the Merger was voidable.  Once Plaintiff asserts a conflict of interest under § 13.1-691, the burden then shifts to the defendant directors to show that their actions complied with the safe harbor provisions of that statute.

90.     On October 20, 2016, the Court issued an order directing Defendants to respond to Plaintiff's Motion for Leave to File an Amended Complaint no later than October 24, 2016 (ECF No. 103), which Defendants filed on that day (ECF No. 106).  On October 25, 2016, Plaintiff filed a Reply Memorandum in Further Support of his Motion for Leave to Amend the Complaint (ECF No. 107).

91.     On October 26, 2016, the Court entered an order denying Plaintiff's Motion for Leave to Amend Complaint (ECF No. 108), finding that due to the possible burden-shift associated with § 13.1-691, allowing Plaintiff to amend the Complaint at such a late juncture (after the close of fact discovery) could result in undue prejudice to Defendants.

### G.     Motions Pending at the Time of Settlement

#### 1.     Defendants' Motions for Summary Judgment

92.     On October 28, 2016, Apple Ten and the Director Defendants and Apple Hospitality and the Executive Defendants filed separate Motions for Summary Judgment and

Memoranda of Law in Support (ECF Nos. 116, 117, 132, 133).   Defendants raised a series of arguments, including that: (1) Plaintiff could not prove damages as a matter of law because there was no evidence of another buyer (besides Apple Hospitality) willing to pay a higher price for Apple Ten; (2) Apple Ten's Articles of Incorporation precluded a damages award; (3) the Director Defendants had acted in good faith and were protected by Virginia's business judgment rule; (4) the Special Committee members were independent as a matter of law; and (5) there was no evidence of aiding and abetting by Apple Hospitality and the Executive Defendants.

93.     At the time of the Settlement (November 2, 2016), Plaintiff had substantially completed drafting his responses in opposition to the motions for summary judgment, which were due to be filed on November 4, 2016.  Plaintiff's opposition brief would have argued, *inter alia*, that: Virginia law did not require Plaintiff to prove the existence of a willing buyer; the Special Committee was not independent nor did the Apple Ten Board act in good faith, citing evidence in the record in support thereof; and defendants Justin Knight and David Buckley had aided and abetted the Director Defendants' breaches of fiduciary duty as supported by evidence in the record.

### 2.    Defendants' Motions in Limine

94.     On October 28, 2016, Defendants filed a Motion in Limine and Memorandum in Support (ECF Nos. 118, 119) to prevent Plaintiff from offering evidence or argument at trial regarding: (1) director fees paid to any Defendant by Apple Ten or any other Glade Knight-founded or controlled entity; (2) prior litigation and investigations involving Defendants, including *DCG&T v. Knight*, 3:13-cv-0067-JAG (E.D. Va.) and the SEC's February 12, 2014 Order Instituting Cease-and-Desist Proceedings, as well as the investigation leading up to that order; (3) compensation paid to Glade Knight in connection with prior mergers or acquisitions of Apple REIT entities and other business endeavors; (4) all facts that go beyond "the procedural

indicia whether the directors reported in good faith to an informed decision-making process"; (5) McGuireWoods' representation of Apple Ten and other Apple REIT entities prior to the firm's engagement by the Special Committee in connection with the Merger; and (6) the existence of insurance and indemnification obligations that might be called upon to fund or finance any judgment against the Defendants.

### 3. Plaintiff's Motions in Limine

95.     On October 28, 2016, Plaintiff filed two Motions in Limine and Memoranda in Support to prevent Defendants from offering evidence or argument at trial regarding: (1) Plaintiff's standing, adequacy, and ownership of Apple Hospitality stock; and (2) the SEC's endorsement or approval of the Proxy (ECF Nos. 112, 113, 114, 115).

### 4. The Parties' *Daubert* Motions

96.     Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579 (1993), on October 28, 2016, Plaintiff moved to exclude the opinion and testimony of Defendants' deal process expert, William R. Rakes, Esq. (ECF Nos. 109, 110).

97.     Defendants filed *Daubert* motions and sought to exclude both of Plaintiff's experts, Mr. Coffman and Professor Subramanian (ECF Nos. 120, 121, 122, 124). Defendants primarily argued that Professor Subramanian's opinion should be excluded because his opinion was irrelevant under Virginia's business judgment rule and that his opinion regarding the utility of a go-shop was irrelevant to any issue in dispute, and therefore, would mislead the jury. As to Mr. Coffman, Defendants argued that his opinion should be excluded principally because Mr. Coffman failed to retain, and Plaintiff failed to produce, various drafts of the Excel spreadsheet that he used to calculate his fair value of Apple Ten. Defendants also argued that Mr. Coffman's opinion was unreliable as a matter of law because it failed to address whether there was a buyer willing to purchase Apple Ten at Mr. Coffman's proposed fair value.

98.     With respect to Defendants' *Daubert* motions, Plaintiff was prepared to argue, *inter alia*, that Mr. Coffman was under no obligation to retain or produce every single draft or iteration of the Excel spreadsheet that his report was based on, as explicitly envisioned by Federal Rule of Civil Procedure 26(b)(3)(A) and (B).   Plaintiff was also prepared to argue, *inter alia,* that Professor Subramanian's opinion was relevant to whether the Apple Ten Special Committee members "act[ed] in accordance with [their] good faith business judgment of the best interests of the corporation" by "engag[ing] in an informed decision making process . . ." as required by the *Willard* decision.

### H.     Plaintiff's Counsel's Trial Preparation

99.     Plaintiff's Counsel devoted substantial effort to preparing for trial and was nearly ready to the try the case to a jury when it settled just twelve days before trial was scheduled to start.   These significant efforts allowed Plaintiff and his counsel to assess with clarity the strengths and vulnerabilities of Plaintiff's claims, Defendants' defenses, and ultimately, Plaintiff's chances of obtaining a favorable judgment that would survive appeal.   Had the case proceeded to trial, it would have required extensive and substantial resources, including significant expenditure of time by attorneys and their staff, consultants and experts.

100.   At the time of settlement, Plaintiff's Counsel had substantially completed all necessary pretrial submissions.   On October 31, 2016, Plaintiff filed with the Court his witness list, initial exhibit list and deposition designations Plaintiff intended to introduce at trial (ECF Nos. 139, 140).   On that same day, the Parties met and conferred regarding a stipulation of uncontested facts, and Plaintiff's Counsel provided Defendants with a draft for Defendants to review in advance thereof.   Plaintiff's Counsel was also preparing proposed jury instructions and voir dire questions to submit to the Court by the November 9, 2016 deadline.

101.    Plaintiff's Counsel also retained trial graphics experts who assisted in preparing demonstrative exhibits that Plaintiff's Counsel intended to use at trial.

## III.    THE SETTLEMENT

102.    The Parties participated in two settlement conferences with Judge Novak.  The first one, held on August 4, 2016, was unsuccessful.  In advance of the mediation, on July 28, 2016, Plaintiff sent to Judge Novak a confidential mediation statement, supplemented the next day with additional information and expert analysis relating to damages.  At the time of this mediation session, Plaintiff's Counsel had filed the Complaint only two weeks prior and had served discovery requests in advance of his P.I. Motion but had not received any documents nor taken any depositions.

