# Exhibit "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


James Quinn,

                                        Plaintiff,

        versus                                  3:16CV610

Glade M. Knight, et al.,

                                        Defendants




        Before:  HONORABLE JOHN A. GIBNEY, JR.
               United States District Judge




        Preliminary Injunction Motion



                August 26, 2016

               Richmond, Virginia




                GILBERT F. HALASZ
              Official Court Reporter
                U. S. Courthouse
              701 East Broad Street
              Richmond, VA 23219

APPEARANCES


Geoffrey C. Jarvis, Esq.

Robin Winchester, Esq.

Charles L. Williams, Esq.

For the plaintiff



Elizabeth F. Edwards, Esq.

Charles W. McIntyre, Esq.

for defendants Glade M. Knight, et al.



Mark D. Gately, Esq.

Andrea Trento, Esq.

Jon M. Talotta, Esq.

David Buckley, Esq.

for defendants Justin Knight, et al.

# i n d e x

| WITNESS | pg | ln |
|---|---|---|
| Glade Knight - direct | 51 | 21 |
| Glade Knight - cross | 58 | 5 |
| Justin  Knight - direct | 68 | 3 |
| Justin Knight - cross | 74 | 10 |
| Justin Knight - redirect | 90 | 1 |

1          THE COURT:  All right.  We opened twice.

2          THE CLERK:  Case number 3:16 CV 610.

3          James Quinn versus Glade Knight and others.

4          Mr. Geoffrey C Jarvis, Jr., Ms Robin Winchester,

5    Mr. Charles L. Williams represent the plaintiff.

6          Ms Elizabeth F. Edwards, Mr. Charles W. McIntyre, Mr.

7    Mark D. Gately, Mr. Andrea Trento, Mr. John Talotta and

8    Mr. David Buckley represent the defendant.

9          Are counsel ready to proceed?

10         MR. JARVIS:  We are, Your Honor.

11         MS EDWARDS:  We are.

12         THE COURT:  All right.

13         We are here today on plaintiffs' motion for a

14   preliminary injunction in this case.

15         And I apologize for being late, but I was

16   re-reviewing some of the documents in this case plus

17   reading my favorite case, and Ms Edwards' favorite case,

18   Willard versus Monetta Building Supply, on corporate

19   shenanigans in Bedford, Virginia.

20         All right.  So before we -- I am not going to decide

21   the motion to dismiss today.  But I have got -- there are

22   things I don't quite understand about this case.  Maybe

23   some of Mr. Quinn's lawyers can explain them to me.

24         Is Mr. Quinn -- I don't quite know the volume of

25   stock that is out for either A Ten, which is what I call

1    Apple REIT Ten, or Apple.

2        But isn't it true that if Mr. Quinn wins this case

3    his Apple stock gets damaged?

4        Does somebody want to address that?

5        MS WINCHESTER:  Happy to.

6        THE COURT:  Why don't you come up to the podium.

7        MS WINCHESTER:  Sure.

8        THE COURT:  You are Ms Winchester.  Are you a

9    Philadelphia lawyer?

10       MR. GATELY:  I acknowledge.

11       THE COURT:  You guys are from -- where are you from?

12       MS WINCHESTER:  Our offices are located in Radnor,

13   Pennsylvania, which is about a mile down the road from

14   Villanova University.

15       THE COURT:  I know where Radnor is.

16       MS WINCHESTER:  A very fine law school they have

17   there.

18       THE COURT:  At Villanova?  Are you a graduate?

19       MS WINCHESTER:  I happen to be a graduate from there,

20   Your Honor.

21       THE COURT:  Well, that is good.

22       So does our Magistrate Judge, Judge Novak.

23       MS WINCHESTER:  Yes.

24       THE COURT:  And tell me this, ma'am.

25       Are you a Philadelphia native?

1        MS WINCHESTER:  I am, Your Honor, I was born and

2    raised in Philadelphia.

3        THE COURT:  Did you actually grow up in city?

4        MR. JARVIS:  I did not.  My parents are from south

5    Philadelphia.  My family all live in south Philadelphia.

6    My parents moved to the suburbs in Delaware County, which

7    is where I was born, in Philadelphia.  Raised in Delaware

8    County.

9        THE COURT:  Where in the county?

10       MR. JARVIS:  Ashton, Pennsylvania which is in

11   Delaware County.  I attended Cardinal Harrison School, St.

12   Joe's University, and if I am lucky in a basketball game

13   rooting for the Hawks.

14       THE COURT:  The Hawks.  Well, the Hawks never die.

15       MS WINCHESTER:  The Hawks never die.

16       My father is a graduate of St. Joe's prep, which is

17   an all -- although he voted for it to go co-ed, that was

18   voted down.

19       THE COURT:  Are you disappointed about the departure

20   of Carlos Ruiz from the Phillies?

21       MS WINCHESTER:  Essentially known as Chooch.  I am up

22   very upset that Chooch is gone.  He is the last of the

23   World Series, besides Roy Halladay, but yes, right now is

24   the the last man standing of the World Champions.

25       THE COURT:  He is not exactly standing the way he

1    used to.

2        MS WINCHESTER:  No, he is hitting pretty good.

3        THE COURT:  Has for the past month, since the All

4    Star Game.

5        Tell me the answer to my question.  Are these the

6    same Philadelphia lawyers that came down here last time?

7        MR. WILLIAMS:  They are affiliated, but --

8        THE COURT:  From the same firm?

9        MR. WILLIAMS:  Yes, sir.

10       THE COURT:  Okay.  Well, good.  All right.  So go

11   ahead, ma'am, I'm sorry.

12       MS WINCHESTER:  I'm sorry.  Your Honor --

13       THE COURT:  My question was, they raise the point

14   that Mr. Quinn has interests on both sides of this case.

15       So, doesn't it hurt him more to win than to lose?

16       MS WINCHESTER:  Well --

17       THE COURT:  Or doesn't it hurt him more to lose than

18   to win?

19       MS WINCHESTER:  I would say depends on which side you

20   are on.

21       THE COURT:  Okay.  Well, let's take a look.

22       Mr. Quinn is on both sides.  If Mr. Quinn -- Mr.

23   Quinn has a ton, by my standards, of Apple Hospitality

24   stock.  And if he jacks up the price through this

25   litigation of Apple Ten, doesn't his, doesn't the value

1    per share of Apple Hospitality go down?

2        MS WINCHESTER:  Not necessarily, Your Honor.  The

3    value of Apple Hospitality is determined by the market, so

4    whatever the market thinks is the true value of Apple

5    Hospitality is what the value will be.  At the end of the

6    day, where the damages come from?  Well, he is suing

7    individuals directly.  So the damages could come from the

8    individuals themselves, in which case it's not out of

9    Apple Hospitality's pocket.

10        Also, Mr. Quinn has testified that his intent is to

11    slowly sell down his shares of Apple Hospitality.  So it

12    is speculative at this point to say, well, what is his

13    total share value?  And, again, the cases that have

14    addressed this issue are only in the context of when an

15    individual has both direct and class claims.  There are no

16    cases out there that say that an individual who happens to

17    hold stock in both a target and acquirer are in any way a

18    sufficient plaintiff.  Rather, those cases say when you

19    have both direct and class claims, i.e. you are both suing

20    the company and suing on behalf of the company, that, yes,

21    could be an issue there because at the end of the day you

22    are trying to recover damages for both the company and the

23    class from the company.  So when there is one pot of money

24    in which you are seeking to retain a recovery, yes, that

25    makes sense that there is a theoretical difference there.

1       Now, some courts have found that that is improper.

2   Frankly, in the State of Delaware plaintiffs regularly

3   bring class and derivative claims, and it is not, is not

4   found to be a conflict.

5       Again, I don't believe there are no cases out there

6   that say that Mr. Quinn has any economic antagonism

7   whatsoever.  Rather he has shown that regardless of the

8   fact that he happens right now to own more shares of

9   Hospitality than ten, his main interest is to make sure

10  Ten has a correct value, and he is getting a fair value,

11  as well as the right of the stockholders, for those

12  shares.

13      THE COURT:  Well, if he gets, Apple Hospitality gets

14  Apple Ten at a discount, doesn't he profit as a

15  shareholder of Apple Hospitality?

16      MS WINCHESTER:  I think all the stockholders do, yes,

17  Your Honor.

18      THE COURT:  Yes.  So he is sort on both sides of the

19  fence here, isn't he?

20      MS WINCHESTER:  But he is not suing on -- he is not

21  suing -- he doesn't have class claim on behalf of Apple

22  Hospitality.

23      THE COURT:  I understand he doesn't have a class

24  claim on behalf of anybody, but the point of the these

25  kinds of standing issues is whether he has an interest in

1  going ahead with the case.  And I am just a little puzzled

2  as to how he can go -- I mean, where his true interest is.

3  Here is the question that I would ask.  If I was him, why

4  wouldn't I throw the case and lose it so that my Apple

5  Hospitality shares, of which I own many more, increase in

6  value?

7      MS WINCHESTER:  I guess I would ask, why is he

8  bringing the case to begin with?

9      THE COURT:  Okay.

10     I will tell you why he brought it to begin with.

11  There are lot of reasons he could bring the case to begin

12  with.  One of them might be to help the lawyers make a lot

13  of money, which seems to me to be one of the main

14  impetuses in shareholder litigation.

15     But, let's forget about why he brought the case to

16  begin with --

17     MS WINCHESTER:  But, Your Honor --

18     THE COURT:  -- ma'am, when I talk, you listen.  And I

19  will try to do the same.  Okay?

20     MS WINCHESTER:  Yes.

21     THE COURT:  Whatever his motives are, isn't -- I

22  mean, eventually he will scratch his head and say, gee, I

23  could make more money if I lose this case.

24     MS WINCHESTER:  Well, Your Honor, I think what he

25  testified in his deposition was that when he saw the

1    transaction disclose, when he received the proxy, he was

2    concerned about the value for his Apple Ten shares is all

3    he was concerned about at the time.  He contacted his

4    financial adviser, spoke with his financial adviser, was

5    doing and investigation on line, and contacted our law

6    firm.  And after speaking with our law firm he directly

7    contacted us.  We did not contact him.

8        THE COURT:  I didn't suggest you did.

9        MS WINCHESTER:  And he called to ask for advice as to

10   what his possible remedies would be.  As a result of that,

11   he determined that he wanted to be a plaintiff in this

12   case.  And I think that he has done over and above what

13   most plaintiffs do, and has shown his commitment to this

14   case in all that he has has done thus far.  He certainly

15   understands what the claims are about.  He was here for a

16   mediation.  He was -- certainly he he gets a little

17   confused, as most people who are not lawyers and not

18   dealing with legal jargon every day, he may get confused a

19   little bit about the technical terms.  But I think he has

20   also shown his level of commitment and determination to

21   make sure that the defendants don't breach their fiduciary

22   duty.

23       As we stated in our papers, that whether or not he is

24   a shareholder of Ten or Hospitality, when you have the

25   same individuals who are on both sides, whether it's

1    Hospitality or Apple Ten, you have the same fiduciary that

2    he wants to insure that those fiduciaries stand by their

3    duties.  So he benefits whether he is an Apple Ten

4    shareholder or an Apple Hospitality shareholder to make

5    sure the board and management fulfill their fiduciary

6    duties to the shareholders of either company.

7        THE COURT:  But I think his interests in the abstract

8    proposition of enforcing fiduciary responsibilities

9    doesn't quite cut the mustard in terms of standing.  I

10   think he has got to have a more tangible interest to go

11   ahead with the suit.

12       But we are not going to rule on that today.  So that

13   is something we will address.

14       All right.

15       MS WINCHESTER:  I appreciate it, Your Honor.

16       THE COURT:  All right.

17       So we are here today on plaintiffs' motion for a

18   preliminary injunction against the voting of the A Ten

19   shares to determine whether they -- whether a merger

20   should go forward or not.

21       Do you all -- does the plaintiff have any witnesses

22   or anything today?

23       MR. JARVIS:  We do not.

24       THE COURT:  And the defendants?

25       MS EDWARDS:  Yes, we do, Your Honor.

1          THE COURT:  All right.

2          Who do you have as a witness today?

3          MS EDWARDS:  We have the chairman of the special

4    committee, Dr. Colton, by deposition.

5          THE COURT:  Okay.  I mean, other than things already

6    in the record.

7          MS EDWARDS:  We also Mr. Glade Knight and Mr. Justin

8    Knight here prepared to testify.

9          THE COURT:  Are they going to testify?  That is a

10   decision you need to make now, because we are going to

11   hear the evidence before we hear the argument.

12         MS EDWARDS:  Then our decision would be yes.

13         THE COURT:  All right.

14         Well, call your witnesses.

15         MR. McINTYRE:  We will start with the deposition.

16         THE COURT:  I will tell you what.  The depositions

17   are attached to the documents that have been submitted,

18   right?

19         MS EDWARDS:  They are, but we put together a short

20   clip of his testimony, which is what you suggested we do

21   when we asked to move the hearing to accommodate his being

22   here to testify live.

23         THE COURT:  Before we do that, let's hear a brief

24   opening from each side.  Let's start with the plaintiff

25   here, Mr. Quinn.

1     Are there class A shares, class A and B shares to the

2  A Ten?

3     MR. JARVIS:  Yes, there are, Your Honor.

4     THE COURT:  And the A shares, those are like what I

5  would think of as regular shares of stock --

6     MS WINCHESTER:  Yes.

7     THE COURT:  -- I might have in Verizon.

8     MR. JARVIS:  Sold to the general public.  And

9  Mr. Quinn bought them.

10     THE COURT:  Mr. Quinn's shares are A shares?

11     MR. JARVIS:  They are A shares, Your Honor.

12     THE COURT:  And he has had those for about five or

13  six years; is that right?

14     MR. JARVIS:  I think that is right, Your Honor.  He

15  got them --

16     THE COURT:  Has the company had dividends during that

17  time?

18     MR. JARVIS:  I believe so, Your Honor, approximately,

19  I believe, over the past five years, $4.72 I think is the

20  number.

21     THE COURT:  Four dollars per an-num?

22     MR. JARVIS:  The total, I think it runs to a return,

23  I did the math, about eight percent.  Something like that.

24     THE COURT:  Eight percent return.

25     MR. JARVIS:  Something like that.

1       THE COURT:  Per year?

2       MR. JARVIS:  Per year.

3       THE COURT:  Okay.

4       MR. JARVIS:  Then the B shares were Glade Knight and

5   more akin to options, you know.  He has a right to convert

6   to A.  They were actual shares, but they sort of look like

7   options a little bit.

8       THE COURT:  A little like options, except you don't

9   have to pay money to get them.

10      MR. JARVIS:  Well, they pay ten cents a share.

11      THE COURT:  Well, you are not paying money now.

12      MR. JARVIS:  Yes, and you didn't have to pay much

13  then.

14      THE COURT:  How many shares are there in A Ten?

15      MR. JARVIS:  Your Honor, I am not totally sure.

16      MS EDWARDS:  In Mr. Justin Knight's declaration there

17  are 87,558,918 shares issued and entitled to vote on the

18  merger.

19      THE COURT:  87 million class A shares.

20      MS EDWARDS:  This includes the conversion of the Bs,

21  right?

22      MR. BUCKLEY:  Yes.

23      MS EDWARDS:  87 million.

24      THE COURT:  86 million minus the class B.

25      MS EDWARDS:  I am sorry, I was wrong, Your Honor, it

1    doesn't include B.  Just the A.

2        THE WITNESS:  87 million class As.  And then there is

3    how many class Bs?  480,000?  All right.

4        Go ahead.  I'm sorry.  I asked you to do an opening,

5    and then I jumped in.  Go ahead.

6        MR. JARVIS:  That is quite all right, Your Honor.

7        I am not sure how much of an opening you want.  I

8    sure had -- I saw it more as oral argument.  I didn't know

9    we were going to call live witnesses until a few seconds

10   ago.  But let me give you an overview of where we are

11   going to go with this thing when we get down to argument

12   more in general.

13       You know, if it please The Court, Geoff Jarvis with

14   with Kessler Topaz, Ms Winchester.  Mr. Williams is our

15   local and been assisting us in this matter.  And we are

16   here, obviously, for Mr. Quinn and on behalf of the

17   company in this derivative action.  We are -- I am here to

18   argue for you to enjoin the vote for two reasons.  One,

19   because of the process problems we identified in our

20   brief, and I will briefly go over in the opening.

21       COURT REPORTER:  Mr. Jarvis, could you speak about

22   half as fast?

23       MR. JARVIS:  I'm sorry?

24       COURT REPORTER:  Could you slow up?

25       MR. JARVIS:  Sure.  I apologize.

1      THE COURT:  You are in the south now.

2      MR. JARVIS:  I have been the south at various points

3   in my life, but too many years up north I think.

4      THE COURT:  Well, okay.

5      MR. JARVIS:  In any event.  Let me try to slow down

6   and I will try to be loud, too.

7      My hearing is terrible, so I understand --

8      THE COURT:  Mine is, too.  I have got two hearing

9   aids that I changed batteries this morning just for you.

10      MR. JARVIS:  My problem is worse.  They say pride

11   goes before a fall.  I don't have mine in.  But in any

12   event.  We are here really two claims, right?  It is

13   clear, Your Honor knows this.  There are fiduciary duties

14   from management and the directors of the of the company to

15   the shareholders.  Under those duties they have this, you

16   know, they have to act in utmost good faith, you know, no

17   clashes of interest.  Yes, there is a business judgment

18   statute here in Virginia stricter than many other places

19   but that doesn't immunize the directors from all actions.

20   It says, you know, requires them to act in accordance with

21   good faith business judgment to the best interests of the

22   corporation.

23      And there is two cases that I know Your Honor and Ms

24   Edwards have clashed over in the past, the Tyson case and

25   the Willard case.

1          I will go first to the Tyson case.  I think it was a

2    fact that --

3          THE COURT:  W.L.R. v. Tyson.

4          MR. JARVIS:  W.L.R. v. Tyson.

5          THE COURT:  Which unfortunately I referred to the

6    last time we were here as W.T.F. v. Tyson.

7          That was an error, and thank God it didn't go to the

8    Fourth Circuit.

9          MR. JARVIS:  I have trouble with initials, I know,

10   and I am sticking with "Tyson."  I have eaten enough

11   chicken over the years and it is kind of easier to go

12   with.

13         You know, Tyson was the case, a process case, Ms

14   Edwards was relying on before, but look at the language

15   they quote from their brief, which is at Tyson, is, you

16   know, 65 F (unintelligible) -- The Court will look at

17   advisers, consulted by the directors, their

18   qualifications, how they were selected, the general topics

19   on which they advise, whether the advice was followed.