103.    On November 2, 2016, just twelve days before trial, the Parties participated in a second all-day mediation session with Judge Novak.  In advance of the mediation, on October 26, 2016, Plaintiff submitted a supplemental mediation statement that included analyses performed by Plaintiff's experts Mr. Coffman and Professor Subramanian.  The participants in the mediation session included Plaintiff, Plaintiff's Counsel and Defendants' in-house and outside counsel.  The Parties engaged in extensive discussions and rounds of settlement demands and offers.  Ultimately, at the conclusion of the mediation session, Judge Novak made a proposal to resolve the Action for $32 million, which the Parties separately accepted.  The Parties then negotiated and executed a Memorandum of Understanding memorializing the material terms of the settlement, subject to the negotiation and execution of the settlement documents.  As part of those negotiations overseen by Judge Novak, the Parties agreed that Plaintiff's Counsel may seek from the Court an award of attorneys' fees in the amount up to one-third of the Settlement Amount plus reimbursement of expenses, and Defendants would not oppose or object to such motion.

104.    Thereafter, Plaintiff's Counsel began working on the Stipulation and all of the other documents to be submitted with Plaintiff's motion for preliminary approval of the Settlement.   Over the next three weeks, counsel for the Parties negotiated the specific terms of the Stipulation, exchanged multiple drafts of the Stipulation and the related settlement documents, and participated in several conference calls to discuss their respective positions on the settlement documents.

105.    While finalizing the terms of the Settlement, Plaintiff's Counsel reviewed bids from several firms specializing in shareholder class action notice and administration, ultimately selecting Strategic Claims Services, subject to Court approval, as the proposed Administrator for the Settlement.

106.    On November 28, 2016, the Parties executed the initial Stipulation of Settlement, and Plaintiff's Counsel filed with the Court the Stipulation of Settlement (and related exhibits) along with their Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice (the "Preliminary Approval Motion") (ECF Nos. 146, 147).   Thereafter, in response to the Court's comments and inquiries regarding the Notice and Stipulation, the Parties executed an Amended Stipulation of Settlement on December 7, 2016 and filed the Amended Stipulation with the Court that same day (ECF Nos. 148, 149).   The following day, December 8, 2016, the Court entered the Preliminary Approval Order, scheduling the Settlement Hearing for March 15, 2017 at 9:00 a.m. (ECF No. 150).

## IV.    THE SIGNIFICANT CHALLENGES AND RISKS OF THE ACTION

### A.    Challenges and Risks Related to Plaintiff's Ability to Prove His Case at Trial

107.    Based on publicly available documents, discussions with consultants, and the extensive fact and expert discovery conducted in the Action, Plaintiff's Counsel believe they had adduced substantial evidence to support Plaintiff's claims and were prepared to proceed to trial.

Plaintiff's Counsel realize they would have to overcome substantial challenges to successfully convey to the jury the facts underlying all of elements of the claims.  Plaintiff's Counsel, in consultation with experts, developed strategies for presenting the complicated subject matter as clearly and persuasively as possible.  Plaintiff's Counsel intended to use expert testimony to introduce and explain to the jury many of the complicated matters of fiduciary duties, Virginia law, corporate entity valuation and financial damages.  Plaintiff's Counsel nonetheless recognized that winning the "battle of the experts" and prevailing at trial was not guaranteed.

108.   Plaintiff's Counsel expected to use their M&A negotiation expert, Professor Guhan Subramanian, to be their primary vehicle for introducing certain key concepts and topics such as the utility (or lack thereof) of having a "go-shop" in a deal like the Merger as well as other corporate fiduciary duties and protections contained in Apple Ten's corporate documents and charters.  Moreover, in light of Defendants' pending motions to exclude the testimony of both of Plaintiff's experts, Plaintiff's Counsel could not be certain of the extent to which they could make use of their expert testimony at trial.

109.   At trial, Plaintiff would have had to rely on the transcribed deposition testimony of certain key witnesses, like Jung, the representative from Citi who assisted the Special Committee in its negotiations, and Kieske, the representative from Wells Fargo who assisted Apple Hospitality with its negotiations, which may have been less compelling to a jury than live testimony, and would have afforded Defendants the right to counter-designate testimony from these same witnesses.  All of the fact witnesses who were available for live testimony were Defendants, and thus adverse to Plaintiff.

110.    In addition, the Parties' motions in limine were partially briefed, and until they were fully briefed and decided, Plaintiff could not be certain that all the evidence underpinning his ideal trial narrative would be available to introduce at trial.

111.    Defendants' primary defense to liability would be that Defendants operated under (and were entitled to) the protection of Virginia's business judgment rule, Va. Code § 13.1-690. Under Virginia's business judgment rule, a director need only act "in accordance with his good faith business judgment of the best interests of the corporation." Va. Code § 13.1-690(A). Thus, overcoming the Virginia business judgment rule is considered to be a significant challenge. Courts in Virginia have granted great deference to decisions made by directors, and generally presume that they "act on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the corporation." *Poth v. Russey*, 281 F. Supp. 2d 814, 826 (E.D. Va. 2003). Similarly, *Willard*, the seminal case in Virginia addressing derivative claims for breach of fiduciary duty in the merger context, was a known problem for Plaintiff from the outset of the case in light of its director-friendly holding. As this Court noted during the preliminary injunction hearing, "***Willard* is a big problem for the plaintiff** in this case because essentially *Willard* says you can give the company away to your son for a lot less than somebody else is offering, and we are not going to look behind that to see whether there is more money available." Prelim. Inj. Hr'g Tr. 36:11-16.

112.    Defendants likely would have argued that they were independent and acted in good faith in accordance with Virginia law and that they relied on the advice of their independent advisors. Although Plaintiff and Plaintiff's Counsel believe strongly in the merits of the case, they recognize that Defendants would have attempted to present credible alternative explanations for Defendants' conduct. Defendants likely would have emphasized to a jury that the Special

Committee retained Citi, a leading financial institution, as well as McGuireWoods, both of whom provided them with independent advice. The Special Committee members also likely would have argued that they were not receiving any of the windfall payments in connection with the Merger.  Defendants' arguments created a substantial risk that either the Court or a jury could find that their actions were insulated from liability.

113.    Further, while Plaintiff was confident in the strength of his aiding and abetting claims against Apple Hospitality and defendants Justin Knight and David Buckley, Plaintiff was less assured in his arguments against the remaining Executive Defendants, defendants Peery, Gathright and McKenney.

114.    Also, this was not a case where there was a parallel civil or criminal governmental investigation and/or proceeding which could have aided Plaintiff in proving certain elements of the case.

### B.    Ability to Prove Damages

115.    At trial, Plaintiff would have sought two distinct forms of monetary damages. First, Plaintiff would have sought an additional $1.92 per Apple Ten share in merger consideration (an aggregate $165 million).  Second, Plaintiff would have sought disgorgement of the portion of the $65 million paid to defendant Glade Knight and other culpable Defendants upon the conversion of Glade Knight's Class B shares.  Each of these damage models had its own strengths and weaknesses.

116.    To prove that Apple Ten's shareholders were entitled to any increased merger consideration, Plaintiff would have needed to establish a breach of duty by the Special Committee charged with protecting their interests.  As discussed in ¶¶ 107-13 *supra*, this would not have been an easy task.

117.   Assuming that Plaintiff was able to prove that the Special Committee breached their duty to protect the Apple Ten shareholders, Plaintiff would have needed to prove that the merger price was in fact unfair.  Plaintiff's expert witness Mr. Coffman opined that the Merger undercompensated Apple Ten shareholders by $1.92 a share, *i.e.*, that the fair price for Apple Ten was $12.77 per share, almost 20% more than the actual Merger consideration.  Citi, the Special Committee's financial advisor, opined that the merger consideration was fair.  Plaintiff would have needed to convince a jury that Citi's analysis was wrong.  Plaintiff would have argued that Citi blessed the inadequate merger consideration in order to receive its $4 million success fee.  But Plaintiff would have needed to convince the jury that an impartial Wall Street investment bank would give its professional opinion that the price paid was fair when it was actually undervalued by 20%.