20         And then after that comes Willard.  I know Your Honor

21   took the position that it is unclear exactly what you are

22   looking at in Willard, but you look at more than just the

23   raw profit, you know.  Did they go to a meeting?  Without

24   going to what they said.  You have to look a little beyond

25   that.  And I think that is implicit in the W. L. R. v

1    Tyson.  In other words, how can you tell whether they

2    followed the advice unless you have a really good idea,

3    not in just some over-arcing sense, but what were these

4    guys told, and did they do it, or did they do something

5    else for some other reason?  And the case we are going to

6    present to Your Honor on process falls exactly in that

7    area.  We say, look at the process.  I mean, they are

8    going to point there.  Committee, they are going to say,

9    we do all those process things, but we are going to take

10   you through it, and we are going to say every point in

11   time where the Citibank, the adviser, made a

12   recommendation, or at least presented an option as a

13   favored option without necessarily recommending, but

14   steering the special committee, they ignored the Citibank,

15   and they went with what Hospitality wanted.  I will give

16   you a brief overview.  We sort of have three or four

17   areas.

18        I mean there are conflicts, I mean, it is undeniable,

19   right?  Mr. Knight is on both boards.  His son, Mr. Justin

20   Knight, is on both boards.  The management is all the

21   same.  There is clear conflict, and they know that.  Your

22   Honor previously denied a motion to dismiss, frankly, for

23   the existence --

24        THE COURT:  Slow down.

25        MR. JARVIS:  Previously denied a motion to exist

1    because of the existence of those conflicts.

2         They tried to fix it, I will grant you.  They came up

3    with a special committee and said, ah ha, we are going to

4    deal with the problems Your Honor somewhat identified in

5    the prior case, and we are going to do this special

6    committee.

7         But they picked Dr. Colton to head.  And the problem

8    with Dr. Colton -- and m I am sure he is a very nice

9    man -- but he has a heck of a lot of connections with

10    Mr. Glade Knight.  They have known each other by

11    Mr. Colton's admission since the early '90s.  I think

12    Mr. Knight testified since the early '70s.  They see each

13    other socially, putting aside their board

14    responsibilities, two or three times a year.  And in just

15    the last, I don't know, 12, 13, 14 years Mr. Glade Knight

16    has appointed Mr. Colton to seven different boards of

17    directors, a university, and then six entities controlled

18    by Mr. Knight, all of which have substantial fees.  And

19    Mr. Colton being retired -- and we can develop this for

20    record -- expedited -- but not even for -- seven different

21    boards, who were, you know, the last ten, mostly over the

22    last ten years -- seven different -- six of those boards

23    over the last ten years.

24         THE COURT:  But, you know, in your brief you say that

25    Mr. Knight started Southern Virginia University and put

1    Mr. Colton on the board there.  That is not exactly true,

2    is it?

3        MR. JARVIS:  I understood --

4        THE COURT:  My understanding is Virginia University

5    existed for a long time as a place called Southern

6    Seminary, right?

7        MR. JARVIS:  I will be honest with Your Honor, I will

8    take your word for it.  I am not familiar with that fact.

9        THE COURT:  You can ask Mr. Williams.  I am sure that

10   he drove down there from time to time in his undergraduate

11   days.  It was known as Southern Sem to people of

12   Mr. Williams' ilk.  And I am sure that -- I mean, it

13   existed.  He may have helped to revitalize it, but does he

14   get as the chairman of the board of trustees did he get to

15   appoint members to the board?

16       MR. JARVIS:  Well, my understanding -- Mr. Colton's

17   testimony was a tad unsure on this -- not unsure, a little

18   unclear -- he said first that he was, basically Mr. Knight

19   asked to be on the board, and then he said, well, actually

20   it was another member of the board who specifically asked

21   him, but I got the strong sense from his testimony that it

22   was in connection with Mr. Knight during the '90s that had

23   led to his being appointed to the board.  But I actually

24   consider that first, to be far, that is the university,

25   you know, it is something that socially (unintelligible)

1    obviously it is important to be on the board, but less

2    significant, I think that board, you know, social good, I

3    don't know how much you get paid to be on board of

4    trustees of a university -- if I was on one I wouldn't

5    care to get paid, I would just be happy to be on the board

6    of trustees, to be perfectly honest.

7         THE COURT:  You know, Buena Vista is the home of

8    Charles Manuel.

9         MR. JARVIS:  Chuck Manuel.

10        THE COURT:  Charlie Manuel.

11        MR. JARVIS:  Charlie.  Chuck, they actually call him

12   in the club.  I am a big Phillies fan, too.

13        THE COURT:  Are you?  These are tough days.

14        MR. JARVIS:  Very tough days.  Actually, I mean, you

15   asked about Chooch.  I was actually sort of happy to see

16   him go.

17        THE COURT:  He gets to be on --

18        MR. JARVIS:  Dodgers, he gets another play off run,

19   you know, he wasn't on the team next year anyway.  So, you

20   know, he has been a great name for us the last decade.

21   pretty much (unintelligible).

22        THE COURT:  I'm sorry.  Go ahead.

23        MR. JARVIS:  That is all right.

24        So, I don't think -- I think it is there, it is

25   certainly the beginning of the connection early 2000.  But

1      then there is Cornerstone, Glade Knight Company.  And then

2      there is Apple 5, Apple 7, Apple 8, Apple Hospitality, the

3      very acquirer here.  Mr. Colton only got off the board end

4      of '14.  Eight months later Hospitality is coming after

5      the company where he was head of the special committee.

6      And then Ten.  All of those, Mr. Colton testified he is

7      retired.  I don't know what his financial situation is,

8      but sooner or not (unintelligible).

9          THE COURT:  Slow down when you talk.

10         MR. JARVIS:  My point to you is not that Mr. Colton

11     is a bad guy, and that he was just sitting there looking

12     out for Mr. Glade Knight.  I mean, clearly there is some

13     reason for him to want to favor Glade Knight's interest.

14     He is a friend, has all of these economic interests -- and

15     mind you, the case that we cited in our reply brief, which

16     is a more recent case from the Delaware Supreme Court,

17     suggests those kind of holistic, you look at everything,

18     look at personal relationships, look at economic

19     relationships, are sufficient in fact.  That is a Delaware

20     County Retirement case versus Sanchez, Supreme Court of

21     Delaware from --

22         THE COURT:  That case, though, was on a motion to

23     dismiss, wasn't it?

24         MR. JARVIS:  Yes, it was.

25         THE COURT:  So here we have got a different

1    procedural posture, at least at this stage, looking at a

2    broader record than just a motion to dismiss.

3        MR. JARVIS:  You are.  But the key point that the

4    Chief Justice was trying to make there is, you can't just

5    parse each little thing and say well, that is not enough,

6    that is not enough, you have to look at sort of all the

7    evidence, and the reason to believe that this particular

8    director is going to -- whether consciously or

9    unconsciously -- favor the interests of someone on the

10   acquiring side versus someone on the company where he was

11   a director.  I think there is enough here to suggest that

12   might be the case.

13       So what does that suggest to us?  Well, then let's

14   look at what happened.  I will go briefly.  I have more

15   (unintelligible).

16       THE COURT:  That is not just Mr. Colton.  There are

17   other members of that committee.

18       MR. JARVIS:  Mr. Colton was the chairman.  And that

19   suggests, I think he testified he had the ability to lead,

20   not in a decisional sense, but to lead.  He led the

21   process.  He was the primary point of contact.  Looking

22   through the record Mr. Colton was the most involved.  Not

23   to say Mr. Hall and Adams weren't, they were, but

24   Mr. Colton led.

25       But, it is the what happened.  Where did they go?

1    What was the process?  Did they follow the advisers?  Let

2    me just give you a couple of quick ones.  And we will go

3    through, and I -- and I will cite for for the record more

4    later, I don't do that now, I will give you an overview.

5         So on the -- first thing he did was, what are we

6    going to do here?  We are dealing Hospitality, or are we

7    going to do a broader market check?  Citibank has put

8    aside, said, hey, do a broad pre check, that is the most

9    investor friendly thing.  And I will cite you to that.  At

10   some point in like around February 11 they got an offer

11   from Hospitality.  Mr. Jones, deposed, said, your know, we

12   told that offer was insufficient, and we were going to --

13        THE COURT:  That is not what he said.

14        MR. JARVIS:  Actually, he did.

15        THE COURT:  No, that is not what he said.

16        Mr. Young said something a little more ambiguous than

17   that.

18        MR. JARVIS:  110 and 111, I believe he used the word

19   "insufficient," because I typed that yesterday my own

20   self.  Let me get you the exact quote.  I won't try to

21   mislead you at all.

22         Look at plaintiff's Exhibit 3 of Mr. Young's

23   deposition.  Look at pages 110 and 111.

24        He says -- I am looking page 110 line 18.

25        Question:  "What kind of verbal guidance did you

1   provide to Wells Fargo in connection with the economics

2   after the February 11 audit?"

3       Line 21.

4       Answer:  "That it was insufficient, and that the

5   special committee is looking for more value."

6       And then he went and says, "Whoever suggests that the

7   offer was not increased, the special committee would

8   consider other alternatives, such as a market check or

9   option."

10      Answer:  Now I am on page 111.  "I do recall that we

11  had a general discussion with Wells Fargo special

12  committee also evaluated doing broader market checks.

13  Also established specifically after the February 11 --

14      THE COURT:  Slow down.

15      You need to slow down, sir.

16      MR. JARVIS:  I apologize.  I get wound up.

17      THE COURT:  We are trying to take this down here to

18  make a record for the National Archives.

19      MR. JARVIS:  Right.

20      Starting at 110, line 24.

21      "Was there ever a suggestion that the offer was not

22  increased, that the special committee would consider other

23  alternatives, such as market check or options?"

24      Answer:  Line three.  "I do recall that we had a

25  general discussion with Wells Fargo that the special

1   committee is also evaluating doing a broader market check.

2   I don't know if that was specifically after the February

3   11 letter or prior.

4       And what was Wells response to that?"

5       Answer:  Line eleven on page 111.  "That it was not

6   Hospitality's desire to participate in any broader market

7   check."

8       THE COURT:  Well, okay.  But then he was asked

9   whether the offer from Hospitality was necessarily

10  insufficient.  And he said, could we get more from

11  somebody else?  He says, maybe, but who knows?  Of course

12  that was one of the reasons you put it for a pre-bid.  But

13  what is the difference between putting it out for a

14  pre-bid and a post bid?  I mean, presumably if the company

15  has got some value, it has the same value afterwards it

16  had before.  Right?

17      MR. JARVIS:  Well, there is a lot of evidence out

18  there in the world.  I can go into it in detail right now

19  if Your Honor wants to hear it now or later as to the

20  benefits of a pre market check versus a go shop.

21  (unintelligible).

22      THE COURT:  Don't go into all the evidence in the

23  world, now.  We save that for later.

24      MR. JARVIS:  So, we want to, our first point is,

25  that, look, they had a chance to do it, they even

1    suggested pre market check.  (unintelligible) Hospitality

2    says no, no, check.  Perhaps -- that, you know, that

3    February 11 order I just, offer, I just referred, to was

4    insufficient.  Mr. Young's language.  But it had a big

5    problem.

6         THE COURT:  You need to slow down.

7         MR. JARVIS:  One really big mess.  That one really

8    big mess was all stock.  And all stock implicates

9    something called a roll up (unintelligible), which again I

10   will go into it in far more more detail later -- but

11   (unintelligible) position was very valuable potentially to

12   shareholders.  Incorporated in the bylaws, not Mr. Knight

13   or his lawyers, requirement basically imposed by Virginia,

14   by Virginia, I believe.  It is a model provision adopted

15   by an outfit called NYSSA, or, rather, I'm sorry, NASSA.

16        THE COURT:  What does it allow them to do?

17        MR. JARVIS:  What?

18        THE COURT:  What does it allow them to do?

19        MR. JARVIS:  The broad provision requires that, you

20   know, what is called a roll up, in other words, you take

21   an untraded REIT and bringing it up.  You have to, A, have

22   to, mandatory, have it appraised.  After the appraisal

23   takes place then the roll up, the person sponsoring the

24   roll up, has to offer two options, the second of which has

25   two prongs.  One, you have to say, okay, you have seen the

1    appraisal, you can still take the stock we gave you.  B,

2    if you don't want to take the stock we gave you, then we

3    have to offer you one of two alternatives; either, A, the

4    cash, your pro rata value of the appraisal; or keep your

5    shares.  And that second option is at the roll up

6    offerer's discretion.  So they don't -- they can either

7    say, take cash or take -- keep your shares.  It is not the

8    shareholders' discretion.  It's the roll up offerer's

9    discretion.  It is a little unclear when you read the

10   bylaws, to be honest with you, but I went back to the

11   actual underlying proposal from which it is closely taken,

12   and in a footnote that makes clear that it is a roll up

13   offerer's option on whether it is cash or keep your

14   shares.

15        And that is really valuable, right?  It is really

16   what Mr. Quinn, who we talked about at the opposite, was

17   asking for -- he said -- repeated in his deposition.  I

18   want independent value.  I want someone to tell me it is

19   not -- to get paid for getting the deal done, what this

20   thing is worth.

21        And in this particular instance, the initial offer

22   the 11th, would have done.  Somewhere along the way

23   somebody told, hey, Hospitality, hey guys, remember the

24   roll up provision, you keep all cash or all stock -- just

25   the way their provision is drafted -- then, you know, you

1    are stuck with this provision.

2        So they come back on March 4 with a revised offer,

3    but nothing to intervene, no intervening counter, they

4    change their offer to one that had 91 percent stock to

5    nine percent cash.  And Mr. Young asked them, hey, why are

6    you changing your offer?  They told them, we don't want

7    the roll up provision.

8        THE COURT:  Okay.  I understand that point.  Let's --

9    this is a brief opening.

10       MR. JARVIS:  What?

11       THE COURT:  This is a brief opening, so just what is

12   your next point beyond the roll up?

13       MR. JARVIS:  So that (unintelligible) open.  As you

14   know, you as you know from our briefing, in our view they

15   gave it away, (unintelligible) enforce its value, they

16   just said, okay, fine, we will respond.

17       What is the next thing that happened?  Well, the next

18   thing that happens is we finally get to a price.  And, you

19   know, there is a first real offer would be the 11th.  The

20   next offer is March 4th.  Minutes of board, say, hey,

21   there is really no difference, there is no economic

22   difference between the 11th and the 4th.

23       Then their final, that is final is on the 18th, which

24   was -- the fourth, the fourth was one dollar plus point

25   501 shares.  They come back finally on the 18th, their

1    best and final, one dollar plus point (unintelligible).

2    And ultimately, as I am sure Your Honor is aware, the deal

3    was struck for two thousandths of a share at point 522.

4        So what did they really get?  What did the

5    negotiations get them?  The only difference between what

6    they offered on the 11th, which was really their first

7    real offer, and what they paid, two percent.  They paid --

8    the whole negotiation got two percent.  So what did they

9    really get?  Nothing.  They paid off at value price.

10       THE COURT:  They got two percent.

11       MR. JARVIS:  No, two percent is effectively de

12   minimis.  It is effectively Hospitality's price.  So what

13   do we say about the process?  The structure of the

14   negotiation, single bidder, Hospitality wanted, that is

15   what happened.  They structured a deal.  Stock and cash.

16   Hospitality wanted that to happen.  The price that was

17   paid, essentially Hospitality ruled the price, a little

18   bump, two percent, that is not nothing, I grant you, but

19   not a lot either.  Two percent.  They paid Hospitality's

20   price.

21       What will they tell you they got?  They got the deal

22   protection.  We got the go shop.  I will go into more

23   detail -- I think there is a lot of evidence out there, if

24   you look and see, from some of the Dell opinion, which I

25   will go through with Your Honor a little bit.  Not the

1    language --

2        THE COURT:  This is your opening.  You don't have

3    to --

4        MR. JARVIS:  You know, so we will go through it

5    later.

6        But the go shop isn't worth very much, particularly

7    given the way the merger structured, we have something

8    called matching rights.  In the contract, we have what

9    they call matching rights, which means that if somebody

10   comes in to go shop and with a superior bid, they would

11   have be required to negotiate more with Hospitality,

12   match.  We are matching rights.  Go shop, no one is

13   going -- when you know there are matching rights no one is

14   going to bother, because they know they will get matched

15   if they have a fair offer.

16       So the process simply didn't get anything but what

17   Hospitality wanted from a conflicted committee.  And then

18   from there we go to, and given that process, which, okay,

19   even Your Honor would say, I see your problem, but it is

20   not enough for me.  I say, great.

21       But let's look at the disclosure.  Given the process

22   it is tainted.  Clearly tainted.  Even you say it is not,

23   I think it is bad enough, but that is Your Honor's call.

24   Then you need disclosures, the need for disclosures was

25   never greater.  And we will go through in some gory detail

1    more, maybe not, but here the disclosure just didn't give

2    enough.

3        Now, they want to say, yes, but you don't have to,

4    you really just want them to be able to conduct their own

5    independent evaluation.  Not -- no, we don't want to be

6    able to conduct, you know -- those shares, most of these

7    shareholders can't do that.  But they have to be able to

8    see enough -- there are things -- and we will go through

9    it -- that any shareholder could or would understand, or

10   might understand, that would provide them the ability to

11   judge whether Citi's opinion is something they can rely

12   on.  You remember right now the untraded REIT is the

13   parent and the only indicia this is a reasonable value --

14       THE COURT:  It not exactly a parent.

15       MR. JARVIS:  Well, a related entity, right.  It is

16   not a parent.  Not a parent.  Related.

17       THE COURT:  It is a related entity.

18       MR. JARVIS:  Related.  People who know this business

19   better than anyone.  And the only indicia that might be a

20   fair price is the Citi opinion.  And the Citi opinion is

21   provided in pretty broad terms.  There are a few things,

22   they say, oh, my God, it is 140 pages, 141, but how much

23   more do you want?  Probably only about two pages of stuff

24   that would provide people the ability to provide

25   additional judgment.  For that reason alone we think that

1    this joint deal, should be void for disclosure, if nothing

2    else.

3        Obviously we will talk later about irreparable harm.

4        THE COURT:  So we have got conflict, we have got

5    inadequacy of disclosure.  Are there any other factual

6    matters that you want to allude to in your opening that

7    would go to the validity of the deal?

8        MR. JARVIS:  Ah, yeah, well, you know, the test is

9    obviously so far, success on the merits.  We have to show

10   irreparable harm.  We think clearly disclosures do that.

11   We don't think they really address that.  Their primary

12   counter point is, yeah, but the balance of the harms are

13   going to be that, you know, Hospitality could walk.

14   Mr. Justin Knight says in his declaration that Hospitality

15   might walk.