118.   Mr. Coffman's expert views were also hotly contested by Defendants' damages expert, who opined that the consideration paid to Apple Ten shareholders was fair and that Mr. Coffman's analysis was wrong.  The inevitable "battle of the experts" at trial creates substantial litigation risk because there can be no assurance which party's expert a jury will find more persuasive and, in reality, most jurors are not likely to be attuned to complex matters of corporate valuation.  Had Defendants' damages arguments been accepted, damages in this case could have been greatly reduced or even eliminated.

119.   Defendants also argued at summary judgment that to prove that Defendants' alleged breaches of fiduciary duty in fact caused his damages, Plaintiff was required to prove there was a viable market for Apple Ten shares at $12.77 per share, relying on the Virginia Supreme Court's decision in *SunTrust Bank v. Farrar*, 675 S.E.2d 187, 191 (Va. 2009).  Plaintiff would have argued that since Defendants intentionally avoided contacting viable alternative

bidders for Apple Ten until a merger agreement was already signed, *SunTrust* was inapplicable. Plaintiff recognizes, however, that if the Court were to credit Defendants' argument, Plaintiff's ability to prove (and recover) damages would have been severely undercut.

120.    Ultimately, while Plaintiff was certainly willing to try the case, he believed that his chances of winning a $165 million jury verdict on this theory were relatively slim.

121.    Plaintiff also sought disgorgement of some of the approximately $65 million that Glade Knight received in return for the "B Shares" he held in Apple Ten, the recovery of which was far from certain.  As Apple Ten disclosed in its Proxy, approximately $25 million of the $65 million was set to be distributed by Glade Knight to various members of Apple Ten management, including defendants Justin Knight, Buckley, Peery, Gathright and McKenney. Discovery did not support strong claims against any of these individuals except Glade Knight (who received approximately $40 million of the $65 million), Justin Knight ($4 million) and General Counsel Buckley ($2 million), such that only $46 million of the $65 million would likely have been recoverable.  Of course, success on this $46 million claim was far from certain.

122.    Glade Knight did not participate in the Merger negotiations or vote to approve the Merger, and, in reality, the higher the price paid to Apple Ten shareholders in the Merger, the more money he would have made on the deal.  Plaintiff would have needed to prove that Glade Knight was a silent puppeteer behind a sham Special Committee process, and that his son and in-house counsel conspired to do his bidding.  Plaintiff hoped to succeed on this claim, but recognized that he would have needed to convince a jury that Glade Knight's recusal from the negotiations was inadequate, and that he was unentitled to receive *any* bonus compensation for setting up and selling a profitable REIT.

123.   Therefore, the risk that the jury, or the Court during summary judgment or pretrial or post-trial motion practice, would credit Defendants' damages position over that of Plaintiff's had considerable consequences in terms of the amount of likely recovery for Apple Ten and its shareholders, even assuming liability was proven. Instead of risking a lower recovery (or no recovery) after trial, Plaintiff settled for $32 million, an amount that equates to approximately 15% of Plaintiff's maximum "top-line" recoverable damages.

124.   Also, even if Plaintiff were to prevail at trial, there was substantial uncertainty arising from a potential adverse appellate decision.  This risk was especially acute here, where the issues of law were complex and Virginia law is not extensively developed.  Among other things, Plaintiff faced substantial adverse appellate risk related to the Court's decision that Virginia Code § 13.1-672.1(A)(1) does not impose a continuous ownership requirement for the maintenance of derivative proceedings.  Plaintiff also faced adverse appellate risk related to the Court's decision that Plaintiff's simultaneous ownership of Apple Hospitality and Apple Ten stock did not rise to the level of "economic antagonism" that would render Plaintiff an inadequate derivative representative under F. R. Civ. P. 23.1.  While Plaintiff is confident that the Court correctly decided these issues, the uncertainty of appellate litigation cautions against any level of hubris in the face of such unsettled areas of the law.

125.   All of these considerations support Plaintiff and Plaintiff's Counsel's view that the Settlement is in the best interests of Apple Ten and its former shareholders.

## V.   THE SETTLEMENT DISTRIBUTION IS FAIR AND ADEQUATE

126.   In accordance with the Preliminary Approval Order, and as explained in the Notice, pursuant to the Plan of Distribution developed by Plaintiff's Counsel in consultation with their settlement advisor, Strategic Claims Services ("SCS"), and set forth in the Stipulation, each Authorized Claimant will receive a *pro rata* allocation of the Net Settlement Fund (less certain

fees and expenses) based on the percentage of Apple Ten shares each Authorized Claimant held as of September 1, 2016 (the date the Merger closed) out of the total number of Apple Ten shares then held by all Authorized Claimants.

127.    Specifically, following approval of the Settlement and the Effective Date, Authorized Claimants shall be paid their *pro rata* portions of the Net Settlement Fund (plus any interest earned thereon) after deduction of (i) any Fee and Expense Award to Plaintiff's Counsel, including any Case Contribution Award to Plaintiff; (ii) certain costs associated with the administration of the Settlement ("Notice and Administration Expenses"); (iii) taxes; and (iv) other fees and expenses authorized by the Court (the "Net Settlement Fund").

128.    Plaintiff's Counsel believes that the Plan of Distribution provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants and respectfully submits that the Plan of Distribution should be approved by the Court.

## VI.    PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

129.    The Court's Preliminary Approval Order, among other things (i) directed that notice of the proposed Settlement of the Action be disseminated to former Apple Ten shareholders; (ii) set March 1, 2017 as the deadline for Apple Ten shareholders to submit an objection to the Settlement, the Plan of Distribution, or the application for attorneys' fees and expenses; and (iii) set a final approval hearing for March 15, 2017 at 9:00 a.m. (ECF No. 150).

130.    The Preliminary Approval Order authorized Plaintiff's Counsel to retain SCS as the Administrator to supervise and administer the notice procedure for the Settlement, as well as distributing the Net Settlement Fund, ECF No. 150 ¶ 5.   In accordance with the Preliminary Approval Order, Plaintiff's Counsel instructed SCS to: (i) mail, on or before twenty days after entry of the Preliminary Approval Order, copies of the Court-approved Notice by first-class mail

to the former Apple Ten shareholders, ECF No. 150 ¶ 7; *see also* Bravata Aff. ¶¶ 4-5.  Before mailing the Notice, Plaintiff's Counsel obtained the list of former Apple Ten shareholders from David Lerner Associates, Inc., Apple Ten's exclusive broker.  Before mailing the Notice, SCS updated addresses of Settlement Members by: (1) using the National Change of Address Databank maintained by the United States Postal Service to update the mailing addresses who appear in the Apple Ten shareholder list; and (2) performing a skip-tracing of each Settlement Member using a commonly used skip-tracing firm (Experian) to further verify or update addresses.  Bravata Aff. ¶¶ 4-5.

131.   The Notice contained important information concerning the Action and the Settlement, including a description of the proposed Settlement, information regarding the claims asserted in the Action, and the proposed Plan of Distribution. The Notice also provides information for former Apple Ten shareholders to determine whether to object to any aspect of the Settlement, the Plan of Distribution, or the application for attorneys' fees and expenses.  The Notice also informs recipients of Plaintiff's Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund and payment of litigation expenses incurred in prosecuting the Action.

132.   In accordance with the Preliminary Approval Order, on December 22, 2016, SCS disseminated 23,225 copies of the Notice to all former Apple Ten shareholders by first-class mail.  *See* Bravata Aff. ¶¶ 4-5.  Also in accordance with the Preliminary Approval Order, SCS posted the Notice and the Stipulation of Settlement on its website.  *Id*. ¶ 6.