16       THE COURT:  Well, they might walk.

17       MR. JARVIS:  I want to argue that a little bit, too,

18   because I think that the declaration he put in can be,

19   maybe again he can do it on the stand, we will see, can

20   be, you know, quibbled with, if you will.  That would

21   really be what they would do.  Also, Mr. Young's comments,

22   albeit elicited from me, by me, you know, that is taking

23   their desire to walk with a grain of salt.  What he

24   informed us.  I think also informs the discussion.  So we

25   are going to suggest that the real harm is the idea

1    Hospitality might walk if Your Honor enjoins or requires

2    more disclosure is not something that is truly likely in

3    this world.

4        THE COURT:  All right.

5        MR. JARVIS:  That is all I have got.

6        THE COURT:  All right.

7        Thank you very much.

8        Let's hear a brief opening on behalf of Glade Knight,

9    Mr. Colton -- or is the Dr. Colton? -- Hall, Adams,

10   Keating and Apple Ten.

11       MS EDWARDS:  Thank you, Your Honor.

12       As you recognized, you and I have quibbled about the

13   Willard case, but I am a champion of Willard today.  I

14   think we are not talking about discovery today.  We are

15   talking about what the law of Virginia is with how you

16   measure a director's fiduciary obligation and their

17   discharge of those obligations.  And Willard is the road

18   map that gets us right into 13.1-690, which is where we

19   belong, because, very significantly, the only claim in

20   this case is the breach of fiduciary duty claim.

21       We are not hear under section 14(a) claims.  We don't

22   need to quibble about what the Federal Securities laws

23   require in a proxy.  Plaintiffs have not chosen to make

24   that claim.

25       THE COURT:  Well, I understand, but they are allowed

1    to say, I think, that the disclosures were inadequate at

2    some level.  I mean you couldn't lie in the disclosures.

3         MS EDWARDS:  Absolutely, Your Honor, but what

4    disclosures were required under Virginia law is dictated

5    by the Virginia code, not by the Federal Securities law.

6    There is a much broader --

7         THE COURT:  Also some, I mean, fiduciary aspects of

8    things also play into the nature of the disclosures

9    because, you know, a fiduciary has an obligation to be

10   honest and open with people for whom he or she is a

11   fiduciary.  But I agree with you that Willard is a big

12   problem for the plaintiff in this case because essentially

13   Willard says you can give the company away to your son for

14   a lot less than somebody else is offering, and we are not

15   going to look behind that to see whether there is more

16   money available.  That is the holding of Willard, isn't

17   it?

18        MS EDWARDS:  Well, Willard, the holding in Willard is

19   that Virginia is not a Revlon state.  You don't have to

20   get the best price.  Absolutely, Your Honor.  And we are

21   not talking about that.  Although, Mr. Quinn in his

22   deposition, that is his motivation.  He wants -- he

23   doesn't think that the price is necessarily fair, he said.

24   And he wants a third party to appraise it, which is

25   exactly where he can get with his statutory appraisal

1    rights, which he will have.  But, that is an issue that

2    will --

3    THE COURT:  An issue that goes to irreparable --

4    well, it doesn't go to irreparable harm, because at the

5    end if the sale goes ahead, or if the merger goes ahead --

6    and based on the information you have provided me it looks

7    like it will fly through pretty easily -- then there won't

8    be any A Ten any more.  And I think that that is sort of

9    the quintessential to irreparable harm, the absence of

10    existence.

11    MS EDWARDS:  Well, Your Honor, absolutely.  If the

12    merger goes through the Apple Ten shareholders will cease

13    to be Apple Ten shareholders.  They will get their dollar

14    in cash, plus point 522 shares in Apple Hospitality.  That

15    will give them the ability, because Apple Hospitality is

16    publicly traded, to, you know, have liquidity to get their

17    money in or out of the investment when they want.

18    But not to belabor, because this is a short opening,

19    an injunction is a very serious and significant remedy.

20    And it will have significant consequences here for all of

21    the Apple Ten shareholders.

22    THE COURT:  They have got to show a strong likelihood

23    of success on the merits, and that is where Willard versus

24    Monetta is a problem for them.

25    MS EDWARDS:  That's absolutely right, Your Honor.

1       I can quibble with a lot of what Mr. Jarvis just

2   said.  I think the potential conflict that he raises is

3   not present.  They rely heavily on the Sanchez case out of

4   Delaware.  I would suggest to Your Honor that case is

5   decidedly different than the facts in this case.

6       In the Sanchez case the director at issue who was

7   allegedly conflicted was employed, as was his brother, by

8   a company that was controlled by the interested party.

9   There is no allegation here that Mr. Colton in any way,

10  shape or form, has that sort of financial tie to

11  Mr. Knight or anyone in the management of the Apple REIT

12  company.

13      Mr. Colton, as you will see when we play his

14  deposition, is a man of integrity, he is trying to do the

15  right thing for the Apple Ten shareholders.  The fact that

16  he has in the past served on other boards of other Apple

17  companies makes him knowledgeable about the REIT industry,

18  but it doesn't create a conflict.  Knowledge isn't

19  conflict.

20      He is independent.  He believes himself to be

21  independent.  And if he were not, Your Honor correctly

22  points out there are two additional members of the special

23  committee.  The testimony is crystal clear that the

24  special committee acted unanimously, and that Mr. Colton

25  did not strong-arm the special committee or dictate its

1    actions.

2         This is a process that is exemplary.  The special

3    committee was independent.  They engaged in a fulsome

4    process.

5         THE COURT:  Fulsome.

6         MS EDWARDS:  Absolutely, Your Honor.

7         THE COURT:  That is not a word you hear very often.

8         MS EDWARDS:  They had 31 minuet-ed special committee

9    meetings between the first letter from Apple Hospitality

10   and the time the merger agreement was signed.

11        THE COURT:  But nevertheless, they filed a knee-jerk

12   suit.

13        MS EDWARDS:  They didn't file a knee-jerk suit.  The

14   plaintiff did.

15        THE COURT:  That is what I said.  "They" being the

16   other side.

17        MS EDWARDS:  Absolutely, Your Honor.

18        THE COURT:  And your use of adjectives is wonderful.

19        MS EDWARDS:  Thank you, Your Honor.

20        THE COURT:  But not terribly persuasive.  Adjectives

21   don't carry the day, the facts do.  But I think your use

22   of facts is good, too.  I think they have just got

23   problems with Willard.

24        MS EDWARDS:  I absolutely agree, Your Honor.  And if

25   there are specific points you would like me to address, I

1    will be happy to do that.  Otherwise, I will move on to

2    the next phase.

3        We do have a clip of Mr. Colton's deposition which we

4    are prepared to play.  We also have Mr. Glade Knight and

5    Mr. Justin Knight, both of whom are here and available to

6    testify.

7        THE COURT:  I will be glad to hear from them.

8        MS EDWARDS:  All right.  Thank you.

9        THE COURT:  Now, does Justin Knight, Mr. Buckley,

10   Mr. McKenny, Mr. Peery and Apple Hospitality want to make

11   a brief opening?

12       MR. GATELY:  Yes, Your Honor.  I have never passed up

13   the opportunity to talk.  I will try to be brief.

14       THE COURT:  Who are you?

15       MR. GATELY:  I am Mark Gately, Your Honor.

16       May it please The Court, I am from Baltimore.  I

17   don't know if you are going to ask about the Orioles or

18   not.

19       THE COURT:  No, I have nothing to say about the

20   Orioles.

21       MR. GATELY:  I thank your law clerk and I thank you,

22   I was lucky enough to be a law clerk years ago, and I know

23   how much work these things are for The Court, and I

24   genuinely appreciate what it takes.

25       Your Honor, as all the lawyers say, I will try to be

1    brief; and I will try to be brief.

2        One question you had were on the number of shares.

3    You have got the Apple Ten shares.  Apple Hospitality has

4    170,670,720 shares.

5        Just --

6        THE COURT:  How many?  170 million, did you say?

7        MR. GATELY:  Yes.  170,670,720.  I think you already

8    have the Apple Ten.

9        THE COURT:  Right.  Okay.

10       MR. GATELY:  This is obviously substantially, very

11   serious, dangerous day for the shareholder of Apple Ten.

12   I don't stay that with exaggeration.  They are, to state

13   the obvious, the owners of Apple Ten.  There have been

14   many votes cast already, obviously, since the deadline

15   date is the 31st, but voting can take place before that.

16   There have been votes cast on the Apple hospitality side

17   and on the Apple Ten side.  And really, what is being

18   asked here --

19       THE COURT:  Apple Hospitality, that has been in

20   existence how long?

21       MR. GATELY:  It is the roll up of.

22       THE COURT:  That is the one I had the last time, the

23   Apple --

24       MR. GATELY:  I wasn't in the one last time, but I

25   think the answer is "yes."

1        THE COURT:  7, 8, and 9 became Apple Hospitality.

2        MR. GATELY:  That's correct.

3        THE COURT:  Not long after that case was settled, to

4   everyone's shock and surprise they had a public offering.

5        MR. GATELY:  Apple Ten, public offering was,

6   actually, I think the effective date of the S-11 was

7   January of 2011.  But it was in 2010 --

8        THE COURT:  Right.

9        MR. GATELY:  -- that it was in there.

10       No question, what we are asking The Court here for is

11   take the vote away, take the option away from the people

12   who own the company.  And I don't have to tell you, Your

13   Honor has been doing this for a while, that is a pretty

14   serious request.  A pretty high standard in the Fourth

15   Circuit.  I show my age by saying it is the Blackwelder

16   standard.

17       THE COURT:  No, it is not the Blackwelder.

18       MR. GATELY:  I know it is not, but it is the factors,

19   likelihood of success, balance of harm, public interest,

20   and irreparable harm.  On the irreparable harm, since you

21   asked the question, Your Honor, there is a damages action

22   here.  And the plaintiffs have made it clear that they

23   intend to pursue it, and would like a lot of damages.

24   Apple Ten will not disappear after this transaction.  This

25   is in the proxy statement.  It will be merged into the

1    acquisition subsidiary which exists, and it will remain as

2    a wholly-owned subsidiary of Apple Hospitality, will not

3    be rolled up into our Apple Hospitality.  So it will still

4    exist as a company.  The difference will be it will be

5    wholly owned by Apple Hospitality if the deal goes through

6    rather than being owned by the public shareholders, who

7    will have sold their shares.

8         Some questions you asked, Your Honor, I will try to

9    answer just in the interest of time.  The series B shares.

10   The series B shares were what is probably best described

11   as founder shares.  They were issued to Mr. Glade Knight.

12   He paid $40,000 for them, which now looks like a great

13   investment.  At the time he also guaranteed a $400,000

14   loan, and he was the one who initiated the public

15   offering.

16        THE COURT:  But there were 87 million class A shares

17   issued, right?

18        MR. GATELY:  Yes, but --

19        THE COURT:  These were ten bucks a pop, is that

20   right?

21        MR. GATELY:  10.5411, Your Honor.

22        THE COURT:  So other people put in $870 million.

23        MR. GATELY:  Yes, Your Honor, but the point is, when

24   he got those founder shares everyone knows Glade Knight

25   was to play an extremely important role in whether Apple

1    Ten was successful.

2         THE COURT:  I think -- did Mr. Knight own any of the

3    class shares of, the class A shares of A Ten?

4         MR. GATELY:  Well, he does because of the conversion.

5         THE COURT:  Well, okay.  Before the conversion, which

6    hasn't happened yet, since the merger hasn't happened.

7         MR. GATELY:  I believe he has bought some of the

8    class A shares, and he can explain that.

9         THE COURT:  You probably know the answer.  How many

10   class A shares does he have?

11        MR. GATELY:  I don't exactly know that answer.  I

12   think he may have spent a million dollars on this, Your

13   Honor, but I am not positive of that.

14        THE COURT:  How about Justin, does he have any class

15   A shares?

16        MR. GATELY:  I don't know the answer to that, Your

17   Honor.

18        THE COURT:  You don't know that?

19        MR. GATELY:  I probably should, but I don't.

20        THE COURT:  Might be a good thing to know?

21        MR. GATELY:  It probably would be a good thing to

22   know.

23        THE COURT:  The class A shares awarded 8 percent

24   dividend per year, is that right?  That is pretty good.

25        MR. GATELY:  That is high.

1          THE COURT:  It is.

2          Did Apple Ten use Apple advisers as its sort of

3    management company?

4          MR. GATELY:  Yes.

5          THE COURT:  And that is a Mr. Knight company, too,

6    right?

7          MS EDWARDS:  Yes.

8          THE COURT:  How much did they pay to Apple advisers

9    over the years?

10          MR. GATELY:  I don't know the exact rate, but would

11    have paid, whatever normal fees are.

12          THE COURT:  Is it like, you know, ten thousand

13    dollars a year?

14          MR. GATELY:  It would have been more than that.

15          THE COURT:  A lot more than that, wouldn't it?

16          MR. GATELY:  Yes.

17          THE COURT:  How much more?

18          MR. GATELY:  I don't know.

19          THE COURT:  Would it have been a hundred thousand

20    dollars a year?

21          MR. GATELY:  Probably would have been that or more,

22    but obviously they were getting services for that.

23          THE COURT:  I understand they were getting services

24    for that.  And presumably Apple advisers was making a

25    profit on that.

1       MR. GATELY:  Presumably, yes.

2       THE COURT:  You don't know how much they paid to

3  Apple advisers?

4       MR. GATELY:  I don't know exactly, Your Honor.

5       THE COURT:  Somebody know that?

6       MR. GATELY:  Sure.  Mr. Knight knows that.

7       THE COURT:  We will find out forthwith then.

8       MR. GATELY:  Yes, Your Honor.

9       I mean, those are, obviously, Your Honor, legitimate

10  questions, but to me --

11      THE COURT:  What do Apple Hospitality shares trade

12  for now?

13      MR. GATELY:  They don't trade.  I mean, that is one

14  of the key factors here.

15      THE COURT:  No, no, no.  I thought Apple

16  Hospitality --

17      MR. GATELY:  No, Apple Hospitality shares --

18      THE COURT:  They were about 19 bucks at one point.

19      MR. GATELY:  As of yesterday Apple shares were

20  trading at $19.71, meaning that the per share value that

21  the Apple Ten shareholders would get today is $11.29 as

22  opposed to the $10.85 number that Citibank used.  Meaning

23  that because of the share price increase of Apple

24  Hospitality the value of this deal is now 38 point

25  8 million higher than when it was announced.

1    And we heard, and as Your Honor knows, we are not a

2    Revlon state, but nevertheless we heard about post market

3    check, pre market check.  Perhaps one of the most telling

4    things is in the -- it seems like you have read the Young

5    deposition -- but one of the things he said in the post

6    market check, Blackstone had actually said, did you come

7    to us earlier?  But then they looked at the price -- and

8    this is on page 219 of the deposition of Mr. Young --

9    Blackstone came back and felt that this was a full offer.

10   And they, Blackstone -- used to playing in the major

11   leagues -- had to ability to bid above that level.  Which

12   in addition to Citibank and Baird and Wells Fargo is very

13   telling.  Particularly since Blackstone has purchased one

14   of these entities in the past.  So the idea that this go

15   shop afterward was just not worth anything I think is

16   completely incorrect.  I think it is very telling in terms

17   of valuing this deal to know what Blackstone said about

18   it.

19        THE COURT:  You know, the problem with this case from

20   your standpoint -- may not be today -- but the plaintiffs

21   have asked for damages and damages for fiduciary

22   violations.  And the whole thing -- that is going to go to

23   a jury -- and the problem with the case from your

24   standpoint is that there are too many Knights on both

25   sides of the case.  And I think that jurors are going to

1    think that Mr. Glade Knight made out like a bandit on this

2    because, as I just pointed out to you, somebody else put

3    up $870 million to get this company going.  And suddenly

4    he is making $65 million out of the deal by converting

5    essentially worthless securities into class A securities.

6    And I think people are going to scratch their head about

7    that and say, you know, I am not so sure about that.  And

8    somebody may get a substantial damage award against them.

9        MR. GATELY:  As one of my mentors told me, courtrooms

10    in America are dangerous places to be, so I can't disagree

11    with that, Your Honor, although, some comments are, Glade

12    Knight had absolutely nothing do with the proceedings with

13    the special committee here, A.  And B --

14        THE COURT:  You say that.  I have trouble believing

15    that.  Do you believe that?

16        MR. GATELY:  Yes.  I think if you hear from him you

17    may not, Your Honor, with all due respect.  I have no

18    problem.

19        Also, we hear constantly that his interests were

20    different from those of the other stockholders of A Ten.

21    What could possibly be further from the truth?

22        THE COURT:  What could possibly be closer to the

23    truth?  His interests is he turns his ten-cent shares into

24    $10 shares.

25        MR. GATELY:  But that is my point.  Whatever the

1  higher the price for the common shareholders, the more he

2  gets.

3     THE COURT:  He could sell the company, even though he

4  might be better off as a non-sold company.  I don't think

5  you ought to try to paint, not to me at least, that Glade

6  Knight is a saint.  He may be -- I am sure he is a good

7  man.  He has rescued Southern Sem from, or helped rescue

8  it from the doldrums of being a dead institution in Buena

9  Vista.

10     MR. GATELY:  Yes, Your Honor.

11     THE COURT:  But he did pretty well in this whole

12  thing.  I think some fast-talking Philly lawyer could tell

13  some jurors that he made out like a bandit in this.  I

14  don't know Glade Knight.  Maybe he did, maybe he didn't.

15  And God knows he has been very successful in business, and

16  hats off to him for that.

17     MR. GATELY:  But -- I understand, Your Honor.  I

18  mean, I have tried enough jury cases to understand.  But

19  the other side of it is Apple Ten wasn't successful by

20  accident.

21     THE COURT:  Absolutely.  And it was successful

22  because Mr. Knight and his son Justin applied their very

23  good managerial tools to it.

24     MR. GATELY:  Exactly.  That is the other side of

25  that, and were rewarded for it as were the common stock

1    stockholders on the irrepairable harm.  We have already

2    mentioned that.

3        THE COURT:  Let me ask you that.  Are the common

4    stockholders, I mean they have gotten their eight percent

5    dividend, which is nothing to snort at.

6        MR. GATELY:  Not at all.

7        THE COURT:  But that has been for just a couple

8    years, right?

9        MR. GATELY:  Well, they have only because they

10   haven't existed for that long, but, yes, Your Honor,

11   certainly.

12       THE COURT:  Right.  But, are the -- are the A Ten

13   shareholders making a profit for themselves on this sale?

14       MR. GATELY:  They are now, Your Honor, with the price

15   that I told you it is now.

16       THE COURT:  Getting this 19 and a half dollars a

17   share, whatever it is.