133.   As noted above, the Court-ordered deadline for former Apple Ten shareholders to file objections to the Settlement, the Plan of Distribution, or the application for attorneys' fees and expenses is March 1, 2017.  To date, there have been no objections of any kind.  Plaintiff's

Counsel will address any objections received after the date of this submission in their reply papers to be filed with the Court on or before March 8, 2017.

## VII. PLAINTIFF'S COUNSEL'S FEE AND EXPENSE APPLICATION

134. In addition to seeking final approval of the Settlement, Plaintiff's Counsel are making an application to the Court for an award of attorneys' fees and payment of expenses incurred during the course of the Action. Specifically, Plaintiff's Counsel are applying for (i) payment from the Settlement Fund of an award of attorneys' fees in an amount equal to one-third of the Settlement Fund; (ii) reimbursement from the Settlement Fund of Plaintiff's Counsel's expenses incurred in connection with the investigation, prosecution, and resolution of the Action in the amount of $430,608.27; and (iii) payment from the Settlement Fund of a case contribution award to Plaintiff in the amount of $15,000.00.

135. Plaintiff's Counsel have devoted over 4,657 hours to this Action, resulting in a total lodestar of $2,528,454.

136. As discussed above, the Notice disseminated to Apple Ten's former shareholders advised that Plaintiff's Counsel would be applying to the Court for an award of attorneys' fees in the amount of one-third of the Settlement Fund, including a case contribution award to the Plaintiff in the amount of $15,000.00, plus reimbursement of litigation expenses incurred. To date, there have been no objections to any aspect of the Settlement or the Fee and Expense Requests.

137. Following the dissemination of the Notice, Plaintiff's Counsel responded to approximately 150 former Apple Ten shareholders' inquiries about the Settlement. During those discussions, not one Apple Ten shareholder objected to the Settlement or the Fee Request. In fact, the vast majority of former Apple Ten shareholders have expressed their explicit approval

of the Settlement, and multiple callers have even indicated their gratitude and appreciation for Plaintiff's and Counsel's efforts in achieving the Settlement.

138.    A full analysis of the factors courts in this Circuit consider by when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in detail in the accompanying memorandum.   Summarized below are some of the additional factual bases for Plaintiff's Counsel's Fee and Expense Application that are not otherwise discussed above.

### A.    The Risks and Unique Complexities of the Action and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Shareholder Cases

139.    The risks and complexities faced by Plaintiff's Counsel in prosecuting the Action are highly relevant to consideration of an award of attorneys' fees, as well as approval of a proposed Settlement.  Here, the facts underlying Plaintiff's claims were complex and involved highly sophisticated financial issues regarding the fair valuation of a corporate entity.   In addition, Plaintiff's Counsel confronted numerous legal hurdles throughout the course of this Action.  Plaintiff's Counsel also faced the risks of proving Defendants' liability and damages, along with challenges and risks in proceeding to trial, as detailed in Section IV above.  Indeed, the outcome against Defendants, as well as the ability to obtain a substantial recovery for Apple Ten and its former shareholders, was always uncertain.  Moreover, even if Plaintiff were successful in proving liability and damages at trial, Defendants would surely appeal any judgment in favor of Plaintiff, and the outcome of any appeal was uncertain.

140.    These risks are in addition to the omnipresent risks accompanying complex shareholder litigation, such as the fact that this prosecution was undertaken on a contingent-fee basis.  From the outset, Plaintiff's Counsel were challenged by the significant risks inherent in all complex shareholder litigation, such as overcoming motions to dismiss, generating a compelling

factual record through discovery, surviving summary judgment, and prevailing at trial and on any post-trial appeals. Plaintiff's Counsel also understood that this would be a complex, expensive, and fast-paced litigation with no guarantee of being compensated for the substantial investment of time and money the case would require. Throughout this Action's relatively short pendency (which was even more truncated than Plaintiff's Counsel had anticipated at the time of filing of the Complaint), Plaintiff's Counsel ensured that sufficient attorney resources were dedicated to prosecuting the claims, particularly to conducting the fast-paced and complicated document and deposition discovery that was required. Plaintiff's Counsel also retained highly competent experts, as well as necessary outside vendors, and ensured that sufficient funds were available to advance the expenses required to pursue and complete this complex litigation. In total, Plaintiff's Counsel incurred over $430,000 in expenses in prosecuting and resolving this Action for the benefit of Apple Ten and its former shareholders. The financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

141.    Plaintiff's Counsel of course bore the risk that no recovery would be achieved. There are numerous examples of plaintiffs' counsel in contingency-fee cases having worked thousands of hours and advanced substantial expenses, only to receive no compensation. From personal experience, Plaintiffs' Counsel are fully aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

142.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce corporate fiduciary laws and regulations pertaining to the

duties of officers and directors of public companies.  Vigorous private enforcement of corporate

fiduciary laws can only occur if private investors take an active role in protecting the interests of

investors and can retain counsel with expertise to represent them.  The Supreme Court has long

recognized the value of derivative actions.  In *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S.

541, 548 (1949), the Supreme Court stated: "This remedy [derivative actions] born of

stockholder helplessness was long the chief regulator of corporate management and has afforded

no small incentive to avoid at least grosser forms of betrayal of stockholders' interests.  It is

argued, and not without reason, that without it there would be little practical check on such

abuses."  If this important public policy is to be carried out, courts need to award fees that will

adequately compensate private plaintiffs' counsel, taking into account the often risky and

arduous task of prosecuting shareholder derivative actions.

143.    Plaintiff's Counsel's persistent efforts in the face of substantial risks and

uncertainties have resulted in what I believe to be an outstanding recovery for the benefit of

Apple Ten and its former shareholders.   In these circumstances, and in consideration of

Plaintiff's Counsel's hard work and the very favorable result achieved, I respectfully submit that

the requested fee of one-third of the Settlement Fund, or $10,666,665.00, and payment of

$430,608.27 in litigation expenses is reasonable and should be approved.

### B.    The Quality of Plaintiff's Counsel's Representation

144.    As Kessler Topaz's firm resume (attached as Ex. B hereto) demonstrates, Kessler

Topaz is among the most experienced and skilled practitioners in the shareholder and

transactional litigation fields.  Kessler Topaz is a Martindale Hubbell "AV" rated law firm which

has focused its practice on shareholder and transactional litigation over the past twenty-four

years.  With almost 100 attorneys specializing in complex stockholder litigation and with offices

in California and Pennsylvania, Kessler Topaz has served as lead or co-plaintiffs' counsel in

numerous complex litigation matters, including serving as lead or co-plaintiffs' counsel in hundreds of stockholder class action and derivative lawsuits in state and federal courts across the country. Recently, Kessler Topaz exhibited its expertise in corporate and transactional litigation by achieving a rare trial victory in a derivative action, securing the largest monetary damages judgment ever issued by the Delaware Chancery Court – over $2 billion – against the nominal defendant corporation's majority stockholder. *In re Southern Peru Copper Corp. S'holder Derivative Litig.*, 30 A.3d 60 (Del. Ch. 2011), *aff'd, Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). In *Southern Peru*, Kessler Topaz worked through years of discovery on two continents, fought off summary judgment briefing, and pressed through trial to achieve a truly historic result. Moreover, the substantial recovery achieved for Apple Ten and its shareholders here reflects the superior quality of Plaintiff's Counsel's representation.

145.    The quality of the work performed by Plaintiff's Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by skilled counsel from two prominent law firms, McGuireWoods, LLP and Hogan Lovells, who vigorously defended their clients.