18       MR. GATELY:  Well, what they will get will after you

19   convert, it is now --

20       THE COURT:  Eleven bucks a share.

21       MR. GATELY:  $11.29, which is, as I said, $38 million

22   more than what was used in the calculation at the time of

23   merger.  Yes, they definitely will.

24       Another very important thing to consider is that A

25   Ten is publicly issued, but non traded.  So --

1    THE COURT:  Not liquid.

2    MR. WILLIAMS:  And this gives them the liquidity.

3    They may hold it, and as we have said, the dividends were

4    great.  But they can't just go out and sell it.

5    MR. GATELY:  Thank you very much, Your Honor.

6    I appreciate it.  I had to talk about the Orioles,

7    but it sounds like you Phillies fan.

8    THE WITNESS:  I am, and I like the league where the

9    pitchers hit.

10    MR. GATELY:  I do, too.

11    THE COURT:  Thank you.

12    Now, the plaintiffs do not have any witnesses to

13    offer today, so I will then hear from, I guess first we

14    will hear from A Ten and its affiliated entities or

15    individuals, which would be Glade Knight, Dr. Colton,

16    Hall, Adams and Keating.

17    Ms Edwards, do you have some evidence to offer?

18    MS EDWARDS:  Yes, Your Honor.  We have some portions

19    of the deposition testimony of Dr. Colton.

20    (Video of Kent W. Colton played)

21    THE COURT:  Okay.

22    So far it has been a pretty good advertisements for

23    McGuireWoods.  All right.  Thank you.

24    Do you have other evidence you want to put on?

25    MS EDWARDS:  Yes, Your Honor, we do.

1          THE COURT:  Now would be the time.

2          MS EDWARDS:  Then we call Mr. Glade Knight.  All

3    right.  I will ask you to place your left hand on the

4    bible, raise your right, and face the clerk, if you have

5    no objection to swearing on the bible.

6          THE WITNESS:  I love the bible.

7          THE COURT:  Well, okay, but that doesn't mean -- a

8    lot of people love the bible and for that reason don't

9    want to swear on it.

10                        GLADE KNIGHT

11            WAS SWORN AND TESTIFIED AS FOLLOWS:

12                     DIRECT EXAMINATION

13   BY MS EDWARDS:

14   Q    Would you tell Judge Gibney about your relationship

15   with Mr. Colton and how he came to serve on the board of

16   Apple Ten?

17   A    Sure.  I was impressed with his testimony.  His dates

18   are probably correct.  I met him a long time ago.

19         THE COURT:  I hope you are not too impressed with his

20   practicals.  I thought he mentioned the early '90, which

21   was, according to him, 15 years ago.

22         THE WITNESS:  I think we met before that.

23         We did meet at a church meeting.  Our church is very

24   large.  It is world wide.  I don't attend meetings other

25   than some leadership meetings with him.

1       But, very impressed with him as to his professional

2   background, his work with the home builders.  I was

3   impressed with his credentials education wise were very

4   impressive.  I found him and continue to find him just an

5   outstanding individual.

6       THE COURT:  Is he a doctor?

7       THE WITNESS:  He has a PhD in economics, I think from

8   Harvard.  Does a lot of, I think he still does research

9   for Harvard in their housing --

10      THE COURT:  Thank you.

11      Go ahead.

12  BY MS EDWARDS:

13  Q    How did he come to be on the Apple Ten board?

14  A    I asked him to be on Apple Ten board.  I had -- he

15  had served with me, as he indicated, at Southern Sem,

16  which -- it has a unbelievable history.

17      THE COURT:  Yes, it does.

18      THE WITNESS:  And we won't get into that story, but

19  it was rescued.  I led that charge.  Ended up being the

20  chairman of the board for 20 years at the University, and

21  it has been a remarkable experience.  The State of

22  Virginia actually helped out a little bit, and sent some

23  money to it.

24      THE COURT:  Do they still have an equestrian program?

25      THE WITNESS:  That is a sad thing.  I am a horse

1    lover.  That is why I went there.  I went there because I

2    enjoyed the equestrian side, had a friend that asked me to

3    go up and take a look at it, and we did.  I had no idea

4    what the future would be, but it is pretty impressive.

5          THE COURT:  Okay.  Sorry.  Go ahead.

6          MS EDWARDS:  All right.

7    Q    Do you have any financial ties with Mr. Colton?

8    A    No.

9          THE COURT:  Did you have any role in naming the team

10   of Southern Virginia University the "Knights?"

11         THE WITNESS:  Sure.  Sometime I would like to tell

12   you the whole story.  I didn't intend to be involved with

13   the University.  When we took the University over -- and

14   it lost its accreditation from SAGA and performed such a

15   wonderful, wonderful service up there.  Their mascot was

16   the Fillies.  And so they had little horse, all girl's

17   school at one time, and so I had this dream since we

18   became co-educational that it would be the Colts and the

19   Fillies.  So, I went to a group of the students and said,

20   I have came up with a mascot.  I would like to have the

21   Colts and the Fillies, and I would like to have a couple

22   little horses bronzed.  And they said, the first student

23   body was only 75 kids.  They said we have already met, we

24   have our mascot, and it is the "Knights."  And I said, no,

25   I really don't want that.  And they said, that is too bad.

1   It is the "Knights."

2       So with that, with pride when I go to the games, Go

3   Knights, it is pretty impressive.

4       THE COURT:  Okay.  Go ahead.  I am sorry.

5   BY MS EDWARDS:

6   Q    Mr. Knight, could you explain to The Court what role,

7   if any, you had in connection with the negotiations for

8   the Apple Ten Hospitality merger?

9   A    Very difficult for me.  I really didn't have a part

10  in that.

11      We did -- we did follow the independent rules.  I

12  feel like I understand real estate and take very seriously

13  my responsibility to the shareholders.  Take my

14  responsibility to Mr. Quinn very seriously.  This is

15  costing shareholders money.  That bothers me as to the

16  great -- to a great extent.

17      But, the role that I played in it was to remove

18  myself from the process.

19      I, obviously, knew the offers as they went out

20  publicly.  And I did not vote.  Did not vote in the

21  meetings.  It was really a hard process for me to not be

22  involved.

23      I do support, and I think some -- just a little bit

24  of clarity -- this is not a sale.  We have done ten public

25  non-traded, and then some of them came, Cornerstone was

1    traded on the New York Stock Exchange.  We have done ten

2    of them.  And this is, as a shareholder in Ten, they still

3    are shareholders.  They get cash.  They have received

4    today $4.61 in dividends.  $11 investment.  And my shares

5    and Mr. Quinn's shares go into a three and a half time

6    larger publicly traded, very successful company, very

7    large company, and they have greater diversification.

8    They don't have to sell their shares.  But they can make

9    that decision on their own.  It takes out of my hands the

10   responsibility of doing the sale.  And we have looked

11   at -- we look at everything, that is why we sold four of

12   them separately.  If we can get the highest and the best

13   price, that is what we do for our shareholders.

14   Q    But in this case, Mr. Knight, did you have any role

15   in the negotiations between Apple Ten and Apple

16   Hospitality about a potential merger?

17   A    No, I did not.

18   Q    You have heard a lot about the B shares.  Could you

19   explain to Judge Gibney very briefly sort of the nature of

20   the B shares and how you come to have them?

21   A    Sure.

22        The B shares, there has been a lot of discussion

23   about the B shares.  The B shares are --

24        THE COURT:  Let me just ask you.  Would it be fair to

25   say that Dr. Hall --

1         MS EDWARDS:  Colton.

2         THE COURT:  -- Dr. Colton's testimony, that they were

3    incentive for to you make the company run well accurate?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  Thank you.

6         MS EDWARDS:  Enough about the B shares, Your Honor?

7         THE COURT:  That's enough about the B shares.  I

8    understand that it is, you know, it is a lot of money to

9    him, but it is a company that has done well.

10         MS EDWARDS:  Yes, Your Honor.

11    BY MS EDWARDS:

12    Q    There was a question about your additional purchases

13    of Apple Ten stock.  Did you make additional purchases

14    other than the purchase of the B shares?

15    A    Yes.

16         I purchased approximately a million dollars, the same

17    as every other shareholder.  I received nice dividends for

18    those.  And, again, further aligning me with the

19    shareholder.

20         THE COURT:  All right.

21         MS EDWARDS:  Your Honor, that is all the questions I

22    have for Mr. Knight.

23         THE COURT:  Thank you very much.

24         Mr. Jarvis.

25         Wait, you have to answer questions from him.

1        MR. JARVIS:  I didn't hear.

2        THE COURT:  Go ahead.  Ask your questions.

3        MR. JARVIS:  Could I have a little scope on the

4   cross, or scope of direct?

5        THE COURT:  Yes.

6                    CROSS EXAMINATION

7   BY MR. JARVIS:

8   Q    Okay.

9        You are shareholder of Hospitality, right?

10  A    Yes.

11  Q    So about five percent of Apple Hospitality?

12  A    Repeat that.

13  Q    I'm sorry.

14       You have about five percent of Apple Hospitality?

15  A    Approximately.

16  Q    So at 170 million shares you own about what, eight

17  and a half million shares?

18  A    Approximately.  Little less than that.

19  Q    At the B share conversion you own less than one

20  percent.  Do you know what percentage?

21  A    Approximately five percent, yes.

22  Q    What's your percent holding in Apple Hospitality

23  prior to your conversion to B shares?  Point 1 percent,

24  give or take?

25  A    Probably.

1      THE COURT:  Whoa.  Whoa.

2      You just said you own five percent of Apple

3  Hospitality, right?

4      THE WITNESS:  Correct.

5      MR. JARVIS:  Did I say it wrong?  I think I misspoke.

6      THE COURT:  You said Apple Ten; is the --

7      MR. JARVIS:  I think he understood my question even

8  if I said it wrong.

9      THE COURT:  Hold on.  One person talks at a time,

10  otherwise, Mr. Halasz can't take it down correctly.

11      All right?

12      So, as I understand it, you own five percent of Apple

13  Hospitality, but a relatively, looks like maybe half a

14  percent of the class A shares of A Ten after the

15  conversion; is that fair to say?

16      THE WITNESS:  Clarification.

17      The conversion of the B shares has been exactly the

18  same in all ten companies.

19      THE COURT:  Okay.  I am trying to get how much A Ten

20  you own, and the answer is, $480,000 -- 480,000 shares; is

21  that right?

22      THE WITNESS:  Correct.

23      THE COURT:  And that, according to my multiplication,

24  that is about half a percent share of the class A shares

25  of A Ten.  So, a relatively small owner of A Ten shares.

1          MR. JARVIS:  You have got my point.

2          THE WITNESS:  Correct.

3          THE COURT:  Okay.

4     BY MR. JARVIS:

5     Q    So, if A Hospitality buys A Ten on the cheap, you

6     make lot of money, don't you?

7          THE COURT:  Well, me makes a lot of money from the

8     conversion of the shares.

9     BY MR. JARVIS:

10    Q    A lot of money.  Let's say you got -- I know this

11    isn't the case -- you have got it for a dollar, so all the

12    assets that came up very cheaply, now that would enhance

13    the value of your A Hostility shares, as a hypothetical,

14    correct?

15    A    Yes.

16         THE COURT:  Well, the same thing is true of

17    Mr. Quinn.

18    BY MR. JARVIS:

19    Q    I can talk about Mr. Quinn, but you are right.  I

20    understand your point, Your Honor.  I heard earlier.

21         But Mr. Quinn wasn't in charge of the deal.  Let's

22    talk about that.

23         You did a roll up of A, or prior to your roll up of A

24    A 7, A 8 and Apple Hospitality, you had sold the REIT, the

25    non traded public, correct, third party buyers?

1    A    We sold 6 separately.  We sold 5 separately.  We sold

2    2 separately.  To an outside buyer.

3    Q    A 7, A 8, A 9 roll up was the first time you decided

4    to keep them sort of in the family under your control

5    rather than selling off to third parties to take the

6    company, correct?

7    A    No.  We look at all of the options.  Sometimes the

8    public market is better.

9         THE COURT:  The question is, the merger of A 7, A 8,

10   and A 9 was the first time you didn't sell it to somebody

11   outside the Apple family; is that correct?

12        THE WITNESS:  That is not correct.

13   BY MR. JARVIS:

14   Q    So which is the first one?

15   A    Apple Cornerstone was the first one.  And the

16   Cornerstone --

17        THE COURT:  Did Cornerstone become part of Apple

18   Hospitality?

19        THE WITNESS:  It was one of my companies, the same.

20   When you look at Apple Ten companies, it was one of the

21   ten public companies that had B shares, was organized,

22   formed the same way.  Exactly the same way.

23        THE COURT:  I think we are talking on opposite or on

24   parallel, but --

25        MR. JARVIS:  Did you --

1    THE COURT:  Hold on.

2    Parallel but not intersecting tracks here.  Which is

3 of course what "parallel" means.

4    His question is this.  When you had Apple 1 through

5 7, or 1 through 6, did any of those get sold to other

6 Apple entities?

7    THE WITNESS:  No.

8    THE COURT:  Did any of them get sold to other Glade

9 Knight entities?

10    THE WITNESS:  No.

11    THE COURT:  Is that what you are trying to get at?

12    MR. JARVIS:  Yes.  Thank you, Your Honor.  You are

13 doing my job for me.

14    THE COURT:  Okay.

15 BY MR. JARVIS:

16 Q    And after you rolled A 7, A 8, A 9, into Hospitality,

17 the only remaining Apple entity was Ten that was not owned

18 by by your companies; correct?

19 A    Yes.

20 Q    Owned by shareholders.

21    And at any point after, during or after the roll up

22 of A 7, A 8, A 9 into Hospitality was it discussed among

23 management or the board of any of these entities, actually

24 a Ten might want to be considered as joining the family?

25 A    Yes.

1    Q    Mr. Colton was on the board of entities that, where

2    those discussions were held, was he not?

3    A    Yes.

4    Q    So Mr. Colton was aware that there was a plan

5    potentially afoot at some point prior to his leaving the

6    Apple Hospitality board at the end of 2014, he was aware

7    that there might well be an attempt down the road to take

8    A Ten?

9    A    All the board members, and all management was aware

10   that that was their job from the very beginning.  If we

11   could sell in the private market, if we could merge those,

12   we had by our document you could list, we could list

13   without even a vote of the shoulders.  We kept all of our

14   options dependent on the shareholders.  So discussions

15   were on-going about what is the market, what is the trade

16   in the market, what is the private market, where can we

17   maximize for our shareholders?  That was on-going

18   discussions, not a quick, knee-jerk reaction.

19   Q    Mr. Colton knew that there was a strong chance that

20   somewhere down the road that Apple Hospitality, came to be

21   known, might want to consider acquiring A Ten.  That was

22   something that you knew -- you knew that, right?

23   A    Well, you would have to ask Mr. Colton.  I didn't ask

24   him that directly.

25   Q    It was discussed at board meetings where he was

1    present, was it not?

2    A    There were discussions, yes.

3    Q    And you were someone who was suggesting that, were

4    you not, that we might want to acquire A Ten down the

5    road?  Right?

6    A    Correct.

7          THE COURT:  Now, was Colton on the board of Apple

8    Hospitality?

9          THE WITNESS:  Repeat that, please.

10         THE COURT:  Was Colton on the board of Hospitality,

11   Apple Hospitality?  He wasn't until this deal came along.

12         THE WITNESS:  He was on when 7 and 8 merged.  He was

13   a board member.

14         THE COURT:  Okay.

15         THE WITNESS:  And came in and then resigned.

16         THE COURT:  But he became a member of Apple

17   Hospitality board at some point, and then he resigned

18   before this deal occurred; correct?

19         THE WITNESS:  Correct.

20         THE COURT:  Okay.

21   BY MR. JARVIS:

22   Q    Now, Mr. Colton is retired, is he not, from his main

23   business?

24   A    I think he still teaches at the University.  I think

25   he still consults for them.  I know nothing about his

1   business.

2   Q    Mr. Colton joined, or Dr. Colton, excuse me, joined

3   the board of Cornerstone.  He was paid director fees, was

4   he not?

5   A    Repeat that, please.

6   Q    He was paid director fees when he joined the board of

7   Cornerstone?

8   A    Yes.

9   Q    What do the director fees, director fees at

10  Cornerstone run, do you recall?

11  A    I can't recall.

12  Q    20,000 a year, 50,000 a year?

13  A    No.  They are very, very small fees.

14  Q    And he was also paid director fees as director of A

15  5?

16  A    Correct.

17  Q    And A 7?  Correct.  And A 8?

18  A    Correct.

19  Q    Hospitality?

20  A    Correct.

21  Q    A Ten, correct?

22  A    Correct.

23  Q    And as a member of the special committee he received

24  approximately $1,500 for every special meeting the

25  committee held, isn't that the way it was actually

1   structured for the special committee?

2   A     Yes.  I did not establish that.

3   Q     But you were aware of it, right?

4   A     Yes.

5   Q     They had about 30 odd meetings, correct?

6   A     They had a number of meetings.

7   Q     Somewhere in the neighborhood of $50,000

8   (unintelligible) on special committee, isn't it?

9   A     Yes.  I think you will find that very small compared

10  to board fees that are paid.

11        THE COURT:  Well, okay.

12        Just answer the question.

13  BY MR. JARVIS:

14  Q     As an aside, does your biography on the A Ten website

15  describe you as a founder of Southern University, founder

16  of Virginia Southern University?

17  A     I don't believe so.  Oh, it is referred to as the

18  founding chairman.

19  Q     Okay.

20  A     Not the founder.  No, no.  No.  When I resigned they

21  elected to call me rather than "resigned," to call me

22  forever the founding chairman.

23  Q     Okay.

24        Let me just check with my colleague.  See if I missed

25  anything, Your Honor.

1      THE COURT:  All right.

2      MR. JARVIS:  That is all, Your Honor.

3      Thank you.

4      THE COURT:  Thank you very much.

5      I guess the lawyers for Mr. Knight and Mr. Buckley

6   and so forth get to ask questions of him as well, if they

7   want to.

8      They don't have any questions, do they?

9      MR. GATELY:  I do not, Your Honor.

10     THE COURT:  Does Ms Edwards, you don't have any

11  redirect, do you?

12     MS EDWARDS:  I do not, Your Honor.

13     THE COURT:  Mr. Knight, thank you very much for

14  coming today.  You may step down.

15     THE WITNESS:  Thank you.

16                    (Witness stood aside)

17     THE COURT:  Do you have any other witnesses,

18  Ms Edwards?

19     MS EDWARDS:  We do, Your Honor, although Mr. Gately

20  is going to conduct that examination.