### C.    The Significant Time and Labor Devoted to the Action by Plaintiff's Counsel

146.    The work undertaken by Plaintiff's Counsel in investigating and prosecuting this Action and arriving at the present Settlement in the face of substantial hurdles has been time-consuming and difficult. As more fully described above, the Action was settled only after Plaintiff's Counsel overcame multiple legal and factual challenges and just twelve days before trial. Among other efforts, Plaintiffs' Counsel: (i) conducted an exhaustive investigation into Plaintiff's claims; (ii) researched and prepared two detailed complaints; (iii) overcame Defendants' motions to dismiss; (iv) engaged in significant discovery efforts with Defendants and non-parties; (v) obtained, organized, and analyzed approximately 156,000 pages of

documents produced by Apple Ten, Defendants and third parties; (vi) prepared for, took, or defended the depositions of ten fact witnesses, including depositions of nine Defendants and the Plaintiff; (vii) prepared for, took, or defended the depositions of four experts; (viii) engaged in efforts to resolve numerous discovery disputes with Defendants; (ix) consulted extensively with consultants and experts; (x) conducted extensive expert analysis and discovery; and (xi) filed numerous pretrial motions and submissions. *See supra* ¶¶ 9, 12-101.

147.    The process through which the Settlement was ultimately obtained was also hard-fought. The Parties' settlement discussions included two formal mediations facilitated by Judge Novak, followed by the preparation of the Stipulation and related settlement documents and additional negotiations over the specific terms of the Settlement. *Id.* ¶¶ 8, 106.

148.    At all times throughout the pendency of the Action, Plaintiff's Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for Apple Ten and its shareholders, whether through settlement or trial, by the most efficient means possible. Plaintiff's Counsel allocated work among themselves to avoid duplication of effort and to ensure the efficient prosecution of the Action. To this end, I, along with other partners at my firm, maintained daily control and monitoring of the work performed on the case. Experienced attorneys undertook particular tasks appropriate for their levels of expertise, skill, and experience, and more junior attorneys and paralegals worked on matters appropriate for their experience level.

149.    In total, Plaintiff's Counsel expended more than 4,657 hours on the investigation, prosecution, and resolution of the claims against Defendants for an aggregate lodestar of $2,528,454. Plaintiff's Counsel's hourly billing rates here ranged from $465 to $850 for partners, and $350 to $525 for other attorneys.

150.    Overall, Plaintiff's Counsel's fee request results in a multiplier of approximately 4.22 on Plaintiff's Counsel's total lodestar.  The multiplier here falls well within the range of multipliers awarded in other complex cases by courts in this Circuit and elsewhere.

151.    The attorneys and professional staff at Kessler Topaz recorded 4,657.35 hours in connection with the prosecution and settlement of the Actions from the inception of the matter through February 17, 2017.  Based upon the number of hours spent on this case by Kessler Topaz, the lodestar amount for attorney and professional staff time based on the firm's current billing rates is $2,386,162.50.

152.    A breakdown of Kessler Topaz's hours and applicable hourly billing rates is as follows:

| NAME / DESIGNATION | HOURLY RATE | HOURS | AMOUNT |
|---|---|---|---|
| **PARTNERS** | | | |
| Daniel J. Albert | 700.00 | 131.00 | $91,700.00 |
| Geoffrey C. Jarvis | 750.00 | 413.60 | $310,200.00 |
| Matthew Mustokoff | 725.00 | 357.60 | $259,260.00 |
| Lee Rudy | 825.00 | 224.25 | $185,006.25 |
| Mark A. Topaz | 850.00 | 14.05 | $11,942.50 |
| Robin Winchester * | 725.00 | 776.75 | $563,143.75 |
| Eric Zagar | 800.00 | 62.00 | $49,600.00 |
| **ASSOCIATES** | | | |
| Adrienne O. Bell | 525.00 | 44.20 | $23,205.00 |
| Matthew A. Goldstein | 435.00 | 44.00 | $19,140.00 |
| Grant Goodhart * | 400.00 | 751.00 | $300,600.00 |
| Leah Heifetz | 450.00 | 30.75 | $13,837.50 |

| | | | |
|---|---|---|---|
| Seamus Kaskela | 500.00 | 63.90 | $31,950.00 |
| Josh Materese * | 400.00 | 402.50 | $161,000.00 |
| | | | |
| **STAFF ATTORNEYS** | | | |
| E. Teresa Ahonkhai | 350.00 | 257.75 | $90,212.50 |
| Steven D. McLain * | 350.00 | 262.25 | $91,787.50 |
| Henry Young | 350.00 | 117.30 | $41,055.00 |
| **PARALEGALS** | | | |
| Jill Belack * | 250.00 | 208.40 | $52,100.00 |
| Johanna M. Conicello | 250.00 | 65.00 | $16,250.00 |
| Bridget Fitzgerald | 200.00 | 8.25 | $1,650.00 |
| Christopher McGinnis | 250.00 | 137.00 | $34,250.00 |
| Mary R. Swift | 275.00 | 22.80 | $6,270.00 |
| Honey Woloff | 250.00 | 59.25 | $14,812.50 |
| **INVESTIGATORS** | | | |
| Fabiana Angrisano | 300.00 | 30.80 | $9,240.00 |
| Jamie Maginnis | 300.00 | 6.25 | $1,875.00 |
| Henry Molina | 300.00 | 12.75 | $3,825.00 |
| William Monks | 450.00 | 5.00 | $2,250.00 |
| **TOTALS:** | | **4,657.35** | **$2,386,162.50** |

*\* Indicates the individual incurred time spent on fee-related matters which has been excluded from this chart and the total lodestar*

153.   The above schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm.

154.   In addition, the chart below demonstrates the total amount of hours performed by Kessler Topaz during various stages of the litigation:

| STAGE OF LITIGATION | HOURS |
|---|---|
| Pre Filing Investigation/Litigation Demand | 386.60 |
| Complaint/Preliminary Injunction | 934.45 |
| Discovery/Pre-Trial | 2,927.05 |
| Settlement* | 409.25 |
| **TOTAL:** | **4,657.35** |

*Excludes all fee-related time*

155.   All of the work performed by Kessler Topaz was reasonably necessary in the prosecution of the Action.   Set forth below is a description of the service rendered by each attorney, paralegal and professional for whom fees are requested:

a.   Mark A. Topaz is a Partner at Kessler Topaz who oversees case initiation and development in complex securities fraud, ERISA, fiduciary, antitrust, shareholder derivative, and mergers and acquisitions actions.   Mr. Topaz recorded 14.05 hours on this case.   Mr. Topaz's work in this matter involved, *inter alia*, case evaluation and research, reviewing the complaint, and conducting oversight and due diligence regarding the effective prosecution of the Action.   The vast majority of the time expended by Mr. Topaz in this Action was concentrated in the Pre-Filing Investigation/Litigation Demand Stage.

b.   Lee D. Rudy is a Partner at Kessler Topaz who co-manages the firm's mergers and acquisition and shareholder derivative litigation group.   Mr. Rudy recorded 224.25 hours on this case.   Mr. Rudy's work in this matter involved, *inter alia*, pre-suit case evaluation, conducting oversight and due diligence regarding the effective prosecution of the Action, attending both in-person mediation sessions, preparation for trial (including developing case prosecution strategy, preparing direct and cross examinations, and preparing opening statements), attending the deposition of Defendants' rebuttal valuation expert, James Gavin, and reviewing and revising various filings throughout the pendency of the litigation.   Mr. Rudy expended time in this Action in all stages of the litigation.