21     THE COURT:  They are being called by --

22     MS EDWARDS:  Apple Hospitality.

23     THE COURT:  -- Apple Hospitality, is that correct?

24     MS EDWARDS:  Yes, Your Honor.

25     MR. WILLIAMS:  We call Justin Knight.

 1          THE COURT:  All right.

 2                       JUSTIN KNIGHT

 3              WAS SWORN AND TESTIFIED AS FOLLOWS:

 4                     DIRECT EXAMINATION

 5          THE COURT:  All right.  Good morning, Mr. Knight.

 6          THE WITNESS:  Good morning, Your Honor.

 7          THE COURT:  How long do you think this is going to

 8     take?

 9          MR. GATELY:  Less than 20 minutes.

10          THE COURT:  All right.

11          Let's take a break then.

12          Recess for ten minutes.

13          MR. GATELY:  Thank you, Your Honor.

14                     (A recess was taken)

15          THE COURT:  Mr. Gately.

16          All right.  Take it away, sir.

17     BY MR. GATELY:

18     Q    Mr. Knight, famous last words.  I will try to be

19     brief.  But I really am.

20          The Court asked me during opening -- I should have

21     known and didn't -- how many shares of Apple Ten do you

22     own?

23     A    Just under a thousand shares.

24     Q    That is common shares?

25     A    Correct.

1   Q    And you own some series B, also, that were given to

2   you by your father; is that correct?

3   A    There were sold to me, yes.

4   Q    How many shares did you, do you own?

5   A    At eleven dollars the conversion would be about four

6   million dollars.

7   Q    Okay.  If the deal went through?

8   A    If they were converted at eleven.

9   Q    Correct.  Let me ask you this.  If His Honor were to

10  issue an injunction stopping the vote or adding additional

11  disclosures, would that in your view provide or cause any

12  harm or potential harm to A ten shareholders?

13       THE COURT:  That is a little speculative, isn't it?

14       MR. GATELY:  Well, he is an executive of A Ten and an

15  A Ten shareholder.

16       THE COURT:  I understand.  Is he an expert witness?

17       MR. GATELY:  No, he is not, Your Honor.  I don't know

18  if this is a subject for expert testimony.

19       THE COURT:  Well, let's hear what he has to say.

20       How do you think -- tell me all the horrible things

21  that would happen if we delayed all this.

22       THE WITNESS:  The biggest risk, frankly, Your Honor,

23  is if the proceedings or the delay causes the deal to

24  extend beyond the drop dead date, in the current

25  agreement, or the 15th of September, Apple Hospitality has

1    an ability to walk from the transaction.

2         THE COURT:  Why don't we pretend for just a moment

3    that you have a role in Apple Hospitality.  You might be

4    able to predict what Apple Hospitality would do.  Would it

5    walk away?

6         THE WITNESS:  You know, at this point that would be

7    speculation on my part.

8         MR. GATELY:  We have a --

9         THE COURT:  Hold on for a second.

10        Are you the president of Apple Hospitality?

11        THE WITNESS:  I am the chief executive officer.

12        THE COURT:  Oh, CEO.

13        THE WITNESS:  Yes.

14        THE COURT:  So you might be able to predict what

15   Apple Hospitality would do a little better than say

16   somebody on the street.

17        THE WITNESS:  Respectfully, I play a significant role

18   in Apple Hospitality.  Apple Hospitality also has an

19   independent board of directors who is the decision-making

20   body in these negotiations.  And I abstain, as a board

21   member as well, from the votes on that subject.  The

22   independent board members obtained their own adviser.

23        THE COURT:  Wells Fargo?

24        THE WITNESS:  Wells Fargo was the general corporate

25   adviser.  They separately engaged Baird.  Negotiated the

1   contract on their own.  And received a fairness as part of

2   that.  So they acted very much independently as part of

3   the process.

4        THE COURT:  All right.

5        So although you are the CEO of Apple Hospitality you

6   are unable to tell us today how you think they would lean

7   if this deal were delayed?

8        THE WITNESS:  Definitively.  Yes.  I can speak to the

9   relative merits of the transaction.  I can speak to the

10  potential change in valuation because of the relative

11  performance of the two companies.  But I would be

12  speculating to attempt to guess what the independent

13  directors might do.

14  BY MR. GATELY:

15  Q    You mentioned the change in value.  And you are

16  talking about the value that the A Ten shareholders would

17  receive if they were to vote to accept the deal.  Can you

18  please expand on that?

19  A    Well, I highlighted in the declaration that was

20  provided for The Court three different factors.

21       One is the increase in value attributable in large

22  part, not in total, to the appreciation of the stock price

23  for Apple Hospitality.  The result of that is a per key

24  price, which is in Hospitality how we generally gauge one

25  transaction versus another.  That is inflated over where

1    it was originally.  On top of that, if you look at the

2    relative performance of the two companies, Apple

3    Hospitality has performed better on a year-over-year basis

4    than Apple Hospitality Ten.  And so looking at performance

5    versus projections that were used in the original

6    analysis, that is shifted somewhat.  You know, those are

7    factors that I think the board would consider.

8         In addition to that, there was a 45-day go shop,

9    which is not revealed with the superior offer.  I think

10   the board of Hospitality would consider that as an

11   additional point as they determine a course of action.

12   Q    Did any of the bidders -- I say it again because I

13   mentioned it in opening and it is not evidence -- did any

14   of the bidders comment on the price?

15        I'm talking particularly about Blackstone.  If you

16   don't know, say you don't know.

17   A    So, I was not aware of who actually bid on the deal.

18   As we looked at the confidentiality agreement, the names

19   of the bidders were redacted.  Following the go shop

20   period I happened to interact with Blackstone at a

21   conference.  They mentioned that they had reviewed.

22        MR. JARVIS:  Objection.  Hearsay, Your Honor.

23        THE COURT:  Well, he is saying what they told him,

24   and how he knows that Blackstone was one of the entities.

25        I don't think he is going to say what Blackstone

1    thought about the deal, are you?

2        THE WITNESS:  I can say whatever you would like me

3    to, Your Honor.

4        THE COURT:  Well, I would like you to tell the truth.

5        MR. GATELY:  See what a good witness he is, Your

6    Honor.

7        THE COURT:  Well, that is how you became aware

8    Blackstone was involved, correct.

9        THE WITNESS:  Yes.

10       THE COURT:  All right.  Thank you.

11       Were you the person handling the negotiations on

12   Apple Hospitality's behalf between Apple Hospitality and A

13   Ten?

14       THE WITNESS:  I acted as an adviser to the board, but

15   did not negotiate directly with the Citibank or the

16   special committee.

17       THE COURT:  Okay.  Who did that?

18       THE WITNESS:  The Wells Fargo banker interacted.

19       THE COURT:  Okay.

20   BY MR. GATELY:

21   Q    The negotiations, what is it -- I will ask the

22   leading if they don't object, but was it mainly between

23   Wells Fargo and Citibank?

24   A    The majority of the conversations, yes, were between

25   the two banks.

1      MR. GATELY:  Your Honor, shorter than I thought I

2  could be.

3      That is all I have.

4      THE COURT:  Thank you very much.

5      MR. GATELY:  Thank you, Your Honor.

6      THE COURT:  All right.

7      Wait for a moment and see if there is cross

8  examination.

9                    CROSS EXAMINATION

10  BY MR. JARVIS:

11  Q    Good morning, Mr. Knight.  How are you?

12  A    I am doing great.

13  Q    Have you submitted a declaration in connection with

14  your, the company's opposition to the preliminary

15  injunction right?

16  A    Correct.

17  Q    Who drafted that?

18  A    I received an initial draft from counsel based on

19  conversations that we had had.

20  Q    Now, you know that Citibank was the adviser to the

21  special committee, correct?

22  A    Correct.

23  Q    Citibank got a lot of information about Apple Ten and

24  about Apple Hospitality, right?

25  A    Yes.

1    Q    Where did it come from?

2    A    It came from a shared data room that was populated by

3    management.

4    Q    Isn't it true the data room wasn't created until the

5    go shop period?

6         THE COURT:  What?

7         MR. JARVIS:  Data room was not officially created

8    until the go shop period?

9         THE WITNESS:  No, that is not correct.

10   BY MR. JARVIS:

11   Q    Who put the stuff in the data room?

12   A    I don't know specifically.  But it was a group of

13   people from our office.

14        THE COURT:  When was the data room created?

15        THE WITNESS:  The data room was created when we began

16   investigating.  Immediately following the signing of the

17   non disclosure agreement with Apple Ten.

18        THE COURT:  Is this down here on Main Street in

19   Richmond?

20        THE WITNESS:  The data room, I don't know exactly

21   where it is.  Our office is on Main Street, yes.

22        MR. JARVIS:  I think it is an electronic data room

23   server somewhere.

24   BY MR. JARVIS:

25   Q    Do you know if Ms Gathright put the information, COO

1   of both companies?

2   A    I do not know specifically if she up-loaded the data,

3   but she would have been one of the resources.

4   Q    And CFO?

5   A    Sorry?

6   Q    CFO of both companies?

7   A    Honestly they would have the most direct access to

8   the information.

9        THE COURT:  I think his question is, was Ms Gathright

10  the CFO of both companies?

11       MR. JARVIS:  No.  No, no.  I'm sorry.  Let me be more

12  clear, Judge.  I am not being clear enough.

13       Ms Gathright, she is COO of both Ten and Hospitality,

14  right?

15       THE WITNESS:  That is correct.

16  BY MR. JARVIS:

17  Q    And she put information in.

18  A    Right.

19  Q    She gave information to Citi even though she is an

20  officer at Hospitality, right?

21  A    I don't know understand the question.

22       There was a data room that was assembled, that was

23  accessible by both Wells Fargo and Citibank.  And

24  management used our best efforts to insure that any

25  request by one bank resulted in information populated in

1    the data room so that it was available immediately to the

2    other bank.

3    Q    So it was you and the other managers, the senior

4    managers, Ms Gathright, Mr. Peery the CFO, who decided

5    ultimately how to respond to various requests and what

6    went in the data room?

7    A    I am not sure where else they would have received

8    information from the company.

9    Q    And you had -- but the people who were making,

10   telling you what was going on, both Hospitality people and

11   both A Ten people, right?

12   A    We were also the management company overseeing

13   operations for all of the hotels.

14   Q    Now, you indicated that your father sold you some B

15   shares in A Ten that would ultimately net you four million

16   in the case of liquidity, right?

17   A    At eleven dollars.  That's correct.

18   Q    How much did he charge for those shares?

19   A    Consistent with what he was charged to purchase.

20   Q    So he was charged ten cents a share?

21   A    Yes.

22   Q    So you are going to get a return of about a hundred

23   times on what you invested, right?

24   A    I assume a little more.  Assuming that it was a

25   successful transaction, yes.

1    Q     Now, I think you indicated that you did not negotiate

2    directly with Citi.  That was Wells Fargo's job, right?

3    A     Yes.

4    Q     Who interacted with Wells Fargo?

5    A     The board did.  And I did.

6    Q     Did you provide instructions on behalf of the board

7    to Wells Fargo?

8    A     To the extent they instructed me to do so, yes.

9         THE COURT:  Well, did you give them information aside

10   from what the board told you to tell them?  If Wells Fargo

11   had a question they would come to you, wouldn't they?

12        THE WITNESS:  Well, these are two different things.

13   If Wells Fargo had a question related to the operations of

14   the business, they would come to us.  We would provide

15   data in the data room to both banks.  If they had a

16   question related to the negotiations of the transaction, I

17   acted in conjunction with the board as adviser to them.

18        THE COURT:  So you would sort of call up the board

19   members and see what they wanted to do, and pass that

20   along to Wells; is that right?

21        THE WITNESS:  Correct.

22        THE COURT:  Okay.

23   BY MR. JARVIS:

24   Q     Now, initially when you finally got around to a

25   concrete offer, you offered all stock for A Ten, didn't

1    you?

2    A    When you say you?

3    Q    Hospitality.

4    A    The initial offer I believe was all stock.

5    Q    That changed, right?

6    A    It did.

7    Q    Do you know why it changed?

8    A    I do not remember the specific reason that it

9    changed.

10    Q    Was it -- Mr. Young testified that he was told by

11    Wells that it changed because they didn't want to deal

12    with what they call the roll out provision.  Are you

13    familiar with that testimony by Mr. Young?

14    A    I am familiar with that.

15    Q    And you were -- did you ever tell Wells to tell them

16    that we don't want to do this all stock, we don't want the

17    appraisal to be like that?

18    A    That is not a conversation that I had with Wells.

19         THE COURT:  Let me just ask you.

20         Did you all take the all stock offer off the table

21    because you didn't want to do a roll up?  Was that one of

22    the factors?

23         THE WITNESS:  That was one of the factors that was

24    considered.

25         THE COURT:  Okay.  Thank you.

1    BY MR. JARVIS:

2    Q    Wells provided evaluation for the Hospitality board

3    of A Ten?

4    A    Yes.  Several.

5    Q    Do you know what those valuations were?

6    A    I mean, generally speaking, they should have been

7    provided to you.

8    Q    They were.

9         They declined to provide them.

10        THE COURT:  What?

11        MR. JARVIS:  They did not provide us the Wells

12   valuation.  We didn't get that.

13        THE COURT:  Well, okay.  What did Wells value the

14   stock at?

15        THE WITNESS:  They provided a range, and the offer

16   price was within that range.

17        THE COURT:  What was the range?

18        THE WITNESS:  I don't remember the exact range off

19   the top of my head.

20        THE COURT:  Let me see if I have this straight.  You

21   were coming into court to testify today about this

22   transaction, whether it was fair, and you don't know what

23   the range was for the value of the stock that you were

24   buying.  Is that your testimony today under oath in this

25   court?

1        THE WITNESS:  We reviewed multiple transactions,

2   multiple analyzes related to the transaction.  The range

3   depending on which valuation metric was presented in what

4   the bankers referred to as a football field analysis, and

5   that analysis changed depending on a variety of factors

6   including the relative performance of the two companies,

7   and the other.  Generally speaking it was within a dollar,

8   you know, or less on one side or the other.  That was the

9   extent of the range.  And if it was a cash flow valuation,

10  it would be one thing.  If it was based on cap rate

11  valuation, these multiple metrics, which resulted in a

12  variety of football field analyzes, and the stock price at

13  each offer was represented within that range.

14  BY MR. JARVIS:

15  Q    Now, Wells did not offer a fairness opinion, did

16  they?

17  A    They did not.

18  Q    And you had to go to a separate bank who has not been

19  involved in the negotiation of the deal to get a fairness

20  opinion for Hospitality, right?

21  A    I am sorry.  Had to?

22  Q    Well, put it this way.  Let me ask you this.  You

23  chose to go to a separate bank, Baird, to get a fairness

24  opinion, right?

25  A    The board of directors chose to get an independent

1  opinion from Baird, yes.

2  Q    Wells provide this opinion?

3  A    That, we did not ask them to provide that.

4  Q    Why not?

5  A    That was under the direction of the board.

6  Q    Well, you were there, were you not?

7  A    I was.

8       They wanted an independent view of the value of the

9  transaction.

10 Q    On the Ten side, they didn't need to get an

11 independent -- they just wanted to go with the fact of the

12 negotiations, right?

13 A    I was not involved in that process.

14 Q    You couldn't use Wells, right?  You chose not to use

15 Wells, right?

16 A    I did not chose one way or the other.

17 Q    Apple Hospitality chose not to use Wells.

18 A    Apple Hospitality chose to engage Baird.

19      THE COURT:  You know, we could play word games all

20 day long, sir.  Let me just say, I have life-time tenure.

21 We can stay until 2020.

22      Next question.

23 BY MR. JARVIS:

24 Q    In your declaration at paragraph 6, talking about the

25 roll up provision, you say that in this case had Apple --

1    and I am reading from the second, I think sentence, in

2    paragraph 6. "In this case had Apple Ten insisted on all

3    stock deals thus triggering the roll out roll up

4    procedures under Apple Ten's articles of incorporation, I

5    would not have recommended the transaction to the Apple

6    Hospitality board.  Based on my experience in the REIT

7    industry, I believe it unlikely any buyer would consider

8    such a structure."

9         Why?

10   A    The result would be a partial ownership of the

11   acquired entity.

12   Q    Well, let's go through that.

13        You are presuming that shareholders in A Ten had the

14   right to chose after an appraisal was done, either cash or

15   to keep A Ten stock, right?

16        Is that the underlying assumption for what you just

17   said?

18   A    No.  It existed as a possibility.

19   Q    But isn't that a possibility that was solely within

20   the control of A Hospitality as a roll up offer?  In other

21   words, you could chose whether they got cash, whether they

22   kept their stock, right?  That was your choice, not their

23   choice, not A Ten's choice.  That was Hospitality's choice

24   right?

25   A    Well, one of two things would have happened.  Either

1   the shareholders would have retained their shares, or

2   Apple Hospitality, the acquirer, would have been left with

3   a mix of stock and cash that they would not have known at

4   the beginning, at the onset, when they valued the

5   transaction.

6   Q    In other words, you might have had to put out, if the

7   roll up had been in you might have to fork out more cash

8   than you would have, than you thought originally?

9   A    That exists as a possibility.

10   Q    I mean, they could have kept their, what you offered

11   if the appraisal came in at or about your offer price,

12   right?

13   A    Yes.

14   Q    So only if the appraisal came in higher, i.e. an

15   independent appraiser said it was worth more, would you be

16   faced with the possibility that you might either have to

17   pay out more cash or leave them with the A Ten shares?

18   A    No, that is not true.  Because they would have the

19   choice of cash in that case or retaining non-liquid share.

20   Q    That is not true.  That would be your choice under

21   your articles --

22   A    That is what I am saying.  We would have the choice

23   to do one or the other, which would mean, either we would

24   be stuck as an acquirer, we meaning Apple Hospitality,

25   with an un -- with two classes of shares.  One which was

1    completely illiquid, or an indefinite amount of cash that

2    we would have to put into the transaction, which would

3    change the valuation.

4    Q   Right.  And that is only if the appraisal came in --

5    in other words, you were as concerned, right, the

6    appraisal might come in higher than what you were paying?

7    A   No, I was not concerned about that.

8    Q   What you wanted.  Then they could just take the A

9    Hospitality shares and sell them, whichever got them more

10   money, right?

11   A   My understanding is that at the point that is

12   exercised then taking Apple Hospitality shares was off the

13   table.

14   Q   Then I understand that incorrectly.

15   A   You do.

16   Q   The first option is after this appraisal, you have to

17   offer them the deal that was on the table.  If they don't

18   want it, then they can go to cash or keep their shares at

19   your discretion?

20   A   Okay.

21      But for the record, I had no concern that appraisal

22   would provide a higher valuation.

23   Q   Then why did you recommend against allowing the roll

24   up procedure?  I say "you," Apple Hospitality board?