c.   Eric Zagar is a Partner at Kessler Topaz who co-manages the firm's mergers and acquisition and shareholder derivative litigation group.   Mr. Zagar recorded 55.75 hours on this case.   Mr. Zagar's work in this matter

involved preparing for and taking the deposition of defendant Justin Knight, preparing for and attending the deposition of defendant Glade Knight, assisting in developing case theory and an effective prosecution strategy of the Action and reviewing and revising various filings. The time that Mr. Zagar expended in this Action was concentrated in the Pre-Filing Investigation/Litigation Demand and Discovery/Pre-Trial Stages.

d.      I, Robin Winchester, am a Partner at Kessler Topaz in the firm's mergers and acquisition and shareholder derivative litigation group. I served as the partner-in-charge of this matter from June 2016 to the present and recorded 758.50 hours on this case. My work on this case has involved, *inter alia*, pre-suit case evaluation, reviewing and revising the Complaint, working with Plaintiff's financial valuation/damages experts, attending both in-person mediation sessions, engaging in telephone calls, meet and confers, and other forms of correspondence with defense counsel regarding discovery, litigation and settlement, and arguing against Defendants' motion to dismiss. I was also intimately involved in developing and evaluating case strategies and preparation for trial (including developing case prosecution strategy and preparing direct and cross examinations) and conducting oversight and due diligence regarding the effective prosecution of the Action. I was involved in drafting, reviewing, and editing the various filings made in the Action and the settlement documents. I engaged in second-level review of documents produced by Defendants and third-parties, and took the depositions of defendants Bryan Peery and Kent Colton. I also prepped Plaintiff for his deposition and defended his deposition and prepped and defended the deposition of Plaintiff's expert financial valuation/damages witness Chad Coffman. I also communicated regularly with Mr. Quinn about the status of the Action and case strategy. I expended time in this Action in all stages of the litigation.

e.      Daniel J. Albert is a Partner at Kessler Topaz in the firm's mergers and acquisition and shareholder derivative litigation group. Mr. Albert recorded 131.00 hours in this case. Mr. Albert's work in this matter involved pre-suit case evaluation, arguing for Plaintiff during the telephonic hearing for a preliminary injunction briefing schedule, working with financial valuation/damages experts, reviewing and revising Plaintiffs' preliminary injunction filings and Plaintiff's opposition to Defendant's first motion to dismiss. The majority of Mr. Albert's time in this Action was concentrated in the Pre-Filing Investigation/Litigation Demand and Complaint/Preliminary Injunction Stages.

f.      Geoffrey C. Jarvis is a Partner at Kessler Topaz, focusing on securities litigation, international securities litigation, derivative litigation, and other areas of fiduciary litigation. Mr. Jarvis recorded 413.60 hours in this Action. Mr. Jarvis' work in this matter included, *inter alia*, engaging in telephone calls, meet and confer calls and other forms of correspondence

with defense counsel regarding the litigation, reviewing and revising Plaintiff's filings throughout the pendency of the litigation, working with Plaintiff's financial valuation/damages experts and argued the motion for preliminary injunction. Mr. Jarvis also reviewed document productions by Defendants and third parties, and took the depositions of Citigroup representative Jens Thomas Jung, Wells Fargo representative David Kieske, Defendants David Adams and R. Garnett Hall, and Defendants' rebuttal financial valuation/damages expert James Gavin. Mr. Jarvis also was involved in prepping Plaintiff's valuation expert Chad Coffman for deposition. Mr. Jarvis also was intimately involved in developing and evaluating case prosecution strategies and preparing for trial. Mr. Jarvis expended in this expended time in this Action in all stages of the litigation.

g.     Matthew Mustokoff is a Partner at Kessler Topaz in the firm's securities group, focusing on securities and corporate governance litigation. Mr. Mustokoff recorded 357.60 hours on this Action. Mr. Mustokoff's work in this matter included, *inter alia*, attending the final in-person mediation session, engaging in telephone calls, meet and confer calls, and other forms of correspondence with defense counsel regarding the litigation and settlement, developing and evaluating case prosecution strategies, preparing for trial, reviewing and editing various filings made in the Discovery/Pre-Trial Stage, corresponding with trial advisors to prepare demonstrative exhibits, and working with Plaintiff's expert witnesses Guhan Subramanian. Mr. Mustokoff also took the depositions of Defendants' deal process expert witness William Rakes, defended the deposition of and prepped Plaintiff's deal-process expert witness Guhan Subramanian, and attended the deposition of Plaintiff's valuation/damages expert Chad Coffman. Mr. Mustokoff expended time in this litigation during the Discovery/Pre-Trial and Settlement Stages.

h.     Adrienne O. Bell is an Associate at Kessler Topaz who focuses her practice in the area of securities, derivative, mergers and acquisitions, and consumer protection case development and client relations. Ms. Bell recorded 44.20 hours in this Action, mainly dedicated to drafting client-related documents and responding to phone calls from former Apple Ten shareholders in response to the Settlement Notice. Ms. Bell expended time in this Action during Pre Filing Investigation/Litigation Demand and Settlement Stages.

i.      D. Seamus Kaskela is an Associate at Kessler Topaz who focuses his practice in the areas of securities, derivative, mergers and acquisitions, and consumer protection case development and client relations. Mr. Kaskela recorded 63.90 hours in this Action. Mr. Kaskela's work in this matter included pre-suit case evaluation, drafting client-related documents, maintaining communications with Mr. Quinn and attending the first in-person mediation session. Mr. Kaskela expended time in this Action

primarily during the Pre Filing Investigation/Litigation Demand and Complaint/Preliminary Injunction Stages.

j.    Leah Heifetz is an Associate at Kessler Topaz in the firm's mergers and acquisitions and shareholder derivative litigation group.  Ms. Heifetz recorded 30.75 hours on this Action.  Ms. Heifetz's work in this matter included pre-suit case research, investigation and evaluation.  Ms. Heifetz expended time in this Action during the Pre Filing Investigation/Litigation Demand Stage.

k.    Matthew A. Goldstein is an Associate at Kessler Topaz in the firm's mergers and acquisitions and shareholder derivative litigation group.  Mr. Goldstein recorded 44.00 hours in this Action.  Mr. Goldstein's work in this matter included preparing for and taking the deposition of defendant Glade Knight and preparing for and attending the deposition of defendant Justin Knight.  Mr. Goldstein expended time in this Action during the Complaint/Preliminary Injunction Stage.

l.    Joshua A. Materese is an Associate at Kessler Topaz in the firm's securities litigation practice group.  Mr. Materese recorded 402.50 hours in this Action. Mr. Materese was added to the case team after the Complaint/Preliminary Injunction Stage and was intimately involved in all aspects of the litigation from that point forward.  Mr. Materese's work in this matter included, *inter alia*, researching and drafting various filings and other responsive documents, coordinating with Associates and Staff Attorneys on document production and review efforts, as well as communicating with Plaintiff's Counsel's discovery vendor, DLS Discovery.  Mr. Materese also was involved in trial preparation efforts, including litigation strategy and drafting various pre-trial submissions. Mr. Materese also took the deposition of Apple Hospitality director Glenn Bunting and prepared for and attended the deposition of Defendants' deal process expert, William Rakes.  Mr. Materese also assisted in drafting and editing settlement documents.  Mr. Materese expended time in this Action during the Discovery/Pre-Trial and Settlement Stages.