25   A   I didn't.  I said that I would recommend against

1    that.

2    Q    Okay.

3         Now, you have also indicated --

4         THE COURT:  Well, if it's the same thing, why would

5    you recommend against it?  Just because you didn't want to

6    have this hybrid of stock and --

7         THE WITNESS:  Yes.  The reality is, if they are left

8    with their existing shares -- again, this is my

9    understanding -- if they are left with their existing

10   shares, and they are not publicly traded, that is not a

11   good outcome for anyone.  It is not a good outcome for the

12   acquiring company, it is not a good outcome for the

13   shareholders who retained those shares of stock.

14   BY MR. JARVIS:

15   Q    They had the option of taking your your A Hosp

16   option -- they only had the option of taking your A Hosp

17   shares, or you had -- they had the second option, your

18   call, either take cash or keep your shares.  If they

19   wanted liquid they could always take the deal, right?

20        THE COURT:  All right.

21        MR. JARVIS:  I think we belabored this.  I will move

22   on.

23        THE COURT:  You have argued with the witness enough.

24        MR. JARVIS:  I agree.

25   BY MR. JARVIS:

1    Q    Now, in paragraph 7, you know, and 8, you sort of go

2    through this change in the pricing it, and you say that

3    one of the things that might happen is, gee, the price

4    has, because the price Hospitality increased the deal

5    becomes a little bit more valuable to the Apple Ten

6    shareholders and the board.  If the drop dead date went

7    past because an injunction was awarded, might decide to

8    blow up the deal and renegotiate it for for a better deal,

9    right?

10    THE COURT:  What was the question?  That was a little

11    on the long side there.  I sort of lost my way.

12    MR. JARVIS:  True.  Not as scripted as I would like

13    it to be.  We weren't expecting this.  I apologize.

14    THE COURT:  That is all right.

15    BY MR. JARVIS:

16    Q    So, you believe that the compensation that A Ten

17    shareholders, as we sit here today, has increased a bit

18    over what it was in the spring because of the increase in

19    Hospitality share price, right?

20    A    Yes.

21    Q    And as a result of that potential increase in

22    Hospitality A Ten shareholders, the board in your view

23    might consider blowing up the deal and re-negotiating it

24    if the drop dead of September 15 passed?

25    THE COURT:  Which board?

1      MR. JARVIS:  Board of Hospitality.  Right.

2      THE COURT:  Okay.

3   BY MR. JARVIS:

4   Q    Now, in your affidavit you looked at the 10.85 share

5   price.  That is the one you used as an illustration,

6   correct?

7   A    Yes.

8   Q    And that was a share price in April.  What was the

9   share price of Apple Hospitality on March 24 when the

10   board approved the deal, when the board of Hospitality

11   approved the deal?

12   A    I don't remember the specific.

13   Q    If I told you it was $19.32 on March 24, would you

14   have any reason to doubt that?

15      THE COURT:  Well, whether he has reason to doubt it

16   or not is really irrelevant.

17      Let's move on to something else.

18   BY MR. JARVIS:

19   Q    I am telling you the price on March 24th, at least

20   closing price, was $19.32 a share.  Yesterday's price

21   counsel said 19.71.  I saw 19.70.  Take your pick.  That

22   is about a 38 cent increase over what it was when you

23   approved it, right?

24      THE COURT:  Well, 32 cents.

25   BY MR. JARVIS:

1  Q    38, 39 depending.  I saw 70, he saw 71.

2       Right?

3  A    Okay.

4  Q    That would be less than two percent increase if you

5  do the math.  I can tell you it is less than two percent.

6  A    Okay.

7  Q    Are you saying that the Apple Hospitality board,

8  because the Apple Ten shareholders were going to receive

9  two percent more than they would have on the day the deal

10 was approved might consider blowing up the deal and

11 renegotiate it?

12 A    Yes, I am saying that exists as a possibility.

13      THE COURT:  All right.

14      MS WINCHESTER:  Thank you, Your Honor.

15      THE COURT:  Thank you.

16      Any redirect?

17      MR. GATELY:  Yes, Your Honor, briefly.

18      THE COURT:  Hold on a second.

19      Ms Edwards, do you have any questions of this

20 witness?

21      MS EDWARDS:  I do not, Your Honor.

22      THE COURT:  All right.

23      Mr. Gately.

24      MR. GATELY:  Yes, Your Honor.  Thank you very much.

25                  REDIRECT EXAMINATION

1    BY MR. GATELY:

2    Q    Two areas.  One on the Baird Wells Fargo.

3         Was Wells Fargo ever asked to do a fairness opinion?

4    A    Not to my knowledge.

5    Q    Did Wells Fargo ever refuse or indicate that they

6    would refuse to do a fairness opinion?

7    A    No.

8    Q    Why was Baird chosen by the board to do a fairness

9    opinion?

10   A    They requested -- it was their desire to have an

11   independent third party validate the price.

12   Q    Their, being the board of directors?

13   A    Meaning the board of directors, independent members.

14   Q    On the roll up transaction -- and, Your Honor, this

15   is a mountain of paper, among other things exhibit 18 to

16   the Albert declaration and the roll up provision, I think

17   it has said is in the bylaws.  It's not.  It is in the

18   Apple REIT articles of Incorporation.

19        THE COURT:  Oh, okay.  That is a telling point.

20        MR. GATELY:  That is not so telling.

21        It is article ten of the Apple REIT Ten articles of

22   incorporation.

23        THE COURT:  All right.

24   BY MR. GATELY:

25   Q    And can you explain to the The Court why as buyer in

1  general a roll up transaction would not be desirable?

2  A    Beyond what I already explained?

3       THE COURT:  You explained it pretty well.

4  BY MR. GATELY:

5  Q    Okay.

6       Then there is one point I want to make because we

7  talked about an appraisal of the corporation.

8       Would you please read the first sentence of article

9  ten?

10 A    "In connection with any proposed roll up transaction

11 an appraisal of all the corporation's assets shall be

12 obtained from a competent independent expert."

13 Q    So the appraisal is of the assets, not of the entity.

14 A    That is correct.

15 Q    That is all I have, Your Honor.

16      THE COURT:  Okay.

17      So are you saying that when they do the roll up

18 appraisal they wouldn't look at the liabilities?  Is that

19 the point of the question there, Mr. Gately?

20      MR. GATELY:  Your Honor, my point was, it is not a

21 valuation of the entire entity, which I think was implied,

22 such as the valuation that the investment bankers were

23 doing.  It is of what assets you have.  And bear in mind

24 the obvious, this is a real estate investment trust.  What

25 real estate investment assets do you have?  My main point

1   is it was not an appraisal of the entire company as Wells

2   or Citi or Baird did.

3       THE COURT:  And so you are saying then that it would

4   not look at -- would it look at the, like the mortgages on

5   the property to determine the value of the assets?  You

6   wouldn't say that, for instance, the hotel down the street

7   was worth a hundred million dollars when it has a

8   90 million-dollar mortgage on it, would you?

9       MR. GATELY:  I expect the answer is yes, but that is,

10  with all due respect, a better question for Mr. Knight

11  than to me.

12      THE COURT:  Well, okay.

13      I am just trying to get at what point -- so what you

14  are saying is they wouldn't look at the value of the

15  corporation as an on-going entity versus the value of its

16  real estate computers and so forth?

17      MR. GATELY:  You wouldn't get a, this is eleven

18  dollars a share, this is eleven or ten dollars a share.

19  That is not what this is designed to do.  That is my

20  point.

21      THE COURT:  What would you get?

22      MR. GATELY:  You would get, you would get a value of

23  the assets, and there would be limitations, as Mr. Knight

24  said, on the ability to get all of the stock.  It's

25  something -- and he made the point -- that a buyer is on

1    the -- it is desirable from the buyer's standpoint.

2         MR. JARVIS:  Could I ask a couple questions on that

3    point?

4         THE COURT:  No.

5         MR. JARVIS:  No.  Okay.

6         THE COURT:  No.  No recross.

7         All right.

8         Thank you, sir.  You may step down.

9                   (Witness stood aside)

10        THE COURT:  All right.

11        Do either of the defendants have any more witnesses?

12        MS EDWARDS:  We do not.

13        MR. GATELY:  No, Your Honor.

14        THE COURT:  In that case then, I will hear argument,

15   although I think I have heard a pretty fair amount of

16   argument already today.  Let's hear from the plaintiff?

17        Mr. Jarvis.

18        How long do you think you are going to take?

19        MR. JARVIS:  I don't know because, I am sort of

20   trying to triage a little bit as I go through like a

21   13-page outline.  But we talked about some topics.  I

22   don't want to belabor what I already said.

23        THE COURT:  An hour closing?

24        MR. JARVIS:  Probably.

25        THE COURT:  Okay.

1      MR. JARVIS:  Do you want to do it now, or will you

2   need a break?

3      THE COURT:  We will -- we will take it now.

4      MR. JARVIS:  Okay, your Honor.

5      Let's start with the Willard decision, because Your

6   Honor has quite clearly expressed your concern that we

7   simply can't get past Willard given the facts of this

8   case.

9      THE COURT:  Well, you have -- here is the thing.

10   That when you combine Willard with the standard that

11   applies to a preliminary injunction, which is, I think

12   that you have got to show a strong possibility of

13   prevailing, not just a strong likelihood of prevailing,

14   not just that you can get it to the jury, which I think

15   you can -- make no mistake about that -- if this case goes

16   to the jury for them to decide, at least on the damages

17   aspect, yes, I think Willard does provide you some

18   difficulties at this stage of the events.

19      Now, one of the problems that they run into is that

20   all of their arguments involved disaggregating all of the

21   factors that one would look at.  And one of the points I

22   think you made in your opening, which was a good one, is

23   that you look not only at -- you have to look at all of

24   them together.  You don't just look at, was the guy in the

25   same -- were they both in the Rotary or something like

1    that.  You look at that, plus you look at all these other

2    factors to try to see, sort of in a, I think somebody used

3    the used the word "holistic," in a holistic way.

4         MR. JARVIS:  I think that is my word.

5         THE COURT:  In a holistic way how these things factor

6    together.  And that is the jury function.  But also my

7    function at this point, to determine whether you have a

8    strong likelihood of demonstrating that.

9         MR. JARVIS:  Look, I think I understand where Your

10   Honor is are going here.  I recognize.  But let me give a

11   run at least on a couple factors to try to see if we can

12   talk about Willard in a way to, that looks more favorable

13   to you, to me, than Your Honor thinks.

14        Willard was obviously, we all know, as I said many

15   times -- and I am sure that case has been read a hundred

16   times by people in this room.  It is a transaction that

17   everybody knew everybody, everybody knew everything.

18   Everybody was a director.  Everybody was a shareholder.

19   Everybody was conflicted.  I mean, two directors has their

20   son, the other director had his own competing bid.  It was

21   a mess.

22        And the Supreme Court of Virginia had to do the best

23   they could.  What they ultimately decided was, these guys,

24   they looked at valuation opinions, the valuation opinion

25   said it was fair, and basically they followed what -- to

1    the total extent -- they didn't have much.  They didn't

2    have, frankly, nearly the level of advice that Citi gave

3    to the special committee here.  But to the extent there

4    was anything you could discern from what they said, what

5    they have done is not inconsistent with what the advisers

6    told them.  That is really what it holds.

7        And then really, as I said, I think, to be perfectly

8    honest, that, you know, basically these guys are going to

9    vote for it any way, they are the shareholders.  They have

10   unfettered right to use their shares.  You have to view

11   their overall result, even if the board members had thrown

12   up their collective hands, we are all conflicted, we are

13   throwing it to the shareholders.  It is the same three or

14   four people, same result would occur.

15       So if that is the same result, that would -- we are

16   not going to validate this thing.  You have to look at the

17   facts.  Well, they were shareholder they could ratify

18   there.  But on the director point, you know, to the extent

19   there was information from advisers, it is not that much,

20   not like what we have here, they followed it.  Here, and

21   in was a case laid out briefly this morning, Your Honor,

22   they simply did it.

23       I mean, let's talk about the conflicts of Mr. Colton.

24       THE COURT:  What advice from their adviser did they

25   ignore?

1    MR. JARVIS:  Well, okay.  If you look at --

2    THE COURT:  Talking about Mr. Young.

3    MR. JARVIS:  Not just Mr. Young.  But, look at the

4    decision to negotiate only with Hospitality.  Mr. Colton

5    in his deposition, I don't need to negotiate with anybody.

6    Really?  They said Citi told us to do the go shop and not

7    to the pre market check. That is not just true.  We went

8    through some of Mr. Young's testimony on that.  I mean,

9    not saying Mr. Colton is lying, I am really not.  I'm

10   saying, look, these things are some time ago, he

11   misremembered, remember the way he wants to remember,

12   everybody in this court room has done that on more than

13   one occasion.  They are all going to remember the way you

14   remember.  But what do we we see?  Citi in one of the very

15   first slides -- if you want, Your Honor, wants to look at

16   it, this was in a presentation of the 13th, but I don't

17   have that copy -- I tried to bring it but it got screwed

18   up in the processing -- I have a version of the slide.  It

19   is defendant's exhibit 9 at page 43.

20       And if you look at that slide, you know, it lays out

21   right at the front, City is telling them, defendant's

22   exhibit 9 page 43.

23   THE COURT:  I don't have it.

24   MR. JARVIS:  I will be happy to show my page of it as

25   soon as I can find my exhibit.

1       THE COURT:  One of the things you could do is put it

2  on the overhead thing we have over there that will put it

3  up on the screen so all of can see it.

4       MR. JARVIS:  I have used that at trials in the past,

5  I'm not the most -- but I'm happy to give it a go if you

6  Your Honor would prefer.

7       THE COURT:  The ELMO.

8       MR. JARVIS:  The ELMO, yes, I used it before.  I like

9  ELMO.  I am a low tech kind of guy.  If it will turn on,

10  but if not, I can hand it up.

11       THE COURT:  All right.

12       MR. JARVIS:  It has my handwriting.  I want to show

13  it to defense counsel.  It is my copy.  If you have a

14  better copy I could use yours to give it to the Judge.

15       It's the same slide.

16       MS EDWARDS:  We have got it.

17       MR. JARVIS:  Mine was messed up.

18       THE COURT:  All right.

19       MR. JARVIS:  Let --

20       THE COURT:  Let me look at it here.

21       Okay.

22       MR. JARVIS:  Look at the slide.

23       It tells you, this is Citi, mind you, this particular

24  slide was presented to the special committee on the 13th

25  of January.  Right at the front end of the process.  What

1   do they say?  They are the target, remember.  A Ten is a

2   target.  What is most favorable?  Do a pre-signing market

3   check.  What is the most favorable?  Do a pre-signing

4   market check.  Less favorable, go shop, obviously.  Less

5   favorable, go shop (unintelligible).

6       So, first we know Citi is telling them the best way

7   to go here is pre market check.  What else do we know?  We

8   know that Citi told the board, we know people.  You know.

9   We are Citi, we never sleep.  We know a number of buyers

10  in this area who might be interested who we could approach

11  on your behalf.  They were never authorized to do so even

12  though Citi told them what is best thing to do with a

13  target, what is the most favorable, do a pre-signing

14  market check.

15      THE COURT:  So this is given to them?

16      MR. JARVIS:  Early on.  First meeting with Citi.

17  First non, post --

18      THE COURT:  Was this when they were negotiating with

19  Citi to see if they wanted to hire Citi?

20      MR. JARVIS:  Post.  After.

21      THE COURT:  "Trojan" is a word here for the target

22  company.

23      MR. JARVIS:  Sorry.  Trojan is, yes, somebody -- I

24  had to ask Mr. Young, who, one of his assistants, like a

25  college football name, so they had Hoya for Georgetown,

 1    Trojans for S C.  I think the guy went to S C or something

 2    like that.

 3         THE COURT:  All right.  Okay.

 4         MR. JARVIS:  So we see this.  We know, I mean, look,

 5    Mr. Young suggested throughout, we didn't really tell them

 6    what to do, we just gave them options and generalized

 7    advice.  You can see the advice, do a pre signing market

 8    check.  That is the most favorable.  And we have people we

 9    can go to.

10         As we discussed a few minutes ago in my opening, Your

11    Honor, on the eleventh, when we had that little colloquy

12    about the bid of the eleventh is inadequate.  They say,

13    hey, you know, we are going to consider, actually you

14    might want to keep this, never mind -- it was inadequate.

15    We are going to consider pre signing market check.  Mr. --

16    we talked about it a couple times with Mr. Young's people.

17    Said, we don't want to do that process.  We are not

18    interested in being competitive bidders.  We don't want

19    competition.  Cool.  Happy ending.  That is the last you

20    hear right there about a pre market check.  Done.  So what

21    is the first point you have got?  A Hospitality didn't

22    want competitive bidding process.  Citi was suggesting

23    one.  That was the best option.  They told them they had

24    people to go to.  They were never authorized to reach out.

25    They did what A Hospitality wanted.

1    THE COURT:  Well, let me ask you.  Do you have some

2    evidence that if it had gone out the outcome would have

3    been different in any way?  Do you have like an expert

4    that will say that, or anything like that?

5    MR. JARVIS:  We do, actually.  I mean, look --

6    THE COURT:  Their evidence is not here.

7    MR. JARVIS:  Well, I am going to take Your Honor, and

8    I have copies for all, of the Dell opinion.  Dell opinion

9    was an appraisal that was done in Delaware of Dell

10   Corporation.

11   THE COURT:  No, no.  Not something in Delaware, but

12   something here in Richmond.  Have you gotten somebody to

13   look at this and give you an opinion that this would have

14   turned out differently if there had been a pre-bid

15   shopping of this project?

16   MR. JARVIS:  We haven't.  But, as I say, Delaware,

17   Dell opinion.  I won't ask Your Honor to transfer, but

18   there are footnotes I will show Your Honor where it goes

19   through a lot of the academic literature.  In fact, in

20   that particular case the petitioner did retain an expert,

21   a guy named Guhan Subramania.

22   COURT REPORTER:  Whoa, whoa.

23   MR. JARVIS:  Guhan, G-U-H-A-N, Subramania,

24   S-U-B-R-A-M-A-N-I-A, who is a professor at Harvard Law

25   School, and is an expert on corporate transaction

1    takeover.  He actually did an expert report there, not for

2    Dell particularly, just in general, on MBO transactions,

3    management is taking a company, which is more like what

4    happened here.

5         THE COURT:  You know, he didn't testify in this case,

6    he testified in another case.

7         MR. JARVIS:  Yes, but --

8         THE COURT:  You need to talk more slowly, please, so

9    Mr. Halasz can take it down.

10        MR. JARVIS:  Yes.  I do apologize.  I am not trying

11   to be intentionally offensive.