m.    Grant D. Goodhart is an Associate at Kessler Topaz in the firm's shareholder derivative and mergers and acquisition litigation group.  Mr. Goodhart recorded 706.50 hours on this Action.  Mr. Goodhart was involved in all stages of the litigation including pre-suit case research, investigation and evaluation work, drafting pleadings and various filings throughout the pendency of the litigation, and pre-trial submissions.  Mr. Goodhart also played a significant role in the discovery process, including drafting discovery requests and responses and communicating with Plaintiff regarding his discovery responses and production. Mr. Goodhart also participated in reviewing document productions from Defendants and third parties and coordinating with Associates and Staff Attorneys on document review efforts.   Mr. Goodhart also was involved in trial

preparation efforts and strategy.  Mr. Goodhart prepared for and attended the deposition of defendant Bryan Peery and assisted in prepping Mr. Quinn for his deposition.  Mr. Goodhart also assisted in drafting various settlement documents.  Mr. Goodhart expended time in this Action in all stages of the litigation.

n.      Steven D. McLain is a staff attorney at Kessler Topaz in the firm's mergers and acquisitions and shareholder derivative litigation group.  Mr. McLain recorded 262.25 hours on this Action.  Mr. McLain's work on this case included providing first level review and analysis of the incoming document productions made by Defendants and third parties, as well as assisting in other aspects of the litigation, including document retrieval, legal research, and assisting in drafting various filings. Mr. McLain expended time in this litigation during the Complaint/Preliminary Injunction and Discovery/Pre-Trial Stages.

o.      E. Teresa Ahonkhai is a former staff attorney at Kessler Topaz in the firm's mergers and acquisitions and shareholder derivative litigation group.  Ms. Ahonkhai recorded 257.75 hours on this Action.  Ms. Ahonkhai's work on this case included providing first level review and analysis of the incoming document productions made by Defendants and third parties, as well as assisting in other aspects of the litigation, including document retrieval and legal research.  Ms. Ahonkhai expended time in this litigation during the Complaint/Preliminary Injunction and Discovery/Pre-Trial Stages.

p.      Henry Young is a staff attorney at Kessler Topaz, who focuses mainly on securities litigation, mergers and acquisitions litigation, and shareholder derivative litigation.  Mr. Young recorded 117.30 hours on this action.  Mr. Young's work on this case included providing first level review and analysis of the incoming document productions made by Defendants and third parties, as well as assisting in other aspects of the litigation, including document retrieval and legal research.  Mr. Young expended time in this litigation during the Complaint/Preliminary Injunction and Discovery/Pre-Trial Stages.

q.      The paralegal staff in this Action consisted of Jill Belack, Johanna M. Conicello, Bridget Fitzgerald, Christopher McGinnis, Mary R. Swift, and Honey Woloff (Collectively, the "Paralegal Team").  The Paralegal Team recorded a total of 485.40 hours on this case, and included various combinations of professionals at different stages of the litigation.  The Paralegal Team's work included, *inter alia*, proof-reading and cite-checking the Complaint, various correspondences, and all pleadings and filings in the Action.  The Paralegal Team also was in charge of monitoring the docket of this Action, updating the firm's internal case management programs to accurately reflect the status of this case, documenting any upcoming deadlines, ensuring that document

productions from Defendants and third parties were transferred to DLS Discovery and uploaded to the document review platform, and ensuring that filings were submitted in an orderly and timely fashion. The Paralegal Team was also involved in trial preparation in this case, for example by maintaining the index of trial exhibits through discovery, assisting the attorneys in compiling deposition designations, and providing exhibit binders for use during depositions. The Paralegal Team expended time in this Action in all stages of the litigation.

r.    Kessler Topaz's Investigation Department also assisted in this Action. The Investigation Department's efforts in this matter consisted of a team led by William Monks, and included Fabiana Angrisano, Jamie Maginnis, and Henry Molina (collectively, the Investigations Team"). Mr. Monks is a CPA, CFF,[6] CVA,[7] and the Director of Investigative Services at Kessler Topaz. He is a former Special Agent of the Federal Bureau of Investigation (FBI) and a former "Big Four" firm forensic accountant. During his 25-year FBI career, Mr. Monks worked on sophisticated white collar forensic matters involving securities and other frauds, bribery, and corruption. As such, Mr. Monks is very experienced in leading investigations into fraud, asset misappropriation, and financial statement misrepresentation. The Investigations Team recorded a total of 54.80 hours in this Action. Their work included conducting public information research into the individual defendants to uncover professional, familial, and social connections among the Special Committee members and the Knights. The Investigations Team expended time in this Action during the Discovery/Pre-Trial Stage.

156.    The qualifications and backgrounds of the attorneys identified in subsections (a) through (r) of the previous Paragraph may be found in Kessler Topaz's Firm Resume, which is attached hereto as Exhibit B.

157.    The hourly rates for attorneys and professional staff of my firm have been accepted in other stockholder litigation in this Court and other state and federal courts.

---

[6] Certified in Financial Forensics.

[7] Certified Valuation Analyst.

## VIII.   REQUEST FOR PAYMENT OF PLAINTIFF'S COUNSEL'S EXPENSES

### A.   Plaintiff's Counsel Seek Payment of Reasonable and Necessary Litigation Expenses

158.   In addition to the Fee Request, Plaintiff's Counsel also seek payment from the Settlement Fund in the amount of $430,608.27 for expenses that were reasonably and necessarily incurred by Plaintiff's counsel commencing, prosecuting, and resolving the claims asserted in the Action. Plaintiff's Counsel respectfully submit that the request for payment of Plaintiff's Counsel's expenses is appropriate, fair, and reasonable and should be approved in the amount requested.

159.   From the inception of this Action, Plaintiff's Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was successfully resolved. Plaintiff's Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Plaintiff's Counsel were motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

160.   As demonstrated in the chart below, Plaintiff's Counsel have incurred a total of $430,608.27  in expenses in the prosecution of the Action:

| EXPENSE DESCRIPTION | TOTAL AMOUNT |
|---|---|
| Filing Fees | 525.00 |
| Process Server | 60.00 |
| Deposition Transcript and Court Reporter Fees | 31,387.02 |
| Overnight Delivery Services | 1,287.85 |
| Messenger Services | 741.36 |
| Postage | 63.01 |
| Meals, Hotels & Transportation * | 50,919.12 |

| | |
|---|---:|
| Online Research | 5,634.71 |
| Trial Graphics & Support (RLM Trial Graphics) | 9,406.25 |
| Experts: | |
|    Chad W. Coffman, MPP, CFA | 143,772.27 |
|    Professor Guhan Subramanian | 161,324.65 |
|    Garrett Wilson | 12,645.00 |
| Electronic Discovery Platform (DLS Discovery) | 10,219.19 |
| External Reproduction Costs ** | 2,622.84 |
| **TOTAL:** | **430,608.27** |

\* $12,075.00 of this amount relates to cancellation fees for lodging and war room facilities and other related expenses incurred in connection with the trial which were not refunded due to the close proximity of the cancellation to the trial date.

\*\* Additionally, counsel incurred internal reproduction costs of $7,632.70 (76,327 pages @10¢/page) for which they will not seek reimbursement.

161.   These expenses include charges for, among other things (i) experts and consultants in connection with various stages of the litigation; (ii) establishing and maintaining a database to house the over 156,000 pages of documents produced Defendants and third parties; (iii) online factual and legal research; (iv) depositions of nine fact witnesses and four expert witnesses; and (v) travel.   Courts have typically found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of shareholders.