12        THE COURT:  I know, sir, you not are trying to.  It

13   is hard to slow down.

14        MR. JARVIS:  But, I mean, certainly, you know, could

15   I get Mr. Subermanian to show up here for a trial later --

16   not today, no, but he did testify, and will show, and we

17   will go when I go to get to go shop a little bit, is that

18   go shop is called pure go shop where no restrictions can

19   work.  I mean, he cites as a footnote in there, recites it

20   can work, actually create a higher initial bid.  But, it

21   doesn't work in two contexts, Your Honor.

22        THE COURT:  It doesn't work what?

23        MR. JARVIS:  In two contexts.

24        One, where there is an MBO, management is coming in,

25   because management -- well, you know, Your Honor, let me

1    make this a little easier.  Since we are there.

2        Here is a copy.

3        THE COURT:  What are you handing out now?

4        MR. JARVIS:  Decision of the Dell court.  I am not

5    going to ask you to look at the opinion, just look at the

6    footnotes.  Typical lawyer.  Likes the footnotes.

7        And if you look towards the back at basically on the

8    opinion in the lower right corner of the page number, page

9    45, you will see the footnote beginning with 35.  You will

10   see Vice Chancellor Lassiter, really, really likes this.

11   But if you look at sort of footnote 35 and footnote 36.

12   There is talk, and this is lot of academic literature on

13   the efficacy of go shops -- I won't read it to you --

14       THE COURT:  Which footnote are you on?

15       MR. JARVIS:  Thirty-five and 36 on page 45.

16       THE COURT:  Thirty-five and 36.

17       MR. JARVIS:  Right.  This recites to

18   Mr. Subermanian's, one of his articles he wrote.  I think

19   I even spelled it right.  And then also the expert report

20   he had done in that particular case.  And some of his,

21   what his opinions are, that is in the MBO context,

22   because, you know, you are trying to -- management knows

23   more about a corporation, tends not to be (unintelligible)

24   even in a go shop.

25       Thirty-six talks about an article which cites a

1  gentleman named Marty Lipman, who is familiar, New York

2  deal guy, you know, Whactel, Lipman, Rosen and Katz, a top

3  deal guy.  He says, look, a bidder at the front is worth

4  50 percent.  A bidder at the end is worth two percent.  He

5  is (unintelligible) defense all these type cases.  He has

6  no incentive to help my side of this, and he is telling

7  you 50 percent at the front, two percent at the back.

8      If you look at footnote 37, a pure go shop, there is

9  academic evidence suggesting a pure go shop will in fact

10  increase the value.  I won't deny that.  That it is there.

11  The article says that.  What research says.  But then you

12  have got to look down to the next page, page 47, and talk

13  about matching rights.  And we haven't really talked all

14  that much about matching rights in this particular case.

15      In fact, it wasn't brought up in the briefing, quite

16  frankly.  But in the merger agreement here, which I do not

17  have a copy for, Your Honor -- for that I apologize -- if

18  you look at section 5.4 little (e) big D, little before

19  big, there is a provision that deals with the go shop and

20  superior bids.  Under that provision, the one I read

21  before, 5.4 (e) D, if there is a superior bid in the go

22  shop, then the A Ten board has got to go to Hospitality

23  board and give them five days to negotiate.  To see if

24  they want to match that superior bid.  That is what is

25  called a matching right, Your Honor.  What a matching

1    right does, if you look at the research that is in

2    footnote 41 on the top of page 47, basically says, it is

3    the same as the right of first refusal, and it kills the

4    efficacy of a go shop.  That is what all the research

5    says.

6        And why?  Makes absolutely good sense as to why.  You

7    know that management has put a price in on the company.

8    Management knows that company better than anybody.  They

9    know what it is worth because they are the managers.  Much

10   better than you as an outsider will ever understand.  You

11   can come in.  And if you top anything that is within the

12   realm of reason, what it is really worth, you can be

13   assured they are going to match it.  Will match it.  They

14   are not making as much as they would make, but they are

15   still making money.  How do you get the deal if you are a

16   third party when management has matching rights?  You over

17   pay.  Who is is going to come in in a situation knowing

18   that in order to get this I have got to over pay.  Nobody.

19   That is why they don't work when there is matching rights.

20   And the problem is, that I don't believe that anybody ever

21   really told the special committee that.  I asked

22   Mr. Young.  I said, Mr. Young, ever done a go shop?  I

23   didn't ask because I didn't think he knew how to sell a

24   company.  He clearly did.  That is what he said, I know

25   how to sell a company, you do it here, you do it there.

1    What does it matter?  It matters because timing is

2    everything when you are trying to sell it before there is

3    a bid in place for management, that is one thing.  But, I

4    tried to get him to say, in all the situations you know of

5    where somebody topped that go shop -- he didn't know

6    anything -- didn't want (unintelligible).  In fact, if you

7    look at the research, that is in the, I can actually do

8    better than that, if you look at footnote 35 in a standard

9    go shop it is about ten percent of the time there is

10   topping bid.  I mean, (unintelligible) that is not very

11   often.  They didn't know that.  And then Mr. Colton, if

12   you look at his testimony, yes, there is Merit Star Wood

13   deal.  That was a go shop.  That got a lot better value,

14   except, unfortunately -- and that is what he is relying

15   on -- it didn't.  It was a market check.  Wasn't a go

16   shop.  Had it wrong.

17        So the whole point here is that when they are denying

18   the market check; A, doing it because A Hospitality

19   doesn't want it, any kind of competitive process; and B,

20   is go shop panacea, they did not really inform themselves

21   of whether it really would provide the value that the

22   market check.  They say to Citi, saying Citi knows it.

23   Market is worth more.  That is why it is much more pro

24   target than a go shop.

25        Let's go to the roll up provision.  The roll up

1    provision, which Mr. Knight, Justin Knight, and I

2    discussed Your Honor had a little bit of discussion on it,

3    you know, it is in there not, I might add, because of the

4    largess of the Knights when they created this entity, it

5    is something that comes, I think I indicated before, from

6    the NASSA, North America Securities Administrators

7    Association -- they are calling themselves the largest and

8    oldest shareholder protection outfit -- and it is required

9    to be in, I believe in Virginia, but certainly most

10   states, it is required to be included in a non traded

11   REIT.  Because, well, they are non traded.  So there is no

12   indication of what they are really worth.  And they, what

13   you need is an independent appraisal, whether it of the

14   assets, which I might argue, frankly, are more favorable

15   than if you look at the entity, because if you look at the

16   assets you don't have that big management fee, you know,

17   that is a corporate level thing.  They have management a

18   fee that A Ten pays to the Apple entity, looking at those

19   individual assets.  For all I know, it is sitting on a

20   piles of land worth a fortune, much more than operating

21   value.  So to suggest that, you know, oh, I am not sure

22   what counsel was suggesting there, but assets might be a

23   better way to go from my perspective in just looking at

24   the; corporation as holistic, to use that favorite word

25   again.

1          So the commission fee is put in there by the NYSA,

2     not because they really wanted it there, but what is the

3     first thing once they realize that their all-cash offer

4     was implicated, was get it out.  We are not doing a deal

5     structure, or we have this.  And how did that come, you

6     know, comes in, February 11, there are meetings at the end

7     of February.  The board is briefed on it by Mr. Robertson.

8     The board is briefed by Mr. Robertson on the 29th of

9     February of a discussion between Mr. Robertson and his

10    counterpart at Hogan Lovells where they discuss between

11    the two parties the roll up provision.  So special

12    committee counsel discusses it with Hospitality counsel.

13    They are briefed on that.  And then all of a sudden on

14    March 4 comes in an offer, and Mr. Young was told --

15    Mr. Knight confirmed it -- we are changing the structure

16    of the offer.  We don't want that thing.  We don't like

17    it.  Why?  Because it might cause them to pay more money.

18    That is why.  If somebody independent is looking at it,

19    they might have to pay more cash.  And if it is not more

20    cash, it is not higher than any rational shareholder will

21    take the deal.  Only if the appraisal is higher are they

22    put in a position of having to pay either more cash or

23    leave them with their shares if they didn't want to pay

24    the cash.  And they didn't to be put in that position.

25         THE COURT:  It is not exactly addressing the Willard

1    case.  The Willard case says -- in the Willard case there

2    was just a flat out offer of $600,000 more than one of the

3    people was -- than the offeror was making, and The Court

4    said, well, don't have to take that because you can

5    consider other things.  Although, what the other things

6    were in that case, I am not sure.  Other than the fact

7    that one of the offerers was their son.

8        But, you know, you are talking about money here.

9    And --

10       MR. JARVIS:  I saw that, and I'm not going to pivot

11   on you, Your Honor, so you have got all that.  That is a

12   pretext.  That is what the court had.  So Citi, the Citi

13   knew that this was a valuable right.  How --

14       THE COURT:  What?

15       MR. JARVIS:  The Citi knew this was valuable, and

16   this was something that the special committee should give

17   up.  How do we know that?  Because on the 11th of March

18   Citi made a presentation to the special committee.  And if

19   you look at it, oh, dear me -- I believe it is exhibit,

20   plaintiff's exhibit 22, which it is, indeed.

21       The Citi said, okay, it is time to come with a

22   counteroffer.  And we are going to put in our little

23   proposal here -- and I can do this from memory so I can

24   hand this up to Your Honor to see what I am talking about

25   here -- from the Citi proposal, presentation to the board

1    on the 11th of March.  Citi has, says on top, indicative

2    counter proposal.  And it gives them two options.  Option

3    A and B.  The options differ only in the deal protections.

4    But both of them suggest an all stock counter.  That is

5    what they are proposing is, that is the decision here,

6    that is what they wrote up.  They also wrote up, I might

7    add, time sheets for both those options, which could be

8    given to Apple Hospitality.  Those are included in exhibit

9    20 and 21.

10       They didn't write up a proposal for a mixed cash and

11   stock counteroffer.  They didn't write up term sheets for

12   mixed cash and stock counteroffer.  They wrote up a term

13   sheet for an all-stock counteroffer.  That is what they

14   said.

15       Mr. Young said, oh, a little disingenuous.  I found

16   him generally a credible man, but oh, we were responding

17   to the February 11th offer, even though there had been new

18   offers before, and Apple Hospitality flat out told them,

19   by the way, we are putting a new offer in, and we don't

20   want all stock, we don't want the roll up rights.

21       What is Citi essentially trying to tell the special

22   committee to do here?  Counter with all stock.  And guess

23   what?  On the 11th of March the (unintelligible) countered

24   with a mixed stock and cash proposal, a buck ten and point

25   561.

1    They essentially gave that away.  The adviser is

2  telling them what to do.  And they are not listening.

3  That is why it's not like Willard.

4    Willard -- to the extent they got advice, they were

5  in.  Here, they got advice here.  If that isn't advice, I

6  don't know what advice is.  And they are not following it.

7    THE COURT:  What are indicative counter proposals as

8  opposed to counter proposals?

9    MR. JARVIS:  I think -- that was one of the ways Citi

10  dealt with, they didn't say we are telling you what to do,

11  they are saying, gee, guys, here is the kind of counter

12  proposal you could make.  Now, they could have put money

13  in, they could have first looked, I thought it would be A,

14  you know, all stock, B, mixed cash stock.  No.  The

15  difference between A and B differs within the way they

16  dealt with the go shop.  One set out, I will negotiate

17  later, one proposes -- But, both of them, they come up

18  with two.  And they are both all stock.  Why?  Because the

19  Citi knew it was a valuable right.  They are trying to

20  tell them, don't give this thing away, let's keep fighting

21  for it.  Special committee just gave it away.  There is no

22  indication in the record that they asked for additional

23  consideration directly related to the change in

24  consideration.  They did ask, look, look, the counter

25  proposal is more valuable than the one on the fourth.  I

1    am not going to deny that.  But there is no suggestion

2    that they asked for more money because they were giving up

3    this valuable right.  They used that negotiating chip?

4    None.  No one suggested that at all.  Also, I asked, did

5    anyone ask you -- you are investment banker, you value

6    things -- never asked to value it.  What is it worth?

7    What are we giving up?  No.  Never asked.  What is it

8    worth?  Didn't ask.  So, again, unlike Willard, they don't

9    follow their advice.

10        At the end of the day -- I went through this -- I

11   will be brief -- they got point 5 on a buck, they got two

12   percent increase, as I said.  So that is not quite on

13   Willard, more, admittedly, on the price.

14        But what I am trying put across here is that, you

15   know, you heard from Mr. Glade Knight, that Mr. Colton

16   knew what Mr. Glade Knight wanted.  He wanted A Ten and A

17   Hospitality to come up with an option on the A Hosp board.

18   And get it done.  Whether he is doing it overtly or just

19   in the back of his mind, that this is his buddy, and this

20   is what they all wanted to do, they are going with what A

21   Hospitality wants at every single juncture.

22        We have one final on the process.

23        THE COURT:  You know, I have read your briefs.  So,

24   if these are points that you have covered in your brief --

25        MR. JARVIS:  I am trying to -- this is quick.  One

1       reason I want to read you some testimony.

2           At the end of the day, you know, at the beginning of

3       the process, I will not suggest otherwise, they had a

4       status quo option.  It is in their early briefing papers.

5       I think it is in the brief of the 13th.  And then status

6       quo, Apple Hospitality or Apple Ten as a separate company

7       sort of goes away.  And then in a presentation on the

8       18th, on the 18th Hospitality giving their best and final

9       offer, point, a dollar and point 520.  And so the meeting

10      on the 21st they have a slide.  And plaintiffs' exhibit 33

11      at 3.  Again, as is my want these days, I think I will

12      hand it up to Your Honor so you can see it.

13          We didn't go in this because.  I will have more to

14      say than maybe is in our brief.

15           I asked Mr. Young, what does this represent?  This

16      is the Young transcript at page 155.

17          "Question:  Was Citi presenting an option of

18      basically this deal isn't good enough?  Don't do anything

19      for a while?

20          "Answer:  Yes.  That is correct.

21          "Was that Citi's judgment as an option, they should

22      at least consider?

23          "Absolutely, yes."

24          Okay.

25          THE COURT:  What page is this on in his testimony?

1    MR. JARVIS:  155, Your Honor.

2    THE COURT:  Okay.

3    You know, the thing of it is that he had tried to

4    negotiate for more with Wells Fargo earlier.  He said on

5    page 110 -- and you asked him, or somebody asked him --

6    "What kind of guidance did you provide to Wells Fargo in

7    connection with the economics after the February 11

8    offer?"

9    And he said, "It was insufficient and that the

10   special committee is looking for more value, but

11   apparently, they stood -- they stood on the ground."

12   MR. JARVIS:  Right.  And at the end of the process,

13   almost here 5.20, 520, I'm sorry, he is still saying it

14   isn't good enough.  And that is what he is tell the

15   special committee.  It isn't good enough.  Don't do a deal

16   with these guys.  They are not moving.

17   THE COURT:  He said he was, I mean -- okay.

18   MR. JARVIS:  All along.

19   THE COURT:  Now, he didn't -- I don't know whether he

20   said that to the special committee, but he said it to

21   Wells Fargo, which is a whole different story.  People

22   negotiate and they say things -- not that I would ever do

23   this -- but "My client will never settle for this value,"

24   when in fact, you know your client will settle for that

25   value.

1    MR. JARVIS:  I may have been in a negotiation like

2  that.

3    THE COURT:  I bet you were.

4    MR. JARVIS:  But look at, that is what the

5  significance of this quote is.

6    When Citi is presenting, he wasn't presenting options

7  to Wells, he was presenting it to the special committee.

8  This deal isn't -- we are there.  They are giving you

9  their best and final.  It isn't good enough.  Consider

10  status quo.  And he said, look, if you look out there

11  there are negative things.  Status quo.  Okay?  For two.

12  If you look at that, one deals with you may miss the

13  cycle, and the other than one deals with Apple Hospitality

14  might walk if you decide to tell them to go away now, you

15  know, and do it later.  Because you are essentially

16  telling them it is not good enough, basically.

17    I asked him about those two, as you might guess.  I

18  like to talk so much.  And he said, look, as to the cycle,

19  you know, for the lodging industry goes down, and then a

20  few years down the road it is not good enough.  We are

21  talking about two years.  We are not talking about ten

22  years.  We will try to do something, give or take seven

23  years.  Not hard.  And said, wasn't a projection for the

24  business for the next two years turning soft, yes.  And

25  wasn't much cycle risk.  Yes.

1      You can look at 156 on that.

2      THE COURT:  You know, the thing of it is, I have

3   always been taught, don't try to try to predict the

4   market.  And that is probably a pretty good idea in the

5   hotel industry as well.

6      Who knows whether, for whatever reason, I don't think

7   anybody anticipated the whole economy tanking back in 2008

8   and 'lo and behold it did.

9      MR. JARVIS:  A gentleman named Paulsen in New York

10   apparently predicted it, but made about 15 billion

11   dollars.  But he was a little bit of a voice in the

12   wilderness.

13      THE COURT:  Well, there you go.

14      MR. JARVIS:  But these (unintelligible.

15      I don't doubt that both Mr. Knights know their

16   business.  Apple REITS have done well.  They knew, they

17   knew that over the next couple years at least hospitality,

18   can look at the general economy, it could tank.  But

19   basically you can look at where we are going to be, and if

20   you think they are projecting, and this is near term, two

21   years out, that these things would do way above historical

22   long term rates.  Not below.  Way above for the next two

23   years.  So that is the cycle we are dealing with.  Five

24   years out, who the heck knows, Your Honor?  Two years out

25   it is getting better.  That is the first one.  That is the

1    first thing.  That is the first case.

2        The second thing is, they say, hey they might walk.

3    I sort of had a little bit of back and forth with Mr.

4    Young on it.  Said look, you take that with a grain, I

5    said, these are the managers, they are not going to walk

6    from this thing.  He told them they the same take it with

7    a grain of salt.

8        So basically what can you glean from what Citi said?

9    The deal isn't good enough, the things aren't that bad.

10   Did they follow that advice?  They did not.  They did a

11   deal.  And six days later.  Again, unlike Willard, they

12   didn't follow the advice.  Whether explicit or between the

13   lines, Citi is trying to tell them, hey, here is what you

14   should do and didn't do it.

15       Now, what would they say about they didn't?  We had

16   to do it.  Mr. Colton believed he had a hard deadline of

17   seven years to get the deal done.  Had to get liquidity.

18   That is just not so.  As Ms Edwards and her colleagues

19   wrote in the brief, the seven years, if you look page

20   three of their brief, aspirational goal.  Even if you are

21   assuming it was aspirational, Mr. Colton felt the need to

22   get liquidity for the A Ten shareholders, that would not

23   be an unreasonable thing.  He had two years.  He could

24   have told them no for six months, and if they had been

25   told no, would have come back with more money?  Might

1    have, might not have.  But what he did know was Citi was

2    telling them the deal wasn't good enough.  And they didn't

3    do it.  They just went ahead and they took a two

4    thousandth of a share increase from point 520 to point 522

5    to get this deal done.