162.   The cost of Plaintiff's experts and consultants (totaling $317,741.92) represents the largest component of Plaintiff's Counsel's expenses, encompassing approximately 74% of the total expenses. As detailed above, Plaintiff's Counsel retained experts to opine on the materiality of alleged omissions in the Definitive Proxy Statement, total financial damages and the fair value of Apple Ten stock and the process employed by the Apple Ten Special Committee during the Merger negotiations.   Each of these expert analyses was necessary for Plaintiff to prosecute the Action, fully frame the issues, and assess damages for trial.   Both Mr. Coffman and

Professor Subramanian submitted detailed expert reports, were deposed by Defendants and were preparing to testify at trial at the time the case settled.

163.    Another large component of Plaintiff's Counsel's expenses relates to the cost of travel, meals, and transportation, which totaled $50,919.12.[8]  Plaintiff's Counsel was required to travel frequently during the pendency of this Action.  For example, Plaintiff's Counsel traveled to take or defend thirteen of the fourteen depositions in several cities.  Plaintiff's Counsel also had to travel for the preliminary injunction hearing, two separate mediation sessions and the final approval hearing.  Each trip required air or train fare, meals, and lodging.

164.    Another substantial component of the Expense Request are the costs relating to discovery, including the cost of deposition transcripts and court reporter fees ($31,387.02), electronic discovery review ($10,219.19), and copying costs by an outside vendor ($2,622.84) which total $44,229.05.  Plaintiff's Counsel took or defended fourteen total depositions, and due to the expedited nature of the litigation, transcripts were often needed on an expedited basis. Large volumes of documents needed to be printed in a short period of time, which required the use of an outside printing vendor.  As for the remaining discovery costs, the electronic discovery review, the use of an electronic database for document review was vital for the prosecution of the case.  Plaintiff's Counsel's outside vendor, DLS Discovery, maintained a user-friendly database, which was crucial for collecting, organizing, and efficiently reviewing the electronic discovery. Using the database allowed Plaintiffs' Counsel to coordinate and expedite the review of over 156,000 pages of documents among multiple attorneys, consultants, and experts.  These costs were both necessary to effectively prosecute the Action, and are reasonable for reimbursement.

---

[8] Of this amount, Plaintiff's Counsel incurred $12,075 in fees for cancelling a block of rooms and litigation support facilities which needed to be booked in advance of the trial.

165.    Plaintiff's Counsel's expenses also include the costs of online research in the amount of $5,634.71.  This amount represents charges for computerized research services such as LexisNexis, Westlaw, Courtlink, Thomson Financial, Bloomberg and PACER. It is now standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

166.    Plaintiff's Counsel also incurred costs of $9,406.25 for a trial consultant. Plaintiff's Counsel retained RLM Trial Graphics to assist them in creating graphic and demonstrative exhibits for use at trial.  These expenses were necessary for Plaintiff's Counsel to effectively communicate and illustrate the points that they hoped to prove to the jury at trial.

167.    The other expenses for which Plaintiff's Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, process servers, court reporters and postage and delivery expenses.

## IX.    THE COURT SHOULD APPROVE PLAINTIFF'S CASE CONTRIBUTION AWARD

168.    Shortly after the Merger was publicly announced, Mr. Quinn, a long-time shareholder of Apple Ten, contacted Kessler Topaz about his legal rights concerning the Merger and retained us to represent him in the Action.

169.    Throughout the duration of the litigation, Mr. Quinn fulfilled his duties as a fiduciary on behalf of Apple Ten by:  1) maintaining regular contact with his counsel about the status and strategy of the litigation; 2) reviewing drafts or final versions of all pertinent filings and authorizing his counsel to take appropriate action when necessary; 3) traveling to attend both

mediation sessions and his deposition; and 4) participating in the two mediation sessions and authorizing the Settlement of this Action.

170.    For example, Mr. Quinn reviewed and authorized his counsel to: send a letter dated June 22, 2016 on his behalf to the Apple Ten Board of Directors; file the Shareholder Derivative Complaint on or about July 19, 2016; and file a Proposed Amended Complaint on or about October 14, 2016.  Mr. Quinn reviewed Defendants' multiple discovery requests comprised of seven separate sets of discovery requests including a total of fifty-seven interrogatories, twenty-two document requests and six requests for admission, discussed them with his counsel and reviewed and authorized the responses.  He was also required to search for documents responsive to Defendants' discovery requests and produced to his counsel all responsive documents.  This involved reviewing, by hand, scores of monthly statements from three separate accounts that held his investments, dating back to 2008, as well as reviewing his personal files for responsive documents.  Ultimately, Kessler Topaz produced to Defendants 600 pages of documents responsive to the discovery requests.

171.    Mr. Quinn was also required to travel several times throughout the duration of the litigation.  He attended both in-person mediation sessions in Richmond, Virginia conducted by the Honorable Magistrate Judge David J. Novak ("Judge Novak") on August 4 and November 2, 2016.  On August 18, 2016, he travelled to the offices of Kessler Topaz in Radnor, Pennsylvania and spent the day with counsel preparing for his deposition.  On the morning of August 19, 2016, Mr. Quinn traveled from Philadelphia, Pennsylvania to Washington, D.C. for his full day deposition at the offices of McGuireWoods LLP.  He was also prepared to travel to Richmond, Virginia for the duration of the trial and was prepared to testify at trial if needed.

172.   From the time the complaint was filed through the filing of the motion for preliminary injunction, I corresponded or spoke with Mr. Quinn on an almost daily basis.  After the pre-trial order was entered, I continued to maintain contact with Mr. Quinn on a regular basis regarding the status and strategy of the litigation.

173.   On November 2, 2016, after long and hard-fought settlement negotiations overseen by Judge Novak, Mr. Quinn authorized his counsel to enter into the Settlement.

## X.   <u>EXHIBITS</u>

174.   The following unpublished documents cited to Plaintiff's Motions for Final Approval of the Settlement and for Award of Attorneys' Fees and Payment of Litigation Expenses and to Approve Plaintiff's Case Contribution Award are attached hereto as follows:

a.   Attached as Exhibit A is a true and correct copy of the transcript of the Preliminary Injunction Hearing, dated August 26, 2016;

b.   Attached as Exhibit B is a true and correct copy of Plaintiff's Counsel's firm resume;

c.   Attached as Exhibit C is a true and correct copy of *Securities Class Action Settlements: 2015 Review and Analysis* (Cornerstone Research 2016);

d.   Attached as Exhibit D is a true and correct copy of the Order and Final Judgment dated September 15, 2015 in the *DCG&T ex rel. Battaglia/IRA v. Knight,* No. 3:14-cv-00067 (E.D. Va.) action;

e.   Attached as Exhibit E is a true and correct copy of the Final Approval Order and Judgment dated July 22, 2015 in the *Borboa v. Chandler,* No. 3:13-cv-844-JAG (E.D. Va.) action;

f.     Attached as Exhibit F is a true and correct copy of the Final Order and Judgment dated December 20, 2011 in the *Ryals v. Hireright Solutions, Inc.,* No. 3:09-625 (E.D. Va.) action.

## XI.   CONCLUSION

175.   In view of the significant recovery to former Apple Ten shareholders and the substantial risks of this litigation, as described in this Declaration and in the accompanying memoranda, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Distribution should be approved as fair and reasonable. In addition, based on the significant recovery in the face of substantial risks, the efforts of Plaintiff's Counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the case, and the standing and experience of Plaintiff's Counsel, as described above and in the accompanying memoranda, I respectfully request that (i) a fee in the amount of one-third of the Settlement Fund be awarded to Plaintiff's Counsel; (ii) Plaintiff's Counsel's expenses in the amount of $430,608.27 be approved in full; and (iii) Plaintiff's Case Contribution Award in the amount of $15,000.00 be approved in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 22nd day of February, 2017 at Radnor, Pennsylvania.

_____
Robin Winchester