6         The next piece of this is disclosures.

7         THE COURT:  Do you have something to say about

8    disclosures that is not in your brief?  I have read your

9    brief.  They are excellent briefs.

10        MR. JARVIS:  I would like to -- let me go over

11   overarching --

12        THE COURT:  Let me what?

13        MR. JARVIS:  An overarching, a big point.  And I will

14   some of them, little details, I will save -- they are

15   suggesting, keep suggesting that all these disclosures are

16   at the level that would allow someone, you know, we are

17   saying you have to give enough so that every single

18   shareholder can independently value the company.  That is

19   not -- the information we are seeking probably would not

20   allow that.  Perhaps.  But that is not what we are

21   seeking.  We are, we want, what we want is shareholders to

22   know that this company -- they understand what it is, they

23   are invested, they have got a certain, they have got a

24   view to what its likely growth is.  And they have a view

25   as to what its likely long-term process are.  And the

1    question is, are those being taken into account?

2        So what are the things we are looking for?  FFO and

3    AFO.  Why?  They are an important metrics that are growing

4    faster than with a metric they provided, so if you are

5    shareholder, they gave easily two, the one I really rely

6    on have higher growth rate.  That is something I should

7    know.  That makes me think maybe what I want to think

8    about what the Citi opinion, whatever it is.

9        We asked for cash flow information.  The free cash

10   flow.  Again, you know, that is where dividends come from

11   at the end of day.  We will go into FFO, AFFO.  But that

12   is what Citi is looking at.  Why can't we see?  We should

13   see, and the case law is very clear, I mean at least two

14   Delaware cases that are failure to give cash flow

15   information is sufficient to get it.  Irreparable harm in

16   and of itself.  That is important stuff that, you know,

17   irreparable.

18       Then we are asking for a metric of terminal growth.

19   And to me, personally, I will go over the valuations, but

20   that is the most important one, because the Citi didn't

21   use a term, what they call terminal growth or use what

22   they call use multiple method.  But they provided the

23   board, hey, by the way, our multiple method, here is what

24   the growth rate that is implicit in this.  And they were

25   low, negative to 1.8.  Well, elsewhere the board knows,

1    and I think shareholders may have understood, this

2    industry growth pretty much averages around three percent

3    a year.

4          THE COURT:  It does what at three percent?

5          MR. JARVIS:  Growth.

6          THE COURT:  Okay.

7          MR. JARVIS:  What they call reb par growth, long term

8    growth rate.  According to their own materials on reb par

9    is three percent a year.  I think that is in some of

10   their -- I don't know if in the public filings or not --

11   but, you know, knowing that the Citi's valuation --

12         THE COURT:  That is for up-scale hotels?

13         MR. JARVIS:  Upscale, not full service.  They are

14   like up-scale, but they don't offer like spas and things,

15   you know.

16         THE COURT:  As opposed to like --

17         MR. JARVIS:  Like there is a luxury up-scale, and

18   then up-scale with partial service.

19         THE COURT:  This is aimed at this specific industry

20   and doesn't include the Motel 6's of the world.

21         MR. JARVIS:  No.  So, that is what is reflected in

22   their analysis.  Remember, all they have got, all they

23   have got, they have got, you know, just a roll up, they

24   are getting rolled up into the thing, all they have got is

25   this opinion.  Shouldn't they under -- they might well

1    care.  I don't know if they are going to care or not.  But

2    I think it is relevant.  I believe any rational

3    reasonable, person, it is relevant for them.  The Citi

4    opinion is premised on a long-term growth rate which will

5    drive the value a lot, Your Honor, let me tell you, from

6    one who has done these cases a lot, will drive it a lot.

7    Growth rate is really below long term, it is below

8    inflation, essentially a negative, high end of their

9    growth rate is negative, negative real growth, below

10   long-term inflation at around two percent.  That is

11   something that shareholders ought to know.  That is what

12   is driving the VCN valuation.

13       Then on the two other final deals.  These are the

14   points not in the brief.  Our argument to Your Honor was,

15   look, the multiples of Apple Ten, other Apple entities are

16   the best comps.  And then if you don't know what the

17   individual, you know, multiples for the various companies

18   are, and you can't see how the range is derived.  Then I

19   would say, think about this.  If you are a shareholder and

20   you know, you are looking at this list, and you say, hey

21   here is, all these are Apple companies, just like my

22   company, and here is their multiples, the range is really

23   different from that, these are much higher.  Would that

24   inform your judgment as to whether you think this

25   valuation is something that is worth keeping, or worth

1    going with, or maybe you are not getting properly changed?

2    I remind you, even with that limited information

3    20 percent of people voted against, frankly shocking

4    numbers, usually passing in the 90s, quite frankly.  But

5    that is their data.  Like 80 percent, I think, in favor.

6    The best they would ever get, even without knowing some of

7    the stuff I am telling Your Honor about.  Probably passing

8    even if you grant disclosures.  I am not going to say I

9    know the answer.  If I had to bet money, I would say given

10   that, probably will, they usually do, but not always.

11   Deals get voted down.  I mean there was a deal with Dole a

12   few years ago that I think came with ten percent of being

13   voted down.  Similar kind of deal.  So they can happen.

14        But it doesn't matter whether they vote it down.  It

15   matters that when they pull the trigger to get rid of this

16   untraded thing, they at least know what the heck they are

17   doing, and why they are doing it rather than just having

18   to trust to a barely disclosed Citi opinion.

19        Now, let's go -- irreparable harm -- the briefs cover

20   it -- disclosure, I think, gets you there.

21        Really the issue turns on the balance of the

22   equities.

23        THE COURT:  Turns on what?

24        MR. JARVIS:  Balance of the equities, balance of the

25   harms, however you want to --

1     THE COURT:  It turns on likelihood of success on the

2     merits.

3     MR. JARVIS:  And the only issue there really is,

4     Mr. Knight and the board of Apple Hosp is going to walk

5     away because given the stock prices, we know

6     (unintelligible) who knows what it will be September 15,

7     the shareholders of Apple Ten go -- it might -- lets go

8     with the scenario, we will be here.  Your Honor will have

9     said there is a substantial likelihood of success on the

10    merits.  I am enjoining this.  Do these things.  Right?

11    And then, they are going to say, in light of that, Your

12    Honor, we are going to walk on this deal and throw it back

13    to the world because they are getting two percent more.  I

14    think that is so unlikely as to be effectively laughable,

15    Your Honor.

16    There is no real harm here.  They are going to close

17    this deal whether it is 17th of September or the 15th of

18    October.

19    On that thought, Your Honor, having spent less than

20    the hour I promised, I will sit down.

21    THE COURT:  All right.  Thank you very much.

22    Let me see.  Let me give you back -- do you want back

23    this --

24    MR. JARVIS:  Your Honor may keep it.  I will save the

25    Federal Government the cost of Your Honor having to print

1    it off West Law if you want to refer to those footnotes.

2        THE COURT:  Hold on one second.

3        Hold on one second, ma'am.

4        All right.  Do you have anything to add that is not

5    in your brief?  I don't think you do.

6        MS EDWARDS:  I guess I don't.

7        THE COURT:  You, Mr. Gately, don't have anything to

8    add that is not in the brief?

9        MR. GATELY:  Your Honor, the only thing I --

10        THE COURT:  All right.  Thank you very much.

11        I am going to deny the preliminary injunction.

12        Here is the way I look at this case.

13        The problem from plaintiffs' standpoint is two-fold.

14    One is, that they have to make a clear showing of likely

15    success on the merits.  I think what they have outlined

16    today is a jury issue.  I think this goes to the jury.  I

17    think there is a substantial likelihood they will prevail

18    at that point.  But, you know, there is also a substantial

19    likelihood that they won't prevail.  And when I compare

20    this to the Willard case -- and the Willard case, as

21    counsel pointed out, as Mr. Jarvis pointed out, is

22    different in that there are a bunch of people who know

23    each other, it is pretty clear, I think, if you read

24    between the lines that Mr. Willard is just trying to force

25    them to buy him out of the business because he doesn't

1    want to be in business with young Mr. Cappellari, or

2    whatever his name is, with the son of the founders of the

3    business.  And, you know, everybody knew what a building

4    supply business in Bedford, Virginia was worth.  But

5    nevertheless the court engages in this little bit of a

6    fictional review of the business judgment rule and makes

7    it clear that there is substantial discretion on behalf of

8    the corporation and its directors to reject a bid that

9    appears in many ways to be better than the other one.  And

10   what you have got here is I think good arguments that it

11   was a reasonable exercise of the business judgment of the

12   directors.  You have got the appointment of the special

13   committee, which consists of non Knight members.  You have

14   got the selection of Citibank as an adviser, the selection

15   of the law firm of McGuire, Woods, Battle and Boothe to

16   handle the thing, which is I think a fair selection for a

17   company here.  The exclusion of Glade Knight from the

18   process.  The negotiations that went on with Apple

19   Hospitality that, you know, maybe they could have

20   negotiated harder, maybe they couldn't have.  But there

21   was negotiation.  It wasn't just a rubber stamp.  You have

22   got the go shop after a purchaser is selected, which is,

23   you know, it is true that I suppose in some circumstances

24   a go shop that is after a deal is hatched is less likely

25   to succeed, but if the deal was way off the mark, the go

1    shop is going to raise the price some.

2         And I think, at least arguably, the timing is okay.

3         Now, the existence of the B shares as what the

4    plaintiff calls a windfall to Mr. Knight and others who

5    were involved in this transaction, it is a lot of money

6    that goes to him in this.  But the other side of that coin

7    is that everybody knew about the B shares from the very,

8    very start.  And everybody knew that Mr. Knight was

9    looking for a way for his sweat equity in this deal to pay

10   off.  And, you know, the company did well, and he was

11   rewarded for that at the time of what they have

12   euphemistically called the liquidity event, which we might

13   also call a sale.

14        It is troublesome.  And it is an incentive for them

15   to push the deal through.  But I don't think it

16   necessarily poisons, I was going to say poisons the apple,

17   but that is not the right term in this case.  It doesn't

18   poison the strawberry smoothie.  So I think that the

19   business judgment rule precludes me from finding that

20   there is a clear showing of likelihood of success on the

21   merits.

22        Now, I think it is pretty clear that this deal is

23   going to go through.  I think he is right on that,

24   Mr. Jarvis is.

25        I think it is also clear that this is going to be a

1   case that goes to the jury.  And I think if the jury

2   decides against essentially the Knights in this case,

3   because I think that is what this case is going to be,

4   there are going to be some issues.  I think that, you

5   know, if Mr. Justin Knight decides to stand up in front of

6   the jury and say although he is the CEO he doesn't know

7   what Apple Hospitality would do if the deal was delayed,

8   nobody is going to believe that.  That is just -- maybe it

9   is true, but I think that is going to be, that there are

10  aspects of this that are a tough sale when you get to jury

11  time.  So I hope that you all will consider some

12  resolution of this other than going to trial.

13      Now, let's set this case for trial.  Let me say one

14  other thing.  Let me compliment both sides on doing a good

15  job on a compressed schedule in this case.  Not just with

16  the briefing, which was enlightening, but with the degree

17  of cooperation that occurred on what seems to me to be a

18  large amount of discovery in a relatively short time.  I

19  know that you had change to change your schedules to do

20  this.  You had to change your schedule, and I am sure

21  Mr. Knight and his colleagues had to go out of their way

22  to provide information and to sit for depositions.  I

23  don't see that too often.  So, thank you all for doing

24  that.  I especially don't see it with out-of-town law

25  firms.  I am really impressed that on both sides.

1     Now, let's set this case for trial.

2     How do you all look the week of September 26th?

3  2016.

4     MR. JARVIS:  I didn't hear.

5     THE COURT:  September 26.  Next month.

6     MR. JARVIS:  For trial?

7     THE COURT:  Can you try the case then?

8     MS WINCHESTER:  We, as Mr. Jarvis indicated during, I

9  think with Mr. Justin Knight, because we were able to, one

10  of the reasons we did not come, Your Honor, we were able

11  to compromise on the discovery in an expedited manner was

12  there is a lot more discovery, especially on the

13  Hospitality side with respect to the Wells Fargo

14  valuation, communications between --

15     THE COURT:  You are saying you have more discovery to

16  do?

17     MS WINCHESTER:  We have got more discovery to do,

18  Your Honor.

19     THE COURT:  How much more discovery do you have to

20  do?  If you have already looked at 30,000 documents it

21  seems that is a lot.  But, you know, I used to try cases

22  where people shot each other, so, there wasn't a lot of

23  paper in that.

24     MS WINCHESTER:  Your Honor, I can give you -- I don't

25  know how many pages it will take on our side.  I can give

1    you broad categories of information that we don't have.

2    Mainly, stuff on the Hospitality side, i.e. valuation on

3    the Hospitality side, as well as communications between

4    and among Hospitality board.

5        THE COURT:  Okay.  I am sure that there is just an

6    Encyclopedia Britannica worth of discovery to do in this

7    case.

8        Can we try the case then in December?

9        MS WINCHESTER:  I think that is doable, Your Honor.

10       MR. JARVIS:  Depends on their ability to get the

11   stuff to us, obviously.

12       THE COURT:  Well, they have got a whole information

13   room somewhere.

14       MS EDWARDS:  We have already produced that data room,

15   Your Honor.

16       THE COURT:  Well then, we are -- how about the week

17   of December 12?

18       MR. GATELY:  Fine with me, Your Honor.

19       MS EDWARDS:  Fine with us, Your Honor.

20       THE COURT:  All right.

21       You guys are in law firms that don't have hundreds of

22   lawyers to throw at this.  Can you all -- do you have your

23   calendars with you?  Of course not, because we have an

24   antiquated rule that says you can't bring them in.  Do you

25   know your calendars for the week of December 12?

1          MS WINCHESTER:  I think I am fine, Your Honor.  I

2     think we go to an Eagles Red Skins game on the eleventh,

3     but other than that --

4          MR. JARVIS:  Probably by then they won't be worth

5     going to.

6          THE COURT:  I will tell you, that is not true.  The

7     Eagles are going to all right this year.

8          MS WINCHESTER:  That is my aspiration this year.

9          THE COURT:  That is an aspirational goal.

10         MR. JARVIS:  If ever there was one, Your Honor.

11         THE COURT:  I can't do it January.  I have a big

12    patent case that may not settle.

13         MR. GATELY:  Has to be better than that?

14         MS WINCHESTER:  Does it make sense to confer -- I'm

15    not sure on their side when they can produce the

16    documents.  Maybe it makes sense for us to sit down and

17    talk about a time frame and when they can do it, and we

18    can do it and come back to Your Honor with proposals.

19         THE COURT:  All right.  All right.

20         Let's do that then.

21         What do we have next week?  We will have a conference

22    call next week to set this thing for trial.

23         MS WINCHESTER:  That makes sense, Your Honor.

24    That --

25         THE COURT:  That will give you a little chance to

1    chat with your clients.  This is Friday, right?  How about

2    if we do it the 31st at 9:00 o'clock in the morning?

3        MS WINCHESTER:  That works for us.  Telephonically?

4        THE COURT:  Yes.  Do it on the telephone.

5        MS WINCHESTER:  That works for us.

6        THE COURT:  Is that all right, Mr. Gately?

7        MR. GATELY:  All right with me, Your Honor.

8        THE COURT:  Ms Edwards?

9        MS EDWARDS:  Yes, Your Honor.

10        THE COURT:  We will have a conference call on

11    August 31, and between now and then I would like you to

12    confer about the discovery, and if you can come up with a

13    schedule, see if you can work into that schedule a

14    slightly shorter response time on answers to

15    interrogatories and production and so forth.

16        Okay?

17        MS WINCHESTER:  Yes.

18        THE COURT:  Maybe 20 days.  But you know, you all

19    know what is involved in this case better than I do.

20    Although, that is probably glaringly obvious.

21        All right.  Anything else?

22        MS WINCHESTER:  Could I raise one other issue that I

23    said we could do deal, with timing?

24        THE COURT:  Oh, yes.  Yes.

25        MS WINCHESTER:  So I would propose, I know that we

1    discussed maybe 30 days from today.  This way we don't

2    burden The Court with memorandum and stuff, and this way

3    we can discuss among ourselves which should be redacted,

4    which shouldn't, and if I could wrap into that yesterday

5    when defendants filed their reply to the motions to

6    dismiss they had to seal it because it attaches

7    Mr. Quinn's deposition, which does contain some of his

8    personal information, investment information.  I would ask

9    that we could also wrap that into the sealing schedule and

10   deal with the sealing documents that have been filed in

11   this action at one time.

12       THE COURT:  All right.

13       MS WINCHESTER:  And do so in 30 days.

14       MS EDWARDS:  That seems reasonable.

15       THE COURT:  That is a high ceiling in this case, but

16   we will do it.

17       MR. GATELY:  Your Honor, I don't know if you intend

18   to have a separate hearing on the motion to dismiss or

19   just rule on the papers.

20       THE COURT:  Well, I have got to say I haven't read

21   all the papers on that.  And we haven't -- we meaning

22   him -- haven't done all the research on it.  But, if I

23   need a hearing on it I will let you know.

24       MR. GATELY:  We can talk about that on the call.

25   Thank you very much, you and your staff, Your Honor.

1      THE COURT:  You are welcome.  That is what we are

2   here for.

3      Anything else?

4      MS WINCHESTER:  Your Honor, that is all.

5      THE COURT:  All right.

6      How about you, Mr. Jarvis, anything more?

7      MR. JARVIS:  I am good, Your Honor.

8      THE COURT:  How about you three guys over here?  Do

9   you have anything to add?

10      MR. BUCKLEY:  Nothing, Your Honor.

11      THE COURT:  Mr. Williams, are input is always welcome

12   on anything.

13      MR. GATELY:  Your Honor, I have a five-second delay

14   here between what goes in here and what comes out of my

15   mouth.

16      MR. JARVIS:  Only five?

17      MR. GATELY:  If you don't hear me say anything, you

18   know it worked.

19      THE COURT:  Okay.  Thank you all very much.

20      MS WINCHESTER:  Thank you, your Honor.

21      THE COURT:  Mr. Williams, I want to thank you for

22   that work you did as guardian in that case.  I appreciate

23   that.

24      MR. GATELY:  Yes, sir.

25      THE COURT:  Adjourn court.

1           HEARING ADJOURNED.

2

3     THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

4              GILBERT FRANK HALASZ, RMR

5               OFFICIAL COURT REPORTER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